JEFFREY H. WOOD
Acting Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
ANDREW A. SMITH (NM Bar 8341)
Senior Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
P.O. Box 607
Albuquerque, New Mexico 87103
Phone: (505) 224-1468
andrew.smith@usdoj.gov
LILA C. JONES (NM Bar 148098)
Trial Attorney
Natural Resources Section
601 D Street, NW
Washington, D.C. 20004
Phone: (202) 514-9859 (Jones)
lila.jones@usdoj.gov

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, | No. 4:17-cv-00475-TUC-JAS (Lead) |
| | No. 4:17-cv-00576-TUC-JAS (C) |
| Plaintiff, | No. 4:18-cv-00189-TUC-JAS (C) |
| v. | **FEDERAL DEFENDANTS'** |
| U.S. Fish and Wildlife Service, *et al.*, | **MOTION AND MEMORANDUM IN** |
| | **SUPPORT FOR SUMMARY** |
| Federal Defendants, | **JUDGMENT AND IN OPPOSITION** |
| | **TO PLAINTIFF CBD'S MOTION** |
| Rosemont Copper Co., | **FOR SUMMARY JUDGMENT IN** |
| | **No. 4:17-cv-00475-TUC-JAS** |
| Intervenor-Defendant. | |

1

## TABLE OF CONTENTS

2

TABLE OF ACRONYMS .........................................................................................vii

3

NOTE ON ADMINISTRATIVE RECORD CITATIONS......................................... viii

4

INTRODUCTION .................................................................................................. 1

5

STATUTORY BACKGROUND .............................................................................. 3

6

     I.     THE ENDANGERED SPECIES ACT ................................................ 3

7

STANDARD OF REVIEW ..................................................................................... 4

8

ARGUMENT ......................................................................................................... 6

9

     I.     THE DETAILED 2013 AND 2016 BIOLOGICAL OPINIONS COMPLY
           WITH THE ESA ................................................................................ 6

10

          A.     FWS Rationally Determined That The Rosemont Project Would Not
               Destroy Or Adversely Modify Jaguar Critical Habitat ............................. 6

11

               1.     FWS Applied An Appropriate Interpretation Of "Likely" In
                     Assessing Impacts To Jaguar Critical Habitat ............................... 8

12

               2.     FWS Did Not Discount The Importance Of Critical Habitat
                     Impacted By The Rosemont Project ............................................. 10

13

          B.     FWS Correctly Found That The Rosemont Project Would Not
               Jeopardize The Northern Mexican Gartersnake ....................................... 13

14

          C.     FWS Properly Relied On Mitigation Measures In Determining
               Whether The Rosemont Project Would Not Jeopardize The Gila
               Chub And Gila Topminnow ..................................................................... 17

15

          D.     FWS Considered The Potential Impacts From Groundwater
                Drawdown From Private Wells Or Heavy Metals In Determining
                Impacts On Aquatic Species ..................................................................... 19

16

                1.     Groundwater Drawdown From Private Wells Is Included In
                       FWS's Analyses Of Groundwater Impacts.................................. 20

17

                2.     The 2013 And 2016 BiOps Considered Possible Impacts
                       From Mining Contaminants ........................................................ 22

18

          E.     FWS Adopted A Proper Surrogate For Take In Its Incidental Take
                Statement.................................................................................................. 27

i

II.    FWS'S REGULATORY DEFINITION "DESTRUCTION OR ADVERSE MODIFICATION" OF CRITICAL HABITAT IS CONSISTENT WITH THE ESA ............................................................................ 32

III.   THE 2016 BIOLOGICAL OPINION DOES NOT REVISE THE RULE DESIGNATING JAGUAR CRITCAL HABITAT ................................................ 36

IV.    THE FOREST SERVICE PROPERLY RELIED ON THE 2016 BIOLOGICAL OPINION ................................................................................ 39

V.     CBD HAS NOT ESTABLISHED THAT IT IS ENTITLED TO ANY RELIEF ............................................................................................................ 40

CONCLUSION ............................................................................................................ 42

ii

1

## **<u>TABLE OF AUTHORITIES</u>**

2

### **<u>Cases</u>**

3

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
4
    988 F.2d 146 (D.C. Cir. 1993) .................................................................. 40

5
*Amoco Prod. Co. v. Vill. of Gambell, AK,*
    480 U.S. 531 (1987) ...................................................................... 40, 41
6

*Ariz. Cattle Growers' Ass'n v. FWS,*
7
    273 F.3d 1229 (9th Cir. 2001) ........................................................ 27-28, 31

8
*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council,*
    462 U.S. 87 (1983) .............................................................................. 5
9

*Bennett v. Spear,*
10
    5 F. Supp. 2d 882 (D. Or. 1998) ....................................................... 38

11
*Bennett v. Spear,*
    520 U.S. 154 (1997) ........................................................................ 38
12

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
13
    419 U.S. 281 (1974) .......................................................................... 5

14
*Burlington N. & Santa Fe Ry. Co. v. United States,*
    556 U.S. 599 (2009) .......................................................................... 9
15

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs,*
16
    620 F.3d 936 (9th Cir. 2010) ................................................... 12-13, 37, 35

17
*Cal. Communities Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012) ............................................................ 40, 41
18

*Chevron, U.S.A. v. Nat. Res. Def. Council,*
19
    467 U.S. 837 (1984) ........................................................................ 35

20
*Consol. Delta Smelt Cases,*
    717 F. Supp. 2d 1021 (E.D. Cal. 2010) ............................................... 19
21

*Ctr. for Biological Diversity v. Branton,*
22
    126 F. Supp. 3d 1090 (D. Ariz. 2015) ................................................. 13

23
*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.,*
    977 F. Supp. 2d 55 (D.P.R. 2013) ....................................................... 8
24

*Ctr. for Biological Diversity v. Salazar,*
25
    804 F. Supp. 2d 987 (D. Ariz. 2011) ................................................ 16, 17

26
*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
27
    698 F.3d 1101 (9th Cir. 2012) ....................................................... 19, 28

28

*Defs. of Wildlife v. Zinke,*
  856 F.3d 1248 (9th Cir. 2017) ............................................................. 31

*Fla. Power & Light Co., v. Lorion,*
  470 U.S. 729 (1985) ............................................................................. 40

*Friends of Endangered Species, Inc. v. Jantzen,*
  760 F.2d 976 (9th Cir. 1985) ............................................................... 6

*Friends of the Earth v. Hintz,*
  800 F.2d 822 (9th Cir. 1986) ............................................................... 5

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
  378 F.3d 1059 (9th Cir. 2004) .......................................... 32, 33, 34, 38

*Hicks v. PGA Tour, Inc.,*
  897 F.3d 1109 (9th Cir. 2018) ............................................................. 9

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ............................................................................. 6

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ................................................ 2, 5, 6, 15

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ............................................................................. 6

*Morongo Band of Mission Indians v. FAA,*
  161 F.3d 569 (9th Cir. 1998) ............................................................... 5

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ............................................................................. 7

*Nat'l Wildlife Fed'n v. Burford,*
  871 F.2d 849 (9th Cir. 1989) ............................................................ 5, 9

*Nat'l Wildlife Fed'n v. EPA,*
  286 F.3d 554 (D.C. Cir. 2002) ........................................................... 32

*Nat'l Wildlife Fed'n v. Espy,*
  45 F.3d 1337 (9th Cir. 1995) ............................................................. 40

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  524 F.3d 917 (9th Cir. 2008) ............................................................. 16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  422 F.3d 782 (9th Cir. 2005) ............................................................. 19

*Ocasio v. United States,*
  136 S. Ct. 1423 (2016) ......................................................................... 9

*Pac. Rivers Council v. U.S. Forest Serv.,*
  942 F. Supp. 2d 1014 (E.D. Cal. 2013) ............................................. 40

iv

*Pollinator Stewardship Council v. U.S. EPA,*
    806 F.3d 520 (9th Cir. 2015) ............................................................................. 40

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*
    898 F.2d 1410 (9th Cir.1990) ............................................................................ 39

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) ......................................................... 4, 19, 22, 32

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014) ............................................................................ 22

*Save Our Cabinets v. U.S. Fish & Wildlife Serv.,*
    255 F. Supp. 3d 1035 (D. Mont. 2017) ..................................................... 17, 31

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,*
    143 F.3d 515 (9th Cir. 1998) ................................................................. 5-6, 7, 10

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
    671 F.3d 1113 (9th Cir. 2012) ......................................................................... 5, 6

*United States v. Rashkovski,*
    301 F.3d 1133 (9th Cir. 2002) ............................................................................ 9

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ............................................................................................. 5

*W. Watersheds Project v. Salazar,*
    692 F.3d 921 (9th Cir. 2012) ............................................................................ 41

*Wild Fish Conservancy v. Salazar,*
    628 F.3d 513 (9th Cir. 2010) ....................................................................... 15, 39

**Statutes**

5 U.S.C. §§ 701-706 ............................................................................................... 4

5 U.S.C. § 704 ......................................................................................................... 7

5 U.S.C. § 706(2)(A) .......................................................................................... 4, 15

16 U.S.C. § 1531(b) ................................................................................................ 3

16 U.S.C. § 1532(3) ................................................................................................ 3

16 U.S.C. § 1532(5)(A)(i)-(ii) ................................................................................. 3

16 U.S.C. § 1532(6) ................................................................................................ 3

16 U.S.C. § 1532(19) ........................................................................................ 27, 35

16 U.S.C. § 1532(20) .............................................................................................. 3

16 U.S.C. § 1533(a) ................................................................................................ 3

16 U.S.C. § 1533(a)(3)(A) ........................................................................................... 36

16 U.S.C. § 1533(b) ..................................................................................................... 37

16 U.S.C. § 1533(b)(2) ................................................................................................ 38

16 U.S.C. § 1536(a)(2) ...................................................................... 2, 3, 8, 22, 32, 36, 39

16 U.S.C. § 1536(b)(3)(A) ............................................................................................. 4

16 U.S.C. § 1536(b)(4) ................................................................................................ 27

16 U.S.C. § 1536(d) .................................................................................................... 42

16 U.S.C. § 1536(o)(2) ................................................................................................ 27

16 U.S.C. § 1538(a)(1)(B) ........................................................................................... 35

16 U.S.C. § 1540(g) .................................................................................................... 38

**Regulations**

50 C.F.R. § 222.23(a) ................................................................................................... 3

50 C.F.R. § 402.02 ............................................................................... 3-4, 27, 33, 34, 35

50 C.F.R. § 402.12 ....................................................................................................... 4

50 C.F.R. § 402.13 ....................................................................................................... 4

50 C.F.R. § 402.13(a) ................................................................................................... 4

50 C.F.R. § 402.14(a) ................................................................................................... 4

50 C.F.R. § 402.14(a)-(b) ............................................................................................. 4

50 C.F.R. § 402.14(b)(1) .............................................................................................. 4

50 C.F.R. § 402.14(g) ................................................................................................... 4

50 C.F.R. § 402.14(g)(4) .............................................................................................. 4

50 C.F.R. § 402.14(h)(3) .............................................................................................. 9

50 C.F.R. § 402.14(i)(1)(i) ..................................................................................... 28, 31

50 C.F.R. § 402.15(a) ................................................................................................. 36

50 C.F.R. § 402.16(a) ................................................................................................. 27

79 Fed. Reg. 12,572 (Mar. 5, 2014) ........................................................................... 38

79 Fed. Reg. 38,678 (July 8, 2014) ................................................................. 13-14, 16

81 Fed. Reg. 7,214 (Feb. 11, 2016) ..................................................................... 33, 35

1

## **TABLE OF ACRONYMS**

2

ADEQ          Arizona Department of Environmental Quality

3

APA           Administrative Procedure Act

4

BA            biological assessment

5

BiOp          biological opinion

6

CBD           Plaintiff Center for Biological Diversity

7

CBD Memo.  CBD's Summary Judgment Memorandum, ECF No. 107

8

DEIS          draft environmental impact statement

9

EIS           environmental impact statement

10

EPA           Environmental Protection Agency

11

ESA           Endangered Species Act

12

FEIS          final environmental impact statement

13

FWS           U.S. Fish and Wildlife Service

14

NEPA          National Environmental Policy Act

15

ROD           record of decision

16

SBA           supplemental biological assessment

17

SIR           supplemental information report

18

19

20

21

22

23

24

25

26

27

28

vii

## NOTE ON ADMINISTRATIVE RECORD CITATIONS

Federal Defendants have lodged multiple Administrative Records corresponding to the various agency actions challenged in these consolidated cases.  For this brief, documents cited from the U.S. Fish and Wildlife Service ("FWS") February 27, 2018 Administrative Record for the 2016 Biological Opinion are in the form "FWSxxxxxx," where "xxxxxx" is the unique six-digit Bates page number in the lower right hand corner of each page.  Because there are four folders in the FWS Administrative Record, pages from documents in the "FWS_Email" folder are denoted with an "(E)" after the citation, and pages from documents in the "FWS_References" folder are denoted with an "(R)" after the citation.  If there is no denotation after the citation, which is most common, the document will be found in the "FWS_Documents" folder.  Each folder contains an index of documents in that folder, with a tab of the documents ordered by Bates page number ranges for ease of location, with hyperlinks that open the document once the Bates page number is found in the index.

Documents cited from the Forest Service March 16, 2018 (Corrected) Administrative Record are in the form "FSxxxxxxx," where "FS" signifies the Forest Service Administrative Record and "xxxxxxx" is the unique seven-digit Bates page number in the lower right hand corner of each page.  The Forest Service Administrative Record includes a locator tool into which the seven-digit Bates page number can be entered to pull up the cited document.  Additional instructions for using the Forest Service Administrative Record are provided with that Record.

Documents cited from the FWS April 5, 2018 (Corrected) Administrative Record for the Revised Adverse Modification Rule are in the form "AMRxxxxx," where "AMR" signifies the FWS "Adverse Modification Rule" Administrative Record and "xxxxx" is the unique five-digit Bates page number in the lower right hand corner of each page.  The "Adverse Modification Rule" Administrative Record includes an index ordered by Bates page number and document hyperlinks for ease of access.

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure, Federal Defendants hereby move this Court for summary judgment on Plaintiff Center for Biological Diversity's ("CBD's") claims in No. 4:17-cv-00475-TUC-JAS challenging the actions of the U.S. Fish and Wildlife Service ("FWS") and U.S. Forest Service relating to the Rosemont Copper Project in southern Arizona.  Federal Defendants respectfully request that this Court grant summary judgment in their favor and deny CBD's motion for summary judgment on the following grounds: (1) CBD has failed to demonstrate that FWS's 2013 and 2016 Biological Opinions ("BiOps") are arbitrary, capricious, or otherwise contrary to the Endangered Species Act ("ESA"), Compl., ECF No. 1, ¶¶ 111-13 ("First Claim for Relief"); (2) the Forest Service properly relied on FWS's 2013 and 2016 BiOps, *id.* ¶¶ 114-17 ("Second Claim for Relief"); (3) FWS' February 11, 2016 Final Rule revising the regulatory definition of "destruction or adverse modification of critical habitat" is consistent with the ESA, *id.* ¶¶ 118-21 ("Third Claim for Relief"); and (4) FWS did not implicitly revise the rule designating critical habitat for the jaguar in violation of the ESA, *id.* ¶¶ 122-26 ("Fourth Claim for Relief").  This Motion for Summary Judgment is supported by the following Memorandum of Points and Authorities and the Administrative Records lodged with the Court.

## INTRODUCTION

On June 6, 2017, the Forest Supervisor for the Coronado National Forest, Kerwin S. Dewberry, issued a decision approving the Rosemont Copper Project in southern Arizona.  FS0259715, FS0259825.  This decision was the culmination of more than a decade of study, environmental review and analysis, and public participation process resulting in a massive 2,400-page environmental impact statement ("EIS") analyzing and disclosing a host of potential environmental impacts from the Project.  *See* FWS109931-112363(R).  As part of this extensive environmental review process, the Forest Service consulted with the U.S. Fish and Wildlife Service ("FWS") on multiple occasions in

accordance with Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C.
§ 1536(a)(2), to determine the potential impacts of the Project on threatened and
endangered species and their critical habitat.  The result of these consultations was the
issuance of two lengthy biological opinions ("BiOps") in 2013 and 2016 in which FWS
determined that the Rosemont Project would not jeopardize the continued existence of
any species and would not destroy or adversely modify designated critical habitat for any
species.  FWS046292-797; FWS049327-760.[1]

Plaintiff Center for Biological Diversity ("CBD") challenges FWS's BiOps, and
the Forest Service's reliance on those BiOps, under the ESA.  *See* CBD's August 24,
2018 "Memorandum in Support of Motion for Summary Judgment," ECF No. 107
("CBD Memo.").  FWS's 2013 and 2016 BiOps fully analyze and address the relevant
potential impacts to endangered and threatened species and designated critical habitat that
may be affected by the Rosemont Project, compliance with the requirements of the ESA.
CBD's challenges to the BiOps generally concern FWS's interpretations of the ESA,
methodologies in determining potential impacts to listed species and critical habitat, and
expert determinations based on scientific information on whether the Rosemont Project
will jeopardize species or adversely modify critical habitat -- all areas within FWS's
special expertise and for which the agency must be afforded great deference.  *See, e.g.*,
*Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*) ("[W]e are to
conduct a 'particularly deferential review' of an 'agency's predictive judgments about
areas that are within the agency's field of discretion and expertise . . . as long as they are
reasonable.'").  As discussed below, CBD has not met its burden on any of its claims
because it has not established that FWS acted irrationally in applying the best scientific
information.

---

[1] More factual background and detail on the Rosemont Project, the Forest Service's
decision, and the extensive analysis conducted by FWS in the 2013 and 2016 BiOps is
presented in Federal Defendants' and Intervenor-Defendant's accompanying October 12,
2018 "Separate Statement of Facts in Support of Motion for Summary Judgment in No.
4:17-cv-00475-TUC-JAS."

2

1    Because CBD cannot demonstrate that the federal agencies' actions are arbitrary,

2  capricious, or otherwise contrary to law, CBD's claims are without merit and must be

3  rejected.  Therefore, the Court should deny CBD's motion for summary judgment and

4  should grant summary judgment in favor of Federal Defendants on all claims.

5                              **STATUTORY BACKGROUND**

6  **A.    The Endangered Species Act**

7    Congress enacted the ESA "to provide a means whereby the ecosystems upon

8  which endangered species and threatened species depend may be conserved" and to bring

9  such species "to the point at which the measures provided pursuant to [the ESA] are no

10  longer necessary."  16 U.S.C. §§ 1531(b), 1532(3).  Under ESA Section 4, species are

11  "listed" as "endangered" or "threatened,"[2] and "any habitat of such species which is then

12  considered to be critical habitat" is designated.[3]  *Id.* § 1533(a).  In administering the ESA,

13  FWS is responsible for terrestrial and freshwater species, 50 C.F.R. § 222.23(a), such as

14  the species at issue in this litigation.

15    ESA Section 7(a)(2) directs each federal agency, in consultation with FWS, to

16  "insure" that agency actions are not likely to jeopardize the continued existence of any

17  listed species or destroy or adversely modify designated critical habitat.  16 U.S.C.

18  § 1536(a)(2).  These determinations are to be made based on the "best scientific and

19  commercial data available."  *Id.*  "Jeopardize the continued existence of means to engage

20  in an action that reasonably would be expected, directly or indirectly, to reduce

21  appreciably the likelihood of both the survival and recovery of a listed species in the wild

22  by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R.

23  _____

24  [2] An endangered species is one "in danger of extinction throughout all or a significant
portion of its range."  *Id.* § 1532(6).  A threatened species is one "likely to become an

25  endangered species within the foreseeable future throughout all or a significant portion of
its range."  *Id.* § 1532(20).

26  [3] "Critical habitat" includes occupied areas that contain the "physical or biological

27  features essential to the conservation of the species and that may require special
management considerations or protection," as well as unoccupied areas that themselves

28  are essential to the species' conservation.  *Id.* § 1532(5)(A)(i)-(ii).

§ 402.02.  "Destruction or adverse modification" means "a direct or indirect alteration that appreciably diminishes the value of critical habitat for the conservation of a listed species." *Id.*

Consultation is required if an action agency (here, the Forest Service) determines that its proposed action "may affect" listed species or critical habitat.  50 C.F.R. § 402.14(a).  The action agency may prepare a "biological assessment" or "BA" to aid the consultation process.  *Id.* § 402.12.  If the action agency determines, with FWS's written concurrence, that the action "is not likely to adversely affect" listed species or critical habitat, the consultation is terminated.  *Id.*; *see also id.* §§ 402.13, 402.14(b)(1).

If the action agency or FWS determines that the proposed action is "likely to adversely affect" listed species or designated critical habitat, the agencies must engage in formal consultation.  *Id.* §§ 402.13(a), 402.14(a)-(b).  During formal consultation, FWS analyzes the agency's proposed action to identify, among other things, the current status of the species or critical habitat, the environmental baseline, and the direct and indirect effects of the action.  *Id.* §§ 402.14(g), 402.02.  At the conclusion of formal consultation, FWS issues its BiOp determining whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat.  *Id.* § 402.14(g)(4); 16 U.S.C. § 1536(b)(3)(A).  If jeopardy or adverse modification of critical habitat is likely, the BiOp will set forth a reasonable and prudent alternative ("RPA") to the action, if any, that avoids those impacts.  *Id.*

## STANDARD OF REVIEW

CBD's challenges to FWS' and the Forest Service's compliance with the ESA are subject to the judicial review standards of the APA, 5 U.S.C. §§ 701-706.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014).  Under the APA, FWS' final decisions must be upheld unless they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court's task "is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the

4

choice made." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted).

Judicial review of federal agency actions under the APA is exceedingly deferential. *Lands Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008) (*en banc*) (emphasizing the court's limited role in reviewing agency actions under the APA). Under this deferential standard, "[a]n agency will have acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency] made a clear error in judgment.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (quoting *McNair*, 537 F.3d at 994); *see also Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 573 (9th Cir. 1998) (considerable deference must be accorded to the agency with regard to the manner in which it examines the environmental consequences of a project). "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (citation omitted); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.") (citations omitted).

The APA does not allow a reviewing court to overturn an agency action because it disagrees with the agency's decision or even with its conclusions about the scope, breadth or effect of the environmental impacts of the project at issue. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). Thus, the reviewing court's task is simply "to insure a fully informed and well-considered decision, not necessarily a decision [the court] would have reached had [it] been [a] member[] of the decisionmaking unit of the agency." *Id.* "The [agency's] action . . . need be only a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

Agencies are accorded particular deference with respect to scientific questions within their expertise. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,

143 F.3d 515, 523 (9th Cir. 1998).  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Ore. Nat. Res. Council*, 490 U.S. 360, 378 (1989).  "Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'"  *Id.* at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).  A court is not required to weigh conflicting expert opinions or to consider whether the agency employed the best scientific methods. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985).

> We are to be most deferential when the agency is making predictions, within its area of special expertise, at the frontiers of science[, and] . . . we are to conduct a particularly deferential review of an agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.

*McNair*, 537 F.3d at 993 (quotation marks and citations omitted).  "We may not impose ourselves 'as a panel of scientists that instructs the [agency] . . ., chooses among scientific studies . . ., and orders the agency to explain every possible scientific uncertainty.'" *Tri-Valley CAREs*, 671 F.3d at 1124 (quoting *McNair*, 537 F.3d at 988).

<u>**ARGUMENT**</u>

**I.     THE DETAILED 2013 AND 2016 BIOLOGICAL OPINIONS COMPLY WITH THE ESA**

**A.     FWS Rationally Determined That The Rosemont Project Would Not Destroy Or Adversely Modify Jaguar Critical Habitat**

CBD's challenge to the determination in the 2016 BiOp that the Rosemont Project would not destroy or adversely modify designated critical habitat for the jaguar is without merit.  CBD's attempted reliance on findings by staff biologists in preliminary draft BiOps and other internal documents to attempt to undermine FWS's determinations of impacts to jaguar critical habitat is misplaced and contrary to law.  *See, e.g.*, CBD Memo. at 11 (asserting that "FWS biologists repeatedly determined that these impacts would

constitute 'adverse modification' under Section 7 of the ESA," but they were "overruled by the agency's Field Supervisor") (citing SOF 33, FWS047633, SOF 36, FWS Doc. 227); *id.* at 18 (FWS biologists concluded . . .") (citing SOF 33, 35, FWS047633); *id.* at 20 ("As FWS' biologists explained in the draft biological opinions . . ."). Such internal draft documents do not constitute agency "determinations," "findings," or "conclusions," and are not legally or factually relevant to determining whether the findings in the 2016 BiOp are arbitrary and capricious.

In *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), also an ESA case, the Supreme Court held that the Ninth Circuit had erred in considering "internal inconsistency" within the federal agency concerning its obligations under ESA Section 7. *Id.* at 658-59. Noting that federal courts are generally empowered only to review "an agency's *final* action" under the APA, 5 U.S.C. § 704, the *Home Builders* Court stressed that "the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious." *Id.* at 659. Similarly, in *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998), the Ninth Circuit rejected the plaintiff's similar reliance on a "discarded draft ['reasonable and prudent alternative' in a draft BiOp] which had indicated that preservation of [certain] habitat was necessary to the survival of the [listed species]," because "upon further consideration of the matter, the FWS was entitled to, and did, in fact, change its mind" in selecting an alternative that was less protective of the species. *Id.* at 523.[4] "[U]nder the ESA, the Secretary [of the Interior] was not required to pick the first reasonable alternative the FWS came up with," and "was not even required to pick

---

[4] Indeed, here FWS transmitted two draft BiOps to the Forest Service for review during the Section 7 consultation. Neither the July 3, 2013 Draft BiOp (FWS012067(E)) nor the November 30, 2015 Draft BiOp (FWS051931) even preliminarily determined that "adverse modification" of jaguar critical habitat would occur. Instead, these draft BiOps explain why "adverse modification" would not result. FWS012195-99(E), FWS052145-47.

7

1   the best alternative or the one that would most effectively protect the [species] from

2   jeopardy." *Id.* CBD's reliance on other internal documents created to aid FWS's

3   deliberations is also misplaced: "As properly pointed out by Defendants, moreover, the

4   e-mails and other communications in the record simply show that the BiOp was

5   developed from a vigorous (and sometimes heated, as Plaintiffs aptly emphasize)

6   debate." *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 977 F. Supp. 2d

7   55, 74 (D.P.R. 2013).

8          As this case law demonstrates, the only question for this Court is whether FWS

9   was arbitrary and capricious in how it ultimately analyzed impacts to jaguar critical

10  habitat, and judicial review is not based on preliminary positions taken by some agency

11  employees.  In the 2013 and 2016 BiOps, FWS conducted a thorough review and analysis

12  of potential impacts to designated critical habitat for the jaguar, and ultimately

13  determined that the Rosemont Project would not cause destruction or adverse

14  modification of that critical habitat, consistent with ESA Section 7(a)(2).  *See*

15  FWS049615-37.  FWS's analysis is detailed, rational, and based on the best scientific

16  information, and therefore is entitled to heightened deference under the standards of

17  review discussed above.

18          **1.     FWS Applied An Appropriate Interpretation Of "Likely" In**
                     **Assessing Impacts To Jaguar Critical Habitat**
19

20          In considering the significance of potential impacts to designated jaguar critical

21  habitat from the Rosemont Project, Section 7 of the ESA charges FWS to determine

22  whether the proposed action is "likely" to destroy or adversely modify critical habitat.  16

23  U.S.C. § 1536(a)(2); *see also* 50 C.F.R. §402.14(h)(3).  Here, FWS's Field Supervisor

24  looked to Merriam Webster's Collegiate Dictionary and found that term "likely" was

25  defined as "1:  having a high probability of occurring or being true; very probable."

26  FWS047647 (quoting Merriam-Webster's Collegiate Dictionary (10th ed.)).  CBD argues

27  that FWS's reliance on this common dictionary definition violates the ESA.  CBD Memo.

28  at 12-15.

8

Both the Supreme Court and Ninth Circuit commonly rely on Merriam Webster's Collegiate Dictionary and other Merriam Webster's dictionaries in defining ordinary statutory terms.  *See, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611 (2009) (using Merriam-Webster's Collegiate Dictionary (10th ed. 1993) to define the word "arrange"); *Ocasio v. United States*, 136 S. Ct. 1423, 1441 (2016) (using Merriam-Webster's Collegiate Dictionary (11th ed. 2003) to define "another"); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1119 (9th Cir. 2018) (using Merriam-Webster's Collegiate Dictionary (10th ed. 1996) to define "uniform"); *United States v. Rashkovski*, 301 F.3d 1133, 1136-37 (9th Cir. 2002) (using Merriam-Webster's Collegiate Dictionary (2002) to define "persuade").  In contrast, there are *no* Supreme Court or Ninth Circuit cases that rely on the Oxford Living Dictionaries that CBD favors for its definition of "likely."  *See* CBD Memo. at 13 n.9.  And there is only one Supreme Court decision and two Ninth Circuit decisions using the Cambridge Dictionary.  *Id.*[5]

It was reasonable for FWS to turn to a dictionary commonly used by the courts to help it define the term "likely" in the ESA consultation process.  Nor does it matter that FWS or NMFS may have used another reasonable definition of "likely" in implementing another distinct part of the ESA, as CBD contends.  *See* CBD Memo. at 13-14 (citing listing decision cases).  Under the deferential standard of judicial review for agency actions under the APA, "[t]he [agency's] action . . . need be only a reasonable, not the best or most reasonable, decision."  *Burford*, 871 F.2d at 855.  FWS's determination of impacts to jaguar critical habitat, using a common dictionary definition for the term "likely" along the way, was a reasonable approach, even if relying on another dictionary definition would also have been reasonable.  And, protecting listed species from jeopardy

---

[5] CBD quotes the Cambridge Dictionary definition of "likely" as "probably," *id.*, but the actual definition is "expected to happen; probable."  *See* https://dictionary.cambridge.org/us/dictionary/english/likely (last visited Oct. 12, 2018). "Expected to happen" is much closer to the "having a high probability of occurring" definition used by FWS.

9

does not change this calculus, also contrary to CBD's contention that FWS was required to seek out the most protective definition of "likely." *See* CBD Memo. at 14-15. As discussed above, the Ninth Circuit confirmed in *Southwest Center for Biological Diversity* that as long as FWS's decision was reasonable, the agency "was not even required to pick the best alternative or the one that would most effectively protect the [species] from jeopardy." 143 F.3d at 523.

CBD cannot establish that FWS's determination that the Rosemont Project was not likely to destroy or adversely modify jaguar critical habitat was arbitrary and capricious because FWS used one common definition of "likely" instead of another. CBD's claim is without merit and should be denied.

### 2. FWS Did Not Discount The Importance Of Critical Habitat Impacted By The Rosemont Project

CBD next argues that FWS's determination that the Rosemont Project would not destroy or adversely modify jaguar critical habitat violated the ESA because FWS discounted the importance of the critical habitat to the species. CBD Memo. at 16-22. This argument relies on a number of demonstrably flawed and false premises, and must be rejected.

First, CBD's argument relies extensively on "determinations," "conclusions," and "explanations" from early internal draft documents that were never adopted by FWS or put forth as actual agency determinations. *See* CBD Memo. at 17-18 (asserting that "[i]n reaching 'adverse modification' determinations within multiple draft biological opinions, FWS' biologists recognized the importance of the impacted critical habitat units," and then proceeding to quote from these draft documents); *id.* at 20 (arguing that the rationale in the 2016 BiOp "underappreciates" Subunit 4b's importance by asserting that the rationale is inconsistent with prior statements in the internal draft documents). As discussed above, *see supra* Argument I.A, CBD's reliance on internal draft documents is misplaced and does not inform this Court's review of the 2016 BiOp that FWS actually adopted.

1        Second, CBD relies on another internal June 24, 2013 deliberative document to

2  assert that FWS incorrectly concluded that critical habitat Subunit 4b was not important

3  for providing the jaguar connectivity to occupied areas, contrary to the Final Rule

4  designating critical habitat indicating that Subunit 4b was important for connectivity.

5  CBD Memo. at 18-19 (citing FWS047653 and 79 Fed. Reg. at 12,594).  Although this

6  deliberative document explains why the author believed the Final Rule "may have been

7  in error," FWS047653, the 2016 BiOp itself expressly recognizes that Subunit 4b "is

8  essential to the conservation of the jaguar because it contributes to the species'

9  persistence by providing connectivity to occupied areas."  FWS049619.  Thus, the central

10  thesis of CBD's argument "that the deliberative document from 2013 demonstrates FWS

11  "discounted the importance of the affect habitat -- especially Subunit 4b," CBD Memo. at

12  19, is squarely refuted by the express language of the 2016 BiOp.

13        Finally, and most importantly, CBD misrepresents the analysis in the 2016 BiOp

14  when it states that "[i]n the BiOp, FWS found there would be . . . overall as much as

15  114,320 acres of 'long-term loss of function' within Unit 3, Subunit 4a, and Subunit 4b,

16  including 'a 112,194-acre permanent loss of function.'"  CBD Memo. at 19 (quoting

17  FWS049635-36); *see* SOF ¶ 280 (showing relationship of critical habitat units and

18  subunits with Mexico, each other, and the Rosemont Mine).  FWS made no such finding.

19  The acreages CBD recites -- 114,320 acres of long-term loss of critical habitat function,

20  including 112,194 acres of permanent loss of function -- are not presented as a plausible

21  scenario, but only as a product of a confluence of "hypothetical, worst-case scenarios."

22  FWS049636-37 (hypothetical worst-case scenario "Item 5" based on the acreages cited

23  by CBD).  FWS found that this hypothetical Item 5 worst of the worst case scenarios

24  would not constitute destruction or adverse modification of critical habitat because 73

25  percent of Unit 3 and Subunits 4a and 4b would be retained, as well as 85 percent of all

26  designated critical habitat, while retaining some avenues of connectivity to Mexico.

27  FWS049637.

28

But because Item 5 represents only a hypothetical worst of the worst-case scenarios for analysis purposes, the "no adverse modification" determination for this hypothetical scenario was itself just a hypothetical determination.  FWS's actual determination was that the Rosemont Project would not destroy or adversely modify critical habitat because the only plausible scenario was that "jaguar movement between units 3 and 4b will become somewhat restricted," not that all movement would be precluded as in the hypothetical worst-case scenarios.  FWS049637.  This plausible scenario is presented as "Item 1" in the 2016 BiOp.  FWS049635-36.  Under the Item 1 scenario, despite the direct loss of 6,139 acres in Unit 3, all critical habitat units will maintain connectivity with each other and with Mexico.  FWS049635.  In contrast to the plausible Item 1 scenario, Item 5 represents the most extreme of several "hypothetical, and increasingly worst-case effects" that are "unsupported by the best available information."  FWS049637.  Thus, CBD's assertion that FWS "found there would be" acreage losses as great as those postulated in hypothetical worst-case scenario Item 5 that CBD has latched onto for purposes of its argument is simply false.

FWS's actual determination was that the direct loss of 6,139 acres in Unit 3 under Item 1 would not cause the destruction or adverse modification of critical habitat because it would only restrict jaguar movement "somewhat," and the acreage loss represents only 1.75 percent of Unit 3 and 0.80 percent of all critical habitat.  FWS049635, FWS049637.  This determination is consistent with case law holding that not all loss of designated critical habitat rises to the level of destruction or adverse modification.  As the Ninth Circuit held in *Butte Environmental Council v. U.S. Army Corps of Engineers*, "[a]n area of a species' critical habitat can be destroyed without appreciably diminishing the value of critical habitat for the species' survival or recovery."  620 F.3d 936, 948 (9th Cir. 2010).  In *Butte*, the project at issue "would destroy 234.5 acres of critical habitat" for two listed species and "242.2 acres of critical habitat" for another species.  *Id.* at 947-48.  Despite this outright loss of acres of designated critical habitat, the Ninth Circuit upheld FWS's conclusion that this loss did not constitute impermissible adverse modification of

critical habitat because FWS reasonably found that destruction of these areas did not "appreciably diminish" the capability of the critical habitat as a whole of providing for the essential requirements of the species. *Id.* at 948; *see also Ctr. for Biological Diversity v. Branton*, 126 F. Supp. 3d 1090, 1106 (D. Ariz. 2015) (holding that even if an agency's action "completely destroyed" three of seven ponds (stock tanks) designated as critical habitat for the Chiricahua leopard frog, that would not constitute "adverse modification" of critical habitat for that species).

In short, FWS rationally determined that the Rosemont Project would not destroy or adversely modify jaguar habitat.  The 2016 BiOp contains a thorough, rational analysis of this issue based on reasonable assumptions and the best available scientific information.  CBD's claim is without merit.

## B.   FWS Correctly Found That The Rosemont Project Would Not Jeopardize The Northern Mexican Gartersnake

CBD argues that the jeopardy analysis in the 2016 BiOp violates the ESA because FWS failed to consider whether the Rosemont Project may tip the northern Mexican gartersnake past a point at which its survival and recovery is precluded.  CBD Memo. at 22-27.  In support of this argument, CBD relies on case law discussing "tipping points" that is largely inapposite, and CBD also focuses almost entirely on the negative aspects of the Project, drawing statements out of context from the 2016 BiOp to paint a picture for the gartersnake that is substantially different than the overall circumstances set forth in the 2016 BiOp.  FWS's opinion that the Rosemont Project will not jeopardize the continued existence of the gartersnake is explained in detail and entitled to deference.

FWS listed the northern Mexican gartersnake as threatened in 2014.  79 Fed. Reg. 38,678 (July 8, 2014).  "The presence of harmful nonnative species constitutes the most significant threat" to the gartersnake, as these nonnative species directly prey on the gartersnake and compete with them for prey.  *Id.* at 38,687.  The nonnative species of concern include bass, catfish, trout, bullfrogs, and crayfish.  *Id.* at 38,678.  Decline of the gartersnake's prey base, which includes native amphibians and fish populations, also

13

attributed to the presence of harmful nonnative species, was a secondary factor in listing the species.  *Id.* at 38,688.  Along with the presence of harmful nonnative species, "[a]ctivities that reduce flows or dewater habitat, such as dams, diversions, flood-control projects, and groundwater pumping" have a negative impact on gartersnake habitat, again mostly because of the adverse effect to the gartersnake's prey species.  *Id.* at 38,702.  The listing decision expressly recognized the Rosemont Project as a possible threat to the species through dewatering impacts.  *Id.* at 38,706.

After reviewing all of the information on the potential impacts on the gartersnake and the causes for its decline, FWS listed the species as threatened, and not at the more serious endangered level:

> We find that the northern Mexican gartersnake is not currently in danger of extinction because it remains extant in most of the subbasins where it historically occurred, and its known threats have not yet resulted in substantial range reduction or a substantial number of population extirpations to put the subspecies on the brink of extinction. * * * Therefore, we determined that the present risk of extinction is not sufficient to warrant a finding of endangered under the [ESA].

79 Fed. Reg. at 38,741-42.  FWS instead listed the species as threatened because "[w]e expect the status of the subspecies will decline in the next several decades mainly as a result of the continuing and expanding impacts of harmful nonnative species and the increasing nature of threats associated with human population growth and climate change."  *Id.* at 38,742.  Critical habitat has been proposed, but not yet designated, for the species.  FWS049491.

Unlike the cases on which CBD relies for its "tipping point" claim, here the Forest Service and FWS were consulting on the Rosemont Project under ESA Section 7 contemporaneously with the gartersnake's listing under ESA Section 4, and the listing decision expressly recognized the Rosemont Project as a possible threat to the species through dewatering impacts.  79 Fed. Reg. at 38,706.  But despite that threat and the modeling of the downstream impacts that may occur from groundwater drawdown from the Project, FWS found that the gartersnake was not in danger of extinction in the listing

14

decision, consistent with the 2016 BiOp's determination that the Project would not jeopardize the continued existence of the species.  FWS049516.

Nothing in the ESA or its implementing regulations require FWS to establish a "tipping point" in determining whether a proposed action jeopardizes a listed species. Nor has the Ninth Circuit established such a requirement, which would be beyond the purview of the judicial system.  *See, e.g.*, *McNair*, 537 F.3d at 993 ("Nor may we impose procedural requirements not explicitly enumerated in the pertinent statutes.") (*en banc*; quotation marks, modification, and citation omitted).  "Precedent in this circuit indicates that there is no affirmative duty under the ESA to identify a clear tipping point line as to when jeopardy or adverse modification would occur; the importance of such identification depends on the circumstances of the case and the degree of risk to the endangered species."  *Oceana v. Nat'l Marine Fisheries Serv.*, No. 3:14-cv-00253-TMB, 2015 WL 12697739 *7 (D. Alaska Sept. 16, 2015).  Instead, in the case underlying CBD's claim and the district court cases that CBD cites in support of its claim, the Ninth Circuit in *Wild Fish Conservancy v. Salazar*, conducted ordinary "arbitrary and capricious" review under the APA, 5 U.S.C. § 706(2)(A).  628 F.3d 513, 521 (9th Cir. 2010).  In the course of that review of FWS's "no jeopardy" determination, the Ninth Circuit found contradictions between FWS's "findings and its conclusion."  *Id.* at 527.  It was in this context, under the circumstances of that particular case in which the BiOp under review conflicted with an earlier BiOp for the same activity that predicted the listed bull trout population would likely only decline, that the Ninth Circuit questioned why FWS "has not determined when the tipping point precluding recovery of the . . . bull trout population is likely to be reached."  *Id.* at 526-27.  But in no way did the *Wild Fish* Court dictate that a jeopardy analysis must always impose that methodology as CBD contends. Similarly, in *National Wildlife Federation v. National Marine Fisheries Service*, the Ninth Circuit postulated under the circumstances there that "[i]t is only logical to require that the agency know roughly at what point survival and recovery will be placed at risk before it may conclude that no harm will result from 'significant' impairments to habitat

that is already severely degraded."  524 F.3d 917, 936 (9th Cir. 2008).

Here, there are no significant impairments caused by the Rosemont Project to already "severely degraded" habitat, nor are there any contradictions between the 2016 BiOp and any earlier analysis of impacts on the gartersnake.  On the contrary, FWS's 2014 Listing Decision had just concluded that the gartersnake was not currently in danger of extinction, and that the main cause of concern for the species was not a severely degraded habitat but the presence of "harmful nonnative species."  The 2016 BiOp expressly took these factors into account.  Applying its highly precautionary modeling, and assumptions, and the "95th percentile analysis" under which adverse impacts would almost always be less than the model predicted, FWS049516,[6] FWS noted that while there might be some substantial stream impacts in the long term affecting gartersnake prey species, the gartersnake population and amount of habitat affected "represent a relatively small proportion of the species' rangewide distribution."  FWS049516.  And countering these adverse impacts was a "suite of conservation measures" that were part of the Project that would address the main threat facing the species by removing harmful nonnative species, significantly bolstering the status of the gartersnake.  FWS049518; *see also* Listing Decision, 79 Fed. Reg. at 38,721 ("An emphasis on native fish recovery in fisheries management and enhanced harmful nonnative species control to favor native communities may be the single most efficient and effective manner to recover these gartersnakes.").

The two district court decisions on which CBD relies, beyond their imposition of a "tipping point" standard by judicial fiat, are readily distinguishable.  Unlike *Center for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987 (D. Ariz. 2011) (cited at CBD Memo. at 25), FWS did not focus on "localized conditions" and did not ignore the environmental baseline in making its jeopardy determination.  *See, e.g.*, FWS049518 (taking into account Project mitigation that "is expected to substantially improve the

---

[6] *See infra Argument* I.D.1 (explaining conservative "95th percentile analysis" in greater detail).

16

1    baseline status for the northern Mexican gartersnake and its native prey community on a

2    subbasin-level").  And, in *Save Our Cabinets v. U.S. Fish & Wildlife Service*, 255 F.

3    Supp. 3d 1035 (D. Mont. 2017) (cited at CBD Memo. at 25-27), the listed bull trout

4    population was "vulnerable to extirpation" and the success of the local population was

5    "essential to maintaining the existing survival status and potential for recovery" of a

6    larger "core" population of bull trout in the region.  *Id.* at 1049.  Unlike the bull trout

7    population in Save Our Cabinets, the gartersnake population here is not vulnerable to

8    extinction and is not part of a core population for the species at large.

9        CBD has not shown that FWS's determination that the Rosemont Project would

10   not jeopardize the gartersnake is arbitrary and capricious because it did not expressly

11   address a "tipping point" analysis that was not necessary for FWS to reach a reasonable

12   conclusion supported by substantial evidence.  Therefore this claim should be denied.

13

14   **C.    FWS Properly Relied On Mitigation Measures In Determining
                Whether The Rosemont Project Would Jeopardize The Gila Chub And
15              Gila Topminnow**

16       In the 2016 BiOp, FWS identified and assessed a whole suite of conservation

17   measures that Rosemont will implement as part of the Project, at the cost of many

18   millions of dollars.  *See* FWS049337-48.  CBD singles out two of these mitigation

19   measures to argue that they are "uncertain to occur or be implemented as proposed" and

20   thus cannot be weighed in assessing impacts on two listed species in the 2016 BiOp: the

21   gila chub and the gila topminnow.  CBD Memo. at 27-32.  CBD again relies on *Center

22   for Biological Diversity v. Salazar* for this argument, *see* CBD Memo. at 27, but that case

23   is again not relevant.  *Center for Biological Diversity*, and the case law it cites, focuses

24   on the premise that mitigation measures must be "specific and binding" to be weighed in

25   a BiOp, 804 F. Supp. 2d at 1001, whereas CBD's argument here is that the two mitigation

26

27

28

measures will not be *effective*.  *See* CBD Memo. at 29-32.[7]  Thus, *Center for Biological Diversity* does not support CBD's arguments.

Regardless, CBD's mitigation arguments are misplaced.  CBD cites comments from EPA and the Corps of Engineers suggesting that the mitigation measure to enhance flows on Cienega Creek below Pantano Dam, or to improve conditions at Sonoita Creek Ranch, may not be significant or completely effective.  CBD Memo. at 29-32.[8]  FWS's consideration of these mitigation measures is consistent with EPA's view.  *See, e.g.*, FWS049419 ("Whether or not that habitat [below Pantano Dam] is suitable for chub, given the reduced stream gradient below the dam, remains to be seen."); *id.* ("Additional Cienega Creek water rights . . . *may* help protect instream flow) (emphasis added); FWS049421 ("The proposed conservation measures will not preclude anticipated effects to surface water from occurring nor entirely mitigate those effects."); FWS049420 ("The status of Gila chub *should* be improved by actions taken at Sonoita Creek Ranch by creation of additional populations in the ponds.") (emphasis added).

Moreover, in these statements, FWS referred to a host of conservation measures, not just any particular one, and FWS only made statements such that the conservation measures are "*anticipated* to *partially* offset expected effects to Gila chub and their habitat."  FWS049423 (emphases added).  Thus, in considering a whole suite of conservation measures, including enhancing flows below Pantano Dam, FWS plainly did not give them the inordinate weight that CBD suggests.

In short, the mitigation measures adopted as part of the Rosemont Project are binding on Rosemont and sufficiently certain to occur, consistent with *Center for Biological Diversity v. Salazar*, and CBD does not contend otherwise.  To the extent they

---

[7] There is no question that the mitigation measures are required and binding on Rosemont as part of the Project approval.  *See* FS0259764, FS0259769-87 ("Mitigation and Monitoring Requirements").

[8] As CBD concedes, CBD Mem. at 30, the EPA comments are not even about meeting the needs of endangered species, but whether the measures will meet compensatory mitigation requirements of the Clean Water Act.  *See* FWS076117.

18

1    may not be fully effective, FWS expressly recognized that possibility in the 2016 BiOp,

2    and thus only relied on them to that extent in making its determinations of jeopardy for

3    the Gila chub and Gila topminnow.  This approach was not arbitrary and capricious, and

4    thus CBD's mitigation claim must be rejected.

5        **D.    FWS Considered The Potential Impacts From Groundwater**
         **Drawdown From Private Wells Or Heavy Metals In Determining**
6        **Impacts On Aquatic Species**

7        CBD asserts that FWS failed to consider what CBD alleges are two "relevant

8    factors" in its determination of whether the Mine project will jeopardize listed species or

9    adversely modify critical habitat: 1) groundwater drawdown from private wells and 2)

10   potential impacts from toxic heavy metals.  CBD Memo. at 32-38.  Based on this false

11   underlying premise, CBD asserts that it need only show that it is "plausible" that these

12   factors may affect listed species or critical habitat.  *Id.* at 32-33 (citing *Ctr. for Biological*

13   *Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122 (9th Cir. 2012)).

14       As a threshold matter, CBD relies on the wrong standard for these claims because

15   -- as discussed below -- FWS did consider these two factors and determined that they

16   would not cause jeopardy or adverse modification.  FWS's determinations on these issues

17   is thus entitled to a presumption of correctness and are subject to the deferential

18   "arbitrary and capricious" standard of review.  *See, e.g.*, *San Luis & Delta-Mendota*, 747

19   F.3d at 601 ("[T]he standard of review [of a BiOp under the ESA] is highly deferential;

20   the agency's decision is 'entitled to a presumption of regularity,' and we may not

21   substitute our judgment for that of the agency.") (citations omitted).  "The Court must

22   defer to the agency on matters within the agency's expertise, unless the agency

23   completely failed to address some factor, consideration of which was essential to making

24   an informed decision."  *Consol. Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1058 (E.D.

25   Cal. 2010) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782,

26   798 (9th Cir. 2005)).  Because FWS did not "completely fail" to consider private wells

27   and toxic metals, but rationally concluded that these factors would not cause jeopardy or

28   adverse modification of critical habitat, CBD's claim must be rejected.

19

1          **1.      Groundwater Drawdown From Private Wells Is Included In**
2                   **FWS's Analyses Of Groundwater Impacts**

3          The downstream impacts from groundwater drawdown attributable to the

4  Rosemont Project, in conjunction with impacts from climate change and groundwater

5  pumping from private wells, was central to the Forest Service's and FWS's analyses of

6  environmental impacts.  Nonetheless, CBD argues that FWS "failed to consider" these

7  impacts.  CBD Memo. at 33-35.  This argument is plainly incorrect.

8          The 2013 and 2016 BiOps are the result of many years of ESA Section 7

9  consultations between the Forest Service and FWS.  After FWS issued the 2013 BiOp,

10  the agencies reinitiated consultation in large part because new information made it

11  possible to refine the hydrology modeling and analysis that the Forest Service had

12  completed in the FEIS, and the Forest Service was in the process of completing an

13  evaluation of new information as documented in the May 2015 Supplemental Information

14  Report ("SIR") that was transmitted to FWS as part of the consultation.  *See*

15  FWS049329-34 (outlining sequence of events leading to the 2016 BiOp, including

16  formation of an interagency hydrology working group); FWS049336 (noting reliance on

17  the 2015 SIR and other Forest Service documents).  While the 2013 BiOp relied

18  primarily on the Tetra Tech groundwater drawdown model, the selection of which

19  provided the "most precautionary approach" for protecting listed species because it

20  resulted in the greatest drawdown predictions, FWS049349, those results "have . . . been

21  superseded by the rigorous and yet more-precautionary, revised analyses appearing in the

22  SIR and May 2015 SBA," which FWS "incorporated [in the 2016 BiOp] via reference."

23  FWS049350.

24          In the 2015 SIR, the Forest Service addresses groundwater pumping at length.

25  While recognizing that "the installation and pumping of nearby wells can impact the

26  aquatic resources," the agency explained that because of the huge variability on stream

27  flow impacts from groundwater pumping based on the distance and size of the wells,

28  "quantifying its effects . . . with any degree of certainty is speculative and highly

20

1   problematic."  FWS048555.  The Forest Service therefore "determined that *explicitly*

2   incorporating additional stresses due to basin population growth and water use would be

3   speculative and is not warranted."  FWS048556 (emphasis added).

4   　　　　But the Forest Service's analysis did not stop there.  Recognizing that "a wide

5   variety of additional stresses" -- including "increase pumping and development" -- could

6   cause cumulative impacts on top of drawdown from the Mine, the Forest Service

7   considered climate change impacts as "one additional stress scenario in this SIR."

8   FWS048556.  Importantly, however, the agency explained that "[t]he climate change

9   scenario used in this SIR *is representative of any number of stresses*," including

10  "*estimated water demand from basin pumping*."  FWS048557 (emphasis added) and

11  FWS048558 (Figure 9) (emphasis added).  The goals of the analysis of the combined

12  "climate change/mine drawdown scenario," then, were 1) to determine whether impacts

13  from mine drawdown became more significant under a future, more stressed

14  environment, and 2) to assess the level to which the riparian system could be degraded

15  even without mine drawdown.  FWS048557.  Given the uncertainties in the modeling and

16  future conditions, however, the analysis is unable to "predict the exact nature and impact

17  from climate change or any other future stress" like groundwater pumping.  *Id.*[9]

18  　　　　FWS carried the extensive and conservative modeling and assessment from the

19  2015 SIR into the 2016 BiOp.  *See* FWS049350 ("Full details of the methodology and

20  results of the aquatic analysis, including potential impacts to stream flow, standing pools,

21  and riparian vegetation, are contained in the SIR and are incorporated herein via

22  reference.").  In analyzing potential impacts on listed species and their habitats, FWS

23  took the conservative modeling from the 2015 SIR one step further by applying the "95th

24  percentile analysis" in which "97.5 percent of the other possible outcomes . . . are less

25  

26  [9] While CBD relies almost entirely on several stated concerns from BLM about the
    potential impacts on stream flows from groundwater drawdown from the Mine in
27  conjunction with groundwater pumping, CBD Memo. at 33-35, it was precisely those
    concerns that led the Forest Service, together with BLM, FWS, and other expert agencies,
28  to develop the new modeling and analysis in the 2015 SIR.  FWS048476.

21

1   impactful than the effects analyzed in this [BiOp]." FWS049356. In other words, this

2   approach is "conservative and cautious" in favor of protecting listed species by providing

3   "reasonable certainty that the real-world effects of mine drawdown experienced in these

4   ecosystems are unlikely to be worse than those described in this consultation." *Id.*

5          By incorporating the Forest Service's modeling and analysis for climate change

6   impacts that are "representative" of other stresses such as groundwater pumping from

7   development on top of impacts from the Rosemont Project, and by taking a precautionary

8   approach by applying the "95th percentile analysis," FWS conducted a rational analysis

9   of potential jeopardy or adverse modification of critical habitat in light of great

10  uncertainty. In preparing a BiOp, FWS must use the "best scientific and commercial data

11  available," even if that information is imperfect or uncertain, 16 U.S.C. § 1536(a)(2), *San*

12  *Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994-95 (9th Cir. 2014), and

13  its choice of scientific methodologies in conducting a jeopardy analysis is entitled to

14  substantial deference, *San Luis & Delta-Mendota*, 747 F.3d at 618. CBD fails to identify

15  any better scientific information than the modeling used by FWS, and errs in claiming

16  that FWS failed to consider groundwater pumping from private wells in the 2016 BiOp.

17         **2.     The 2013 And 2016 BiOps Considered Possible Impacts From**
             **Mining Contaminants**
18

19         CBD also cannot show that FWS "completely failed" to address the issue of

20  mining contaminants in making its determinations on jeopardy and adverse modification

21  of critical habitat pursuant to Section 7(a)(2) of the ESA. Indeed, CBD itself recognizes

22  that FWS considered this factor in its 2016 BiOp. CBD Memo. at 36 (citing

23  FWS049403). As FWS determined:

24         Discharges to groundwater are not expected to exceed water quality
           standards; if they occur, the cone of depression associated with the mine pit
25         is predicted to capture water contaminants and prevent their movement to
           streams in the action area. In addition, the ADEQ has issued their 401
26         water quality certification for the project and has determined that the
           project is not expected to violate surface water quality standards.
27         Therefore, no impacts to Gila chub or designated critical habitat due to
           potential water contaminants are anticipated given the information in the
28

1
2
3

various BAs.  As stated in the Environmental Baseline section, above, Gila chub occur in Cienega Creek and 22.9 mi (37 km) of the mainstem and tributaries (Mattie Canyon and Empire Gulch) are designated as critical habitat.

4
5

FWS049403.[10]  Because FWS plainly considered this issue, CBD's "failure to consider" claim is without merit.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Even if the Court looks beyond the lack of merit to this claim as presented by CBD, FWS's determination easily withstands review under the deferential "arbitrary and capricious" standard.  As indicated in the passage, operation of the Mine is not expected to result in discharges of toxic contaminants to groundwater through seepage from the tailings or waste rock facilities that exceed water quality standards.  FWS110417(R) (FEIS Table 71 showing that predicted tailings seepage meets groundwater quality standards); FWS110418(R) (FEIS Table 72 showing that predicted waste rock seepage meets groundwater quality standards); FWS110416-17(R) (seepage "daylighting" into surface waters is unlikely to occur); FWS046313-15(R) (2013 BiOp discussing extensive design and monitoring measures to prevent contamination of groundwater and surface water from the Mine site).  And, even if such discharges were to occur, most discharges would be confined to the Mine site as a result of the "cone of depression" drawing them back into the Mine pit.  FWS110423(R) (FEIS analysis of cone of depression capture of seepage).  Therefore, any toxic contaminants discharged would not make their way downstream into the areas occupied by the listed aquatic and riparian species.  *See* FWS049407 (2016 BiOp, concluding that "[c]ontaminants from the mine site are only a concern for fishes in Cienega Creek below the confluence with Davidson Canyon, and only if water quality permits are not followed").

24
25
26

In addition, with respect to seepage, the Clean Water Act certification issued by ADEQ supports FWS's determination.  While CBD notes EPA's concerns with ADEQ's

27
28

---

[10] As noted below in Argument II.E, the Gila chub analyses relating to water conditions generally apply to the other aquatic and riparian species.  *See* FWS049349.

23

permit, ADEQ provided a response, explaining its rationale for issuing the certification.
FWSAR049281-300. As part of this rationale, ADEQ stated that seepage from the waste
rock and tailings piles to the outside water sources (i.e., "daylighting") is not expected to
occur because "buttresses and encapsulating the dry stack tailings in waste rock" will
"prevent[] infiltration of precipitation through the tailings and provid[e] large volumes of
acid-neutralizing waste rock." FWS049286. In addition, Rosemont is required to
monitor for seepage and, if any occurs, must take corrective actions. FWS049286-87.
ADEQ further explained that even if such seepage did occur it is unlikely that it would
exceed surface water standards, taking into account all aspects of tailings seepage
occurring, not just the potential for poor water quality, including stormwater hardness in
Barrel Canyon (which changes the water quality standards), mitigation from waste rock
segregation, and monitoring required by the Forest Service. FWS049285.

The Clean Water Act certification issued by ADEQ also supports FWS's
determination with respect to surface water discharges from "stormwater runoff from the
Project." ADEQ reviewed all available information, including a potential for dissolved
silver from waste rock disclosed in the FEIS. *See, e.g.*, FWS110514(R) (FEIS Table 105
showing scenarios for predicted runoff water quality). ADEQ found it unlikely "that
dissolved silver will exceed surface water quality standards in runoff from the waste rock
facility" and further found it "unlikely that runoff from the waste rock facility will exceed
any surface water quality standard." FWS049287. Based on its consideration of
available information, ADEQ found that "the activities proposed for the Rosemont
Copper Project will not violate applicable surface water quality standards (SWQS) in the
subject waterbodies including McCleary, Wasp, Trail, Barrel and Davidson Canyons, and
Cienega Creek." FS0106495.

CBD relies on early comments from other entities in an attempt to buttress its
argument, but those comments do not account for the unique geology of the Rosemont
Mine site, nor the implementation, mitigation, and design measures that are part of the
Rosemont Project, and subsequent analyses by the Forest Service experts and other

1    agencies.  For instance, CBD asserts that EPA found ADEQ's certification to be

2    "insufficient" and that there was a "substantial risk" to wildlife habitat.  CBD Memo. at

3    37-38 (quoting FWS053673).  But CBD fails to acknowledge that this April 7, 2014 EPA

4    letter provided comments on the *draft* ADEQ certification, *see* FWS053673, not the final

5    ADEQ certification addressed above, which was issued on February 3, 2015.  Similarly,

6    CBD relies on another EPA letter suggesting that EPA had concerns about seepage, CBD

7    Memo. at 38 (citing FWS080920-21), but CBD again fails to note that this letter was

8    dated February 21, 2012 on the Forest Service's *draft* EIS.  *See* FWS080909.

9          CBD ignores the additional analyses that were completed to address the concerns

10   raised in these early letters.  The Final EIS, which FWS incorporated into the

11   environmental baseline for the 2016 BiOp, addressed in great detail the risk of acid rock

12   drainage and seepage into ground and surface water.   *See* FEIS FWS110052(R)

13   (groundwater controls); FWS110091(R) (stormwater controls); FWS110399-401(R)

14   (changes from DEIS for geochemistry/groundwater quality); FWS110401(R) (monitoring

15   has been incorporated); FWS110405(R) (scientific uncertainty and professional

16   disagreement); FWS110405(R) (monitoring to assess geochemical predictions);

17   FWS110411-13(R) (geochemical tests); FWS110414-16(R) (predictions of seepage rates,

18   including analysis in response to EPA DEIS comments); FWS110416(R) (monitoring to

19   assess seepage predictions); FWS110416-18(R) (expected water quality for tailings and

20   waste rock seepage); FWS110420(R) (comparison with other mines); FWS110421(R)

21   (potential for radioactive materials); FWS110421-23(R) (potential for nitrates from

22   explosives residue); FWS0110423(R) (capture of seepage); FWS110433-34(R)

23   (conclusion of mitigation effectiveness); FWS110481(R) (changes from DEIS for surface

24   water quality); FWS110483(R) (analysis methodology); FWS110505-08(R) (potential for

25   acid rock drainage); FWS110508(R) (monitoring to assess potential acid rock drainage);

26   FWS110508-10(R) (potential for other contaminants); FWS110516(R) (conclusions –

27   ability to meet surface water quality standards); FWS110520(R) (conclusion of

28   mitigation effectiveness).

What the agency experts found was that the unique geochemical makeup of the Rosemont deposit, which contains a substantial quantity of buffering limestone, as well as required mitigation and monitoring to ensure that segregation of materials in waste rock and tailings facilities are adequately buffered, minimize the potential for acid rock drainage and seepage:

> As a whole, the body of waste rock is expected to have little potential for acid rock drainage, as there are significant quantities of acid-neutralizing rock and relatively little potentially acid-generating waste rock.  However, proper placement of these two types of waste rock is necessary to take advantage of the acid neutralization potential.  A waste rock segregation plan has been incorporated into the design of the facility and would be informed by continued monitoring and testing of waste rock for acid-generating potential as it is developed from the mine and placed into the waste rock facility.  Proper implementation of the waste rock segregation plan would be effective at reducing the potential for impacts to surface water quality.

FWS110520(R).

As explained in the FEIS, "[t]ailings seepage would have more problematic constituents if it occurred, but as analyzed in the 'Groundwater Quality and Geochemistry' resource section, the probability of tailings 'daylighting' in Barrel Canyon is low."  FWS110510(R).

> Cooperating agencies have raised concerns about the potential for tailings seepage, which is expected to occur at a rate of about 8.4 gallons per minute, to migrate downstream as subsurface flow in shallow alluvial sediments, eventually returning to the surface as a seep or spring. The amount of tailings seepage equals about 13 acre-feet per year. This amount is less than 1 percent of the average annual runoff in Barrel Canyon. As no seeps or springs occur in the alluvial materials of Barrel Canyon upstream of SR 83 under current conditions, the addition of this amount of seepage is unlikely to result in new seeps.

FWS110316-17(R).  The FEIS also discusses design criteria that will minimize the chance of any downstream water quality issues, including that the top of the tailings facility would be relatively impervious, eliminating runoff from precipitation either through evaporation or pumping, FWS110053(R); the tailings facilities will be

26

encapsulated in a thick layer of waste rock, FWS110043(R); and monitoring of waste rock for seepage to identify the presence of seepage and analysis of any leachate, FWS110416(R).  *See also* FWS111735-36(R) (mitigation measures); FWS049284 (requiring corrective measures if monitoring reveals any issues); FWS049287 (same).

Thus, the Forest Service directly addressed EPA's concerns about seepage from waste rock by conducting additional analysis for the FEIS.  FWS110399(R).  In turn, this information was considered by FWS as part of the ESA Section 7 consultation on the Rosemont Project, as noted in the 2016 BiOp.  FWS049328.  Because FWS did not "completely fail" to consider the possible impacts of toxic metals from the Rosemont Project, CBD must show that FWS's determination that seeping of these contaminants would not jeopardize listed species or adversely modify critical habitat was arbitrary and capricious.[11]  But CBD cannot meet this burden, because FWS relied on appropriate expertise and substantial evidence to support its determination.  Therefore, CBD's toxic contaminants claim is without merit and must be rejected.

**E.  FWS Adopted A Proper Surrogate For Take In Its Incidental Take Statement**

After evaluating whether an agency action is likely to jeopardize a listed species or destroy or adversely modify critical habitat, FWS issues an incidental take statement or "ITS."  16 U.S.C. § 1536(b)(4).  The ITS exempts the action agency or applicant from liability for a specified amount of incidental take[12] of listed species associated with the action; if more take than anticipated in the ITS occurs, reinitiation of consultation is triggered.  16 U.S.C. §1536(o)(2); 50 C.F.R. §402.16(a); *Ariz. Cattle Growers' Ass'n v.*

---

[11] When FWS did identify a possible harm to listed species, FWS discussed that issue in the BiOp.  *See, e.g.*, FWS049478 (discussing potential effects on Chiricahua leopard frogs from eating prey exposed to toxic metals at the Mine site).

[12] "Take" of a listed species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  "Incidental take" is "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant."  50 C.F.R. § 402.02.

*FWS*, 273 F.3d 1229, 1239, 1249-51 (9th Cir. 2001).  An ITS may express incidental take numerically as the number of animals expected to be taken, or through a surrogate for take of the species, such as "similarly affected species or habitat or ecological conditions."  50 C.F.R. § 402.14(i)(1)(i).

CBD asserts that FWS's reliance on groundwater drawdown as a take surrogate for several aquatic and riparian species in the 2016 BiOp is inconsistent with these provisions of the ESA and its implementing regulations.  CBD Memo. at 38-44.  Notably, CBD does not challenge FWS's determination that numerically quantifying take associated with possible stream flow reductions was not practical.  *See, e.g.*, FWS049425-26 (explaining rationale for Gila chub);[13] *see also Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127 (9th Cir. 2012) (noting "self-evident" impracticability of quantifying take for fish species).  In accordance with *Center for Biological Diversity*, FWS identified a surrogate -- the extent and magnitude of groundwater drawdowns caused by the Mine project that can reduce stream discharge and harm the species.  *See, e.g.*, FWS049425-29 (explaining rationale for Gila chub); *see also Ctr. for Biological Diversity*, 698 F.3d at 1127 (noting that it is permissible to use "'habitat characteristics' as a proxy for a numerical limit").

CBD does not argue that FWS's surrogate is not based on the best scientific information available or that there is some other better surrogate that FWS should have selected.  Instead, CBD simply posits several misplaced complaints about the selected surrogate.

CBD first asserts that the surrogate's take thresholds of less than 0.1 feet  -- set out in Table GC-4 of the 2016 BiOp, FWS049427-28 -- are "essentially meaningless and unworkable" because the agencies' groundwater model cannot reasonably predict

---

[13] Since the ITSs for the other species forming the basis of CBD's claim are based on the same analysis and rationale as the ITS for the Gila chub, this brief focuses on the analysis for that species but is intended to address the other species as well.  *See* SOF ¶¶ 186-88, 195-96, 206-09, 220-22, 244-47, 256-60 (ITSs for other species).

28

1    groundwater drawdowns less than 5 feet, and natural fluctuations in groundwater

2    drawdown exceed these thresholds.  CBD Memo. at 40-41.  CBD misconstrues the

3    significance and application of these thresholds by failing to recognize the difference

4    between the modeled groundwater drawdowns used for analysis of the Mine's effects on

5    habitat occupied by listed species, *see* FWS048509-613 (2015 SIR refined analysis of

6    impact on seeps, springs, and riparian areas); FWS049349-86 (2016 BiOp summary of

7    effects on aquatic systems), and direct observation of actual groundwater elevations from

8    monitoring wells.  *See* FWS049429 (Table displaying potential groundwater monitoring

9    wells).

10          While there are inherent uncertainties in groundwater modeling, FWS has

11    addressed these uncertainties in favor of protecting listed species in several important

12    ways.  FWS selected the Tetra Tech groundwater model "because it represents the upper

13    end of the range of drawdown that could be observed in the nearest (to the [Mine] pit)

14    and most critically sensitive (to threatened and endangered riparian and aquatic species)

15    areas, specifically Empire Gulch and Upper Cienega Creek."  FWS049427; *see also*

16    FWS049356-57 (discussing how choosing this model represents "the most cautious

17    approach to predicting effects" to "provide the benefit of the doubt to the species").

18    Relying on this single model at the high end of predicting "take" of listed species results

19    in "clear and enforceable thresholds" for "take" in the ITS that will trigger protective

20    measures and reconsultation sooner than if FWS used other models.  *Id.*  The Tetra Tech

21    model has the added benefit that it still being actively maintained, and provides "the

22    spatial coverage to be useful in the measurement of incidental take," which the other

23    models lack.  *Id.*

24          But FWS does not rely on the Tetra Tech model alone in ensuring the highest

25    accuracy of the agency's incidental take predictions.  Instead, future use of the model will

26    be informed by increasingly accurate field data to eliminate "noise" caused by natural

27    fluctuations in groundwater levels.  As FWS explained, including language that CBD

28    takes out of context:

1
2
3
4
5
6
7
8

> We also note that fluctuations in groundwater elevation can vary daily and seasonally from environmental factors.  These daily fluctuations have the potential to exceed the smaller magnitude groundwater drawdowns displayed in Table GC-4 (particularly those ≤0.1 foot).  During the initial implementation phase (site construction, early pit construction) there is an opportunity to monitor daily and seasonal groundwater fluctuations for 2 to 4 years -- under background conditions -- before the anticipated effects from the pit dewatering are realized.  *The results from this initial monitoring will help determine the degree of background (baseline) variation in the observed groundwater elevations before the realization of Rosemont's effects.*  The data will also assist in discerning the groundwater drawdown attributable to the pit from unrelated environmental factors.

9
10
11
12

FWS049428 (emphasis added); *see also* FWS110331-32(R).  By collecting additional actual groundwater drawdown data, FWS will be able to refine and increase the accuracy of the Tetra Tech model as a compliance tool.

13
14
15
16
17
18
19
20
21
22
23
24

      Moreover, the incidental take levels specified in Table GC-4 (FWS049427-28) are at the location of the actual aquatic ecosystems containing the habitat for the listed species.  Recognizing that those sites "currently lack observation wells" and that the sites "will experience confounding influences from recharge by runoff, riparian [evapotranspiration], and drought," FWS instead selected existing groundwater monitoring wells closer to the Mine listed in Table GC-5 (FWS049429) that can serve as proxies for key sites listed in Table GC-4.  Using these proxy monitoring wells reduces the variability that would be found at the key sites.  FWS049428.  Using the conservative Tetra Tech model that favors protection of the species, FWS will be able to convert the take levels in Table GC-4 to drawdown levels at the proxy monitoring wells, and can do so "at any desired time interval," instead of relying on the 0, 20, 50, 150 years post-mining intervals.  *Id.*; *see also* FWS049430 (requiring *annual* groundwater monitoring during the life of the Mine).

25
26
27
28

      CBD's additional complaints are similarly flawed.  The Bureau of Land Management's concerns about "faults, fractures and possible karst formations," *see* CBD Memo. at 41 (quoting FWS0445[1]6), had already been examined and addressed when the Forest Service convened a panel of experts, finding "that the existing models already

30

take into account known regional faults and fracture zones, that they were modeled appropriately as areas of higher conductivity, and that the points raised to the contrary were not sufficient to demonstrate the existence of significant faults that had not been considered." FWS110336(R).  Moreover, using a conservative 0.1 foot drawdown at the key habitat sites as a threshold for incidental take, and using proxy monitoring wells that are closer to the Mine, allows FWS to identify reductions in groundwater level at a very early stage, so that the agencies can determine whether the drawdown can be attributed to Rosemont's activities.  FWS049431.  "Monitoring of some or all of these wells as proxies (for groundwater drawdown at the key locations in Table GC-4) will allow take of Gila Chub to be monitored immediately and during the active life of the mine, rather than waiting for the decades or centuries that it is modeled to take measurable drawdown to reach the affected streams, Cienega Creek and Empire Gulch." FWS049428-29.  Therefore, the concerns of the court in *Save Our Cabinets v. U.S. Fish & Widllife Service*, 255 F. Supp. 3d 1035 (D. Mont. 2017) -- that extent of streamflow changes would not manifest itself until the mining operation was completed, *id.* at 1058-59 (*see* CBD Memo. at 43-44) -- is not at issue here.

    Finally, the ITS provides a "clear standard" for determining when take has been exceeded.  50 C.F.R. § 402.14(i)(1)(i).  "Incidental take statements must 'set forth a "trigger" that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of the ESA], and requiring the parties to reinitiate consultation.'"  *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1264 n.3 (9th Cir. 2017) (quoting *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1249 (9th Cir. 2001)).  That "clear standard" for reinitiation of Section 7 consultation is set forth in Table GC-4, which specifies the incidental take limits in clear, definite terms for four key locations.  *See* FWS049427.  Moreover, the ITS explains and provides a detailed mechanism for determining when these take limits are met or exceeded, identifying a finite list of two to seven potential groundwater monitoring wells that can be modeled to meaningfully correlate with take levels at the key locations.  FWS049428-29.

1
2
3
4
5
6
7
8
9
10
11
12

CBD complains that the ITS does not specify which of these few wells the Forest Service and Rosemont must select for monitoring for each key location, *see* CBD Memo. at 42-43, and that converting information gathered at the monitoring wells requires complex modeling and calculations to determine whether the Mine project (and not some other source) has caused take levels to be exceeded, *see id.* at 43. But these complexities, which are to be expected in any method attempting to determine how the Mine may impact streams many miles away, do not make the take levels specified in the ITS any less clear or definite. *See, e.g.*, *W. Watersheds Project v. U.S. Fish & Wildlife Serv.*, No. 4:13-CV-176-BLW, 2014 WL 4853200, at *9 (D. Idaho Sept. 29, 2014) (upholding ITS that "contains a clear trigger," and monitoring for take that "recognizes the unique problems of monitoring [injury to the species] in a remote and large allotment, and uses the expertise of the agencies to craft a solution that works around those obstacles").

13
14
15
16
17
18
19

The ITS sets forth meaningful incidental take levels and a rational method for determining when those take levels may be exceeded as a result of Rosemont's mining activities. Under the deferential standard of judicial review for ESA claims, courts "will 'reject an agency's choice of a scientific model "only when the model bears no rational relationship to the characteristics of the data to which it is applied."'" *San Luis & Delta-Mendota*, 747 F.3d at 621 (quoting *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 565 (D.C. Cir. 2002)). CBD's challenges to the ITS are insubstantial and must be rejected.

20
21

## II.  FWS'S REGULATORY DEFINITION "DESTRUCTION OR ADVERSE MODIFICATION" OF CRITICAL HABITAT IS CONSISTENT WITH THE ESA

22
23
24
25
26
27
28

Under Section 7 of the ESA, each federal agency must insure that "any action" it authorizes, funds, or carries out "is not likely to . . . result in the destruction or adverse modification of [designated critical] habitat." 16 U.S.C. § 1536(a)(2). In 2016, following the Ninth Circuit's decision in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, 378 F.3d 1059, 1076 (9th Cir. 2004), *amended*, 387 F.3d 968 (9th Cir. 2004), FWS promulgated a revised regulation implementing this statutory requirement, providing that "[d]estruction or adverse modification means a direct or indirect alteration

32

that appreciably diminishes the value of critical habitat for the conservation of a listed species."  50 C.F.R. § 402.02.[14]

CBD argues that by defining "destruction or adverse modification" as a single, unified concept, this revised regulation is inconsistent with the plain language of ESA Section 7(a)(2).  CBD Memo. at 44-49.  In turn, CBD argues, by relying on this allegedly flawed regulation, the 2016 BiOp is also necessarily inconsistent with the ESA.  *Id.*  CBD's arguments are without merit.  In light of FWS's long-established analytical framework that is embodied in the 2016 regulatory definition and centers on how an activity affects the ability of the critical habitat designation as a whole to provide for the conservation of the species, applying independent meaning to the two terms would not change the ultimate outcome of any "destruction or adverse modification" analysis in this consultation on the Rosemont Project or any other Section 7 consultation.

CBD asserts that the disjunctive "or" between "destruction" and "adverse modification" in Section 7(a)(2) of the ESA means that these terms must be given separate, independent definitions.  CBD Memo. at 46.  CBD relies on *Gifford Pinchot*, where the Ninth Circuit faulted the prior regulation for substituting an "and" between "survival" and "recovery," where the statutory language required an "or."  *Id.* at 49 (quoting 378 F.3d at 1070).  The Ninth Circuit found that by requiring destruction or adverse modification to appreciably diminish the value of critical habitat for "*both* the survival *and* recovery" of a listed species, FWS "could authorize the complete elimination of critical habitat necessary only for recovery" as long as sufficient critical habitat for survival of the species remained.  378 F.3d at 1069-70 (quoting 50 C.F.R. § 402.02 (1986)).  Such a result was at odds with the ESA, which "was enacted not merely to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted."  *Id.* at 1070.  Therefore, the

---

[14] FWS published the revised rule with the National Marine Fisheries Service ("NMFS"), which also implements the ESA.  AMR08563 (81 Fed. Reg. 7,214, 7,214 (Feb. 11, 2016)).

1   "survival and recovery" part of the regulation could not stand.

2          In contrast to the *Gifford Pinchot* "survival and recovery" holding, the revised

3   regulation maintains the statutory "or" between "destruction" and "adverse modification"

4   -- the "or" is not replaced with an "and."  *See* 50 C.F.R. § 402.02 (2016).  Indeed, in

5   *Gifford Pinchot*, the Ninth Circuit itself interpreted the statutory phrase "destruction or

6   adverse modification" as a unified concept in precisely the same way the revised 2016

7   regulation does:  "Congress said that 'destruction or adverse modification' could occur

8   when sufficient critical habitat is lost so as to threaten a species' recovery even if there

9   remains sufficient critical habitat for the species' survival."  378 F.3d at 1070.  Consistent

10  with this statement in *Gifford Pinchot*, FWS has defined "destruction or adverse

11  modification" as a singular concept since it first promulgated regulations implementing

12  ESA Section 7(a)(2) in 1978.  *See* AMR08564.

13         Based on dictionary definitions, CBD asserts that "adverse modification"

14  constitutes some level of activities that is "harmful" to a species' habitat or ability to use

15  that habitat, but that does "not rise to the level of permanent destruction."  CBD Memo.

16  at 46-47.  In effect, CBD is arguing that destruction and adverse modification represent

17  different degrees of harm to critical habitat.  But even if "adverse modification" and

18  "destruction" of critical habitat did represent different degrees of harm as CBD argues,

19  those degrees must overlap or at least be continuous, as it would be illogical for CBD to

20  assert that there is some level of harm to critical habitat greater than "adverse

21  modification" but less than "destruction" that is not barred by Section 7(a)(2) of the ESA.

22  FWS expertly and properly ensured that there was no gap in protection under Section

23  7(a)(2) in the unified concept of these statutory terms in 50 C.F.R. § 402.02, consistent

24  with the Ninth Circuit's same interpretation in *Gifford Pinchot*.  When the impairment or

25  loss of an area "appreciably diminishes the value of critical habitat for the conservation of

26  a listed species," then "destruction or adverse modification" of critical habitat has

27  occurred.  50 C.F.R. § 402.02.  Regardless of degree, once the harm crosses the threshold

28

34

of "appreciably diminishes" it is barred under Section 7(a)(2).[15]

The use of such overlapping terms forming a continuous spectrum is found elsewhere in the ESA. For instance, Section 9 of the ESA, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of listed species, where "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). No dictionary is necessary to understand that when an animal is "killed" it has also been "harmed." Just as Congress defined "take" in overlapping terms capturing a whole spectrum of activities that would be harmful to listed species, it was reasonable and consistent with the ESA for FWS to interpret "destruction or adverse modification" in the same way.

FWS's determination that giving independent meaning to the two terms was "unnecessary and would not alter the outcome of section 7(a)(2) consultations," AMR08570 (81 Fed. Reg. 7,214, 7,221 (Feb. 11, 2016)), is entitled to deference under *Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). CBD's challenge to 50 C.F.R. § 402.02, which finds no support in the statutory text or legislative history, is without merit and must be rejected.

//

//

//

//

---

[15] CBD asserts that "the only way FWS could conclude the Mine would not 'destroy' critical habitat in violation of Section 7 was to define 'destruction' out of the statutory requirement by conflating it with 'adverse modification,'" when the 2016 BiOp acknowledges that thousands of acres would be destroyed or suffer permanent effects. CBD Memo. at 48. This assertion is at odds with *Gifford Pinchot* and other controlling precedent from the Ninth Circuit recognizing that the impairment, destruction, or loss of critical habitat areas or acreage rises to the level of Section 7(a)(2) "destruction or adverse modification" only when it appreciably diminishes the value of critical habitat for the species survival or recovery. *See also Butte Envtl. Council*, 620 F.3d at 948 (discussed *supra*, Argument Part I.A.2).

35

1

2

**III**.    **THE 2016 BIOLOGICAL OPINION DOES NOT REVISE THE RULE DESIGNATING JAGUAR CRITCAL HABITAT**

3

4

5

6

7

8

9

CBD argues that by "authorizing" construction of the Rosemont Mine, "FWS implicitly revised the jaguar critical habitat designation so as to effectively exclude these areas from the designation without complying with the ESA's notice and comment rulemaking procedures."  CBD Memo. at 50.[16]  Because the 2016 BiOp attempts to "redefine" areas of critical habitat as "nonessential," according to CBD, the BiOp violates Section 4 of the ESA governing revision of critical habitat designations.  *Id.* at 53-54; 16 U.S.C. §§ 1533(a)(3)(A), (b).  CBD's argument is flawed on several levels.

10

11

12

13

14

15

16

17

18

19

20

21

22

CBD's argument is based on its assertion that "the Mine would result in the permanent destruction of over 4,000 acres of jaguar critical habitat at the Mine site, with another 2,000 acres fenced off for decades, and over 100,000 acres permanently rendered functionally useless for the jaguar."  CBD Memo. at 52 (citing FWS049635-36).  As with CBD's Section 7 challenge to the BiOp, CBD again misrepresents FWS's rationale for determining that the proposed action will not likely destroy or adversely modify designated jaguar critical habitat.  The BiOp rationale describes effects that are relatively certain to occur, as well as a series of "hypothetical, worst-case scenarios" that *may* occur.  FWS049636-37.  CBD misrepresents these hypothetical, worst-case scenarios as leading to impacts that "would result," as in CBD's acreage quote above, when they are far from certain of occurring.  In fact, FWS actually concluded that the hypothetical, worst of the worst-case scenarios (Item 5, described at FWS049636-37) is "unsupported by the best available information."  FWS049637.  Nonetheless, even under this worst of

23

24

25

26

27

28

---

[16] FWS's BiOps do not "authorize" the Rosemont Mine Project.  A BiOp only provides the action agency (here, the Forest Service) with FWS's determination of whether a proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify critical habitat.  16 U.S.C. §§ 1536(a)(2), (b)(3)(A).  It is the action agency that, after consideration of the BiOp, determines whether to authorize a project.  *See* 50 C.F.R. § 402.15(a) ("Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and [FWS's] biological opinion.").

the worst-case scenarios, FWS found that "function would be retained in 73.2 to 73.7 percent of the combined acreage of Unit 3 and Subunits 4a and 4b and in 85.0 to 85.3 percent of all designated critical habitat," and that "connectivity to Mexico" -- the purpose behind designating Units 3 and 4 -- would be maintained.  FWS049635-37.

CBD's argument turns on the premise that allowing the destruction or loss of function of areas within the boundaries of designated critical habitat constitutes a *de facto* revision of that designated critical habitat.  Accepting CBD's premise would mean that any reduction in acres of critical habitat would constitute a revision of the critical habitat designation, requiring separate "notice and comment procedures" to revise the rule designating jaguar critical habitat to exclude the areas that "the Mine would render useless for jaguar conservation."  CBD Memo. at 53.  This premise is at odds with well-settled law on critical habitat.

As discussed above, *see supra* Argument I.A.2, a designation of critical habitat does not put all areas within the boundaries of that designation off limits to development or activities that may adversely impact or even destroy the function of those areas as critical habitat for the species.  *See, e.g.*, *Butte Envtl. Council*, 620 F.3d at 948 ("An area of a species' critical habitat can be destroyed without appreciably diminishing the value of critical habitat for the species' survival or recovery."); *Ctr. for Biological Diversity*, 126 F. Supp. 3d at 1106 (agency action that "completely destroyed" three of seven ponds designated as critical habitat for a frog species would not rise to the level of "adverse modification").

Because the destruction of areas of critical habitat does not necessarily adversely modify designated critical habitat, the loss of critical habitat cannot constitute a *de facto* revision of the designation.  The 2016 BiOp does not reset the boundaries of the critical habitat, does not change the "primary constituent elements" ("PCEs") for that habitat, and does not change the purpose of the designation.  Nor did FWS infuse economic or any other considerations beyond the biological needs of the jaguar in determining that the Rosemont Mine would not adversely modify critical habitat.  *See* 16 U.S.C. § 1533(b)

37

(specifying considerations for designating and revising critical habitat, including "economic impact").  Whether FWS reasonably determined that the loss of critical habitat acres was not likely to adversely modify jaguar critical habitat is a Section 7(a)(2) consultation question, not a Section 4 revision of critical habitat designation question.[17] Indeed, FWS determined that the Mine was not likely to adversely modify jaguar critical habitat in the 2013 BiOp, before the designation was finalized, and FWS expressly took that determination into detailed consideration when making the designation.  *See* 79 Fed. Reg. 12,572, 12,596, 12,599-600, 12,620, 12,626, 12,633-34, 12,638, 12,640, 12,640-43 (Mar. 5, 2014).

The two cases that CBD cites in support of this claim are inapposite.  In *Bennett v. Spear*, the Supreme Court was only faced with the question of whether the plaintiffs could bring a claim that FWS's imposition in a BiOp of minimum water levels in a lake "constituted an implicit determination of critical habitat" for the listed fish species, in violation of Section 4 of the ESA, 16 U.S.C. § 1533(b)(2).  520 U.S. 154, 160-61 (1997). While the Supreme Court found that the plaintiffs had standing and could otherwise bring the claim under the ESA citizen suit provision, 16 U.S.C. § 1540(g), the Court did not opine on whether the plaintiffs' claim was, or even could be, legally and factually meritorious.  520 U.S. at 166, 170-71, 172.  In fact, after the case was remanded back to the district court, the plaintiffs did not even pursue this claim on the merits.  *See generally Bennett v. Spear*, 5 F. Supp. 2d 882 (D. Or. 1998).

And, in *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Service*, the Ninth Circuit faulted FWS for determining that loss of critical habitat was not an "adverse modification" because of the existence of suitable habitat outside of designated critical

---

[17] If a court were to adopt CBD's interpretation of Section 4, it would nullify to some extent the prohibition under Section 7(a)(2).  If FWS was required to revise a critical habitat designation every time critical habitat was destroyed or adversely modified, then that habitat no longer would be critical habitat for purposes of the determination under Section 7(a)(2).  In other words, both Sections 4 and 7(a)(2) can not apply to the same loss of habitat.

38

habitat.  378 F.3d 1059, 1076 (9th Cir.), *amended op.*, 387 F.3d 968 (9th Cir. 2004).  The Ninth Circuit stated that FWS would need to "change the boundaries of the critical habitat" if it wanted to consider that suitable habitat in the "adverse modification" calculus.  *Id.*  Here, in contrast, FWS did not rely on external habitat, but only found that the loss of areas *within the existing boundaries of the designated critical habitat* did not rise to the level of adverse modification, in accordance with Section 7 of the ESA. FWS's determination here is thus consistent with *Gifford Pinchot*.

The 2016 BiOp does not implicitly revise jaguar designated critical habitat. Therefore, CBD has failed to present a viable claim that FWS violated Section 4 of the ESA.

## IV.   THE FOREST SERVICE PROPERLY RELIED ON THE 2016 BIOLOGICAL OPINION

CBD argues that because FWS's BiOp violates the ESA, the Forest Service's Record of Decision must also violate the ESA because it relies on FWS's BiOp.  CBD Memo. at 54.  This argument turns, on its face, solely on CBD's argument that the BiOp violates the ESA.  Therefore, if the Court upholds FWS's BiOp, it must also uphold the Forest Service's Record of Decision.  Moreover, the Forest Service's discussion of its compliance with the ESA does not rely on FWS's BiOp alone, but relied on its own biological assessments as well.  *See* FS0259813 ("Based on the conclusions summarized above as supported in [FWS's BiOp], I find that the selected action meets the [ESA].").  Apart from failing to show any alleged errors in FWS's BiOp that render the Forest Service's assessment inadequate, CBD has failed to put forth any arguments to demonstrate that the Forest Service did not comply with its independent duty to insure its action meets the requirements of the ESA.  *See* 16 U.S.C. § 1536(a)(2).  "An agency's reliance on a biological opinion based on 'admittedly weak' information satisfies its ESA obligations as long as the challenging party can point to no new information undercutting the opinion's conclusions." *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010) (quoting *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir.1990)).

1
2

**V.     CBD HAS NOT ESTABLISHED THAT IT IS ENTITLED TO ANY RELIEF**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

CBD does not provide any argument on the appropriate remedy should the Court rule in CBD's favor on one or more of its claims.  Instead, in a single conclusory paragraph, CBD asserts that "vacating the unlawful agency action is the presumptive remedy."  CBD Memo. at 54-55 (citing *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)).  *Pollinator Stewardship* does not state that vacatur of a federal agency action is the presumptive remedy for a violation of law, and the Supreme Court has repeatedly rejected a presumption of equitable relief such as vacatur for environmental claims against the United States.  *See, e.g.*, *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987) (stating that "[a] presumption [of injury to the environment] is contrary to traditional equitable principles").  On the contrary, a federal court "is not required to set aside every unlawful agency action," and the "decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity."  *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (citations omitted); *see also Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013) ("Vacatur is a species of equitable relief and courts are not mechanically obligated to vacate agency decisions that they find invalid.").  Indeed, the Supreme Court has stressed that remand is the proper remedy in APA cases except in "rare circumstances."  *Fla. Power & Light Co., v. Lorion*, 470 U.S. 729, 744 (1985).

21
22
23
24
25
26
27
28

"Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"  *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  Here, CBD has made no attempt to show that any harm to endangered species will occur during the first years of the Rosemont Project.  Instead, the potentially significant adverse impacts to listed species and critical habitat that form the bases for CBD's ESA claims will not begin to occur until years after Rosemont begins operations -

- after it begins significant excavating the mining pit.  FWS110089(R) (FEIS Table 7 showing pre-mining phase of 18-24 months); FS0202089 (Figure 8-3 showing no pit inflow from groundwater until 1.5 years after the beginning of pit excavation).  If the Court remands the 2016 BiOp to FWS for further review, it is likely that FWS can complete that review on remand in less than one year, well before any significant impacts to any species.  On the other side of the scale, delaying the Project will cost Rosemont millions of dollars and deprive the community of hundreds of important jobs. FWS110089(R), FWS111126(R).

Under similar circumstances, both the Supreme Court and Circuit Courts have denied environmental plaintiffs equitable remedies such as vacatur and injunctions.  For instance, in *Amoco*, the Supreme Court held that economic injuries from an injunction outweighed the environmental harms that may occur from allowing a $70 million oil exploration project to move forward.  480 U.S. at 545-46.  Similarly, in *California Communities Against Toxics*, the Ninth Circuit rejected vacatur of an EPA rule that the Court had found substantively violated the Clean Air Act, because vacatur might delay construction of a private power plant that would provide an important source of electricity for California.  688 F.3d at 993-94.  Such a consequence of vacatur would be "economically disastrous" for this "billion-dollar venture employing 350 workers," while plant operations would not begin until "a new and valid EPA rule" was in place.  *Id.* at 994.  Similarly, in *Western Watersheds Project v. Salazar*, the Ninth Circuit upheld equitable balancing and allowed projects to proceed when the district court "weighed the environmental harm posed by the . . . project against the possible damage to project funding, jobs, and the state and national renewable energy goals . . . and concluded that the balance favored [the United States and the project proponents]."  692 F.3d 921, 923 (9th Cir. 2012).

Here, CBD has failed to demonstrate, and the Administrative Record does not support, that there will be any significant harm to listed species during the initial stages of Rosemont's implementation of its mining plan.  Should the Court find any defects in the

1  BiOp, FWS can likely remedy those defects in short order.  Therefore, under *California*

2  *Communities Against Toxics*, the Court should deny CBD's conclusory request for

3  vacatur or, at a minimum, withhold such relief until Rosemont's operations reach the

4  stage of causing adverse impacts to listed species in a manner inconsistent with any

5  rulings by the Court if FWS has not remedied any defects by that time.  Such a result

6  would be consistent with the ESA, which expressly allows project activities to move

7  forward during consultation, as long as those activities do not "foreclose[] the

8  formulation or implementation of any reasonable and prudent alternative measures"

9  under Section 7.  16 U.S.C. § 1536(d).

10                                              **CONCLUSION**

11             For the foregoing reasons, Federal Defendants respectfully requests the Court to

12  deny CBD's motion for summary judgment and grant Federal Defendants' cross-motion

13  for summary judgment.

14

15  Respectfully submitted this 12th day of October, 2018,

16

17                                    JEFFREY H. WOOD
                                      Acting Assistant Attorney General

18                                    U.S. Department of Justice
                                      Environment and Natural Resources Division

19

20                                    _____*/s/ Andrew A. Smith*_____
                                      ANDREW A. SMITH (NM Bar 8341)

21                                    Senior Trial Attorney
                                      Natural Resources Section

22                                    c/o United States Attorney's Office

23                                    201 Third Street, N.W., Suite 900
                                      P.O. Box 607

24                                    Albuquerque, New Mexico 87103

25                                    Phone: (505) 224-1468
                                      andrew.smith@usdoj.gov

26

27                                    LILA C. JONES (NM Bar 149098)
                                      Trial Attorney

28

                                              42

Natural Resources Section
PO Box 7611
Washington, DC 20044-7611
Phone: (202) 514-9859
lila.jones@usdoj.gov

NICOLE SMITH (CA Bar 303629)
Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20004-7611
Phone: (202) 305-0368
nicole.m.smith@usdoj.gov

*Attorneys for Federal Defendants*

43

1

## <u>CERTIFICATE OF SERVICE</u>

2

3        I hereby certify that on October 12, 2018, I filed the foregoing with the Court's

4   electronic filing system, which will serve all counsel by electronic means. I also certify

5   that the brief in support of Federal Defendants' cross-motion for summary judgment,

6   inclusive of footnotes and excluding the table of contents, table of authorities, note on

7   administrative record and signature block is less than the Court's limit of 14,000 words

8   for opening briefs (ECF No. 90).

9

10                                          */s/      Andrew A. Smith*
                                            ANDREW A. SMITH
11                                          U.S. Department of Justice

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28