1  JEFFREY H. WOOD
   Acting Assistant Attorney General
2  Environment & Natural Resources Division
3  U.S. Department of Justice
   ANDREW A. SMITH (NM Bar 8341)
4  Senior Trial Attorney
5  Natural Resources Section
   c/o United States Attorney's Office
6  201 Third Street, N.W., Suite 900
7  P.O. Box 607
   Albuquerque, New Mexico 87103
8  Phone: (505) 224-1468
9  andrew.smith@usdoj.gov
   LILA C. JONES (NM Bar 148098)
10 Trial Attorney
11 Natural Resources Section
   601 D Street, NW
12 Washington, D.C. 20004
13 Phone: (202) 514-9859 (Jones)
   lila.jones@usdoj.gov
14
15 *Attorneys for Federal Defendants*

16                IN THE UNITED STATES DISTRICT COURT
17                  FOR THE DISTRICT OF ARIZONA

18  _____ )   No. 4:17-cv-00475-TUC-JAS (Lead)
19                                    )   No. 4:17-cv-00576-TUC-JAS (C)
    Center for Biological Diversity,  )   No. 4:18-cv-00189-TUC-JAS (C)
20                                    )
         Plaintiff,                   )
21                                    )   **FEDERAL DEFENDANTS'**
    v.                                )   **MEMORANDUM IN SUPPORT OF**
22                                    )   **CROSS-MOTION FOR SUMMARY**
    U.S. Fish and Wildlife Service, *et al.*, )  **JUDGMENT AND IN OPPOSITION**
23                                    )   **TO PLAINTIFF SSSR'S MOTION**
         Federal Defendants,          )   **FOR SUMMARY JUDGMENT IN**
24                                    )   **No. 4:17-cv-00576-TUC-JAS**
    Rosemont Copper Co.,              )
25                                    )
         Intervenor-Defendant.        )
26                                    )
27  _____ )
28

1

<u>**TABLE OF CONTENTS**</u>

2

INTRODUCTION ............................................................................................................ 1

STANDARD OF REVIEW .............................................................................................. 2

ARGUMENT .................................................................................................................... 4

    I.     THE FOREST SERVICE PROPERLY EXERCISED ITS AUTHORITY
         UNDER MINING LAW AND THE FOREST SERVICE ORGANIC ACT
         ....................................................................................................................... 4

         A.     Laws Governing Mining Operations On National Forest
                 System Lands .................................................................................. 4

         B.     While The Forest Service May "Reasonably Regulate" Mining
                 Operations, Its Authority Is Not Unlimited ...................................... 7

         C.     A Validity Determination Is Not Required For The Forest
                 Service To Approve A Mining Plan Of Operations ........................ 10

         D.     The Forest Service May Approve Operations Related To
                 Mining On And Off Mining Claims ................................................ 13

    II.    THE FOREST SERVICE'S DECISION REGARDING WATER
         IMPACTS PROTECTS PUBLIC LANDS, FEDERAL WATER RIGHTS
         AND WILDLIFE ...................................................................................... 15

         A.     The Effect On Groundwater From Operations Under The Mine
                 Plan Of Operations Does Not Violate The Organic Act ................. 15

         B.     The ROD Does Not Affect Water Rights ....................................... 17

         C.     The Forest Service Complied With The ESA ................................ 19

    III.   THE FOREST SERVICE CONSIDERED MANY PIT LAKE
         MITIGATION MEASURES AND REASONABLY SELECTED A
         MONITORING PROGRAM ..................................................................... 22

    IV.   THE FOREST SERVICE COMPLIED WITH THE CWA AND
         ORGANIC ACT ........................................................................................ 24

         A.     The Clean Water Act ...................................................................... 24

i

B.    The Forest Service's Conclusion That the Project Complies With State Water Quality Standards Is Reasonable And Supported By The Record ................................................................. 25

V.    THE FOREST SERVICE PROPERLY APPROVED RIGHTS OF WAY 30

VI.    THE FOREST SERVICE COMPLIED WITH NEPA ............................. 31

A.    The FEIS Discusses Compliance With All Environmental Laws ....................................................................................... 32

B.    The Decision Discusses Mitigation Measures And Includes Supporting Analysis ........................................................... 33

1.    The FEIS Analyzes And Discusses Mitigation Measures For Potential Dewatering On BLM Lands ........................... 33

2.    The FEIS Analyzes Substantive Mitigation Measures For The Pit Lake ................................................................. 35

C.    The Forest Service Was Not Required To Obtain Additional Information About Smelting Locations Or Water Quality ............. 38

D.    The Forest Service Provided Opportunity For Public Comment On Transportation Routes ................................................ 41

CONCLUSION .................................................................................. 41

ii

1

2

# TABLE OF AUTHORITIES

3

**Cases**

*Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*,
  849 F.3d 1262 (9th Cir. 2017) ......................................................................... 16

*All. for the Wild Rockies v. Brazell*,
  3:12-cv-466-MHW, 2013 WL 6200199 (D. Idaho Nov. 27, 2013) ....................... 38, 39

*Arkansas v. Oklahoma*,
  503 U.S. 91 (1992)........................................................................................ 25, 26

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council*,
  462 U.S. 87 (1983)............................................................................................. 2

*Best v. Humboldt Placer Min. Co.*,
  371 U.S. 334 (1963)........................................................................................... 5

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)........................................................................................... 3

*Cal. Coastal Com'n v. Granite Rock Co.*,
  480 U.S. 572 (1987)........................................................................................... 9

*Cameron v. United States*,
  252 U.S. 450 (1920)........................................................................................... 6

*Cappaert v. United States*,
  426 U.S. 128 (1976)......................................................................................... 17

*Center for Biological Diversity v. Vilsack*,
  276 F. Supp. 3d 1015 (D. Nev. 2017)................................................................. 21

*Chrisman v. Miller*,
  197 U.S. 313 (1905)........................................................................................... 5

*Clouser v. Espy*,
  42 F.3d 1522 (9th Cir. 1994) ............................................................................ 12

*Collord v. U.S. Dep't of the Interior*,
  154 F.3d 933 (9th Cir. 1998) .............................................................................. 6

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  623 F.3d 633 (9th Cir. 2010) ............................................................................ 40

*Def. of Wildlife v. U.S. Fish & Wildlife* Serv.,
  797 F. Supp. 2d 949 (D. Ariz. 2011) ................................................................. 19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

*Exxon Mobil Corp. v. EPA*,
   217 F.3d 1246 (9th Cir. 2000) .......................................................................... 29, 31

*Forest Guardians v. Dombeck*,
   131 F.3d 1309 (9th Cir. 1997) ................................................................................ 10

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) ......................................................................... 13, 15

*Freeman v. U.S. Dep't of the Interior*,
   83 F. Supp. 3d 173 (D.D.C. 2015) ............................................................................ 6

*Friends of Endangered Species, Inc. v. Jantzen*,
   760 F.2d 976 (9th Cir. 1985) .................................................................................... 4

*Friends of the Earth v. Hintz*,
   800 F.2d 822 (9th Cir. 1986) .................................................................................... 3

*Fund for Animals, Inc. v. Rice*,
   85 F.3d 535 (11th Cir. 1996) .................................................................................... 2

*Grand Canyon Tr. v. Williams*,
   98 F. Supp. 3d 1044 (D. Ariz. 2015) ...................................................................... 11

*Great Basin Mine Watch v. Hankins*,
   456 F.3d 955 (9th Cir. 2006) ............................................................................ 26, 27

*Great Basin Res. Watch & W. Shoshone Def. Project*,
   182 Interior 55 (IBLA 2012) ................................................................................... 12

*Great Basin Res. Watch v. Bureau of Land Mgmt*,
   844 F.3d 1095 (9th Cir. 2016) ..................................................................... 32, 38, 41

*Havasupai Tribe v. Provencio*,
   876 F.3d 1242 (9th Cir. 2017) ................................................................................. 11

*High Country Citizens' Alliance v. Norton*,
   448 F. Supp. 2d 1235 (D. Colo. 2006) .............................................................. 18, 19

*In re General Adjudication of All Rights to Use Water in Gila River Sys. & Source (Gila River)*,
   35 P.3d 68 (Ariz. 2001) .................................................................................... 17, 18

*Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts v. United States*,
   832 F.2d 1127 (9th Cir. 1987) ................................................................................. 18

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) .................................................................................................. 4

iv

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ........................................................ 2, 3, 4, 32

*Landwatch v. Connaughton*,
    905 F. Supp. 2d 1192 (D. Or. 2012) ............................................................ 39

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) .......................................................................................... 3, 4

*McMaster v. United States*,
    731 F.3d 881 (9th Cir. 2013) ........................................................................ 12

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) ................................................................. 40, 41

*Morongo Band of Mission Indians v. FAA*,
    161 F.3d 569 (9th Cir. 1998) ........................................................................... 3

*Nat'l Wildlife Fed'n v. Burford*,
    871 F.2d 849 (9th Cir. 1989) ........................................................................... 3

*National Mining Association v. Zinke*,
    877 F.3d 845 (9th Cir. 2017) ........................................................................... 9

*Nw. Envtl. Advocates v. E.P.A.*,
    268 F. Supp. 2d 1255 (D. Or. 2003) ......................................................... 22

*Okanogan Highlands Alliance v. Williams*,
    236 F.3d 468 (9th Cir. 2000) ........................................................................... 8

*Protect Our Water v. Flowers*,
    377 F. Supp. 2d 844 (E.D. Cal. 2004) .................................................... 21

*Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*,
    898 F.2d 1410 (9th Cir. 1990) ............................................................... 19, 22

*Robert N. Shanahan et al.*,
    120 Interior 187 (IBLA 1991) .................................................................... 31

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ............................................................................ 32, 33, 34

*Rock Creek Alliance v. U.S. Forest Serv.*,
    703 F. Supp. 2d 1152 (D. Mont. 2010) .............................................. 24, 26

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*,
    449 F.3d 1016 (9th Cir. 2006) ............................................................... 36, 38

*Save Our Cabinets v. U.S. Department of Agriculture*,
    254 F. Supp. 3d 1241 (D. Mont. 2017) ....................................... 27, 36, 37

v

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) .................................................................. 12

*South Fork Ban Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*,
   588 F.3d 718 (9th Cir. 2009) ...................................................... 40

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
   143 F.3d 515 (9th Cir. 1998) ........................................................ 3

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
   671 F.3d 1113 (9th Cir. 2012) ................................................... 3, 4

*Union Oil Co. v. Smith*,
   249 U.S. 337 (1917) .................................................................. 12

*United States v. Curtis-Nevada Mines, Inc.*,
   611 F.2d 1277 (9th Cir. 1980) ...................................................... 6

*United States v. Locke*,
   471 U.S. 84 (1985) ...................................................................... 5

*United States v. New Mexico*,
   438 U.S. 696 (1978) .......................................................... 7, 15, 16

*United States v. Shumway*,
   199 F.3d 1093 (9th Cir. 1999) ...................................................... 7

*United States v. Weiss*,
   642 F.2d 296 (9th Cir. 1981) ........................................................ 7

*Vane Minerals (US), LLC v. United States*,
   116 Fed. Cl. 48 (2014) ................................................................ 5

*Vt. Yankee Nuclear Power Corp., v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978) .................................................................... 3

*W. Shoshone Def. Project*,
   160 Interior 32 (IBLA 2003) ........................................................ 6

*Washington Toxics Coal. v. EPA*,
   No. C01-132C, 2002 WL 34213031 (W.D. Wash. July 2, 2002) ................ 22

**Statutes**

5 U.S.C. §§ 701–706 .......................................................................... 2

5 U.S.C. § 706 ................................................................................ 43

5 U.S.C. §706(2)(A) ........................................................................... 2

16 U.S.C. § 1536(a)(1) ............................................................................. 2, 19

16 U.S.C. § 1604(a) ........................................................................................... 9

16 U.S.C. § 1604(i) ............................................................................................ 9

16 U.S.C. § 475 ............................................................................................... 15

16 U.S.C. § 478 ...................................................................................... 5, 7, 16

16 U.S.C. § 481 ............................................................................................... 16

16 U.S.C. § 551 .......................................................................................... 5, 7

30 U.S.C. § 22 ..................................................................................... 2, 5, 13

30 U.S.C. § 26 ................................................................................................... 5

30 U.S.C. § 28 ................................................................................................... 5

30 U.S.C. § 612 ................................................................................................. 6

30 U.S.C. § 612(a) ............................................................................................ 6

30 U.S.C. § 612(b) ................................................................................ 7, 9, 10

33 U.S.C. § 1251(a) ........................................................................................ 25

33 U.S.C. § 1311(a) ........................................................................................ 25

33 U.S.C. § 1313 ............................................................................................ 25

33 U.S.C. § 1323 ............................................................................................ 25

33 U.S.C. § 1323(a) ........................................................................................ 26

33 U.S.C. § 1341 ............................................................................................ 26

33 U.S.C. § 1341(a)(1) .................................................................................. 25

33 U.S.C. § 1342 ............................................................................................ 26

33 U.S.C. § 1342(a)(5) .................................................................................. 25

33. U.S.C. § 1342 ........................................................................................... 25

33. U.S.C. § 1342(b) ...................................................................................... 25

42 U.S.C. § 4321 ....................................................................................... 1, 32

43 U.S.C. § 1701 ............................................................................................ 30

43 U.S.C. § 1732(b) ....................................................................................... 30

43 U.S.C. § 1761 ...................................................................................... 2, 31

vii

43 U.S.C. § 2 ........................................................................................... 6

Ariz. Rev. Stat. § 45-141(A) ................................................................. 17

Ariz. Rev. Stat. § 45-141(B) ................................................................. 17

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................... 1

LRCiv 56.1 .............................................................................................. 1

**Regulations**

36 C.F.R. § 228 ....................................... 5, 7, 10, 13, 14, 16, 17, 24, 30, 31

36 C.F.R. § 228.1 ..................................................................... 10, 11, 16

36 C.F.R. §§ 228.1-228.15 ................................................................... 11

36 C.F.R. § 228.2 ................................................................................. 13

36 C.F.R. § 228.3(a) ............................................................ 11, 13, 14, 31

36 C.F.R. § 228.5 ................................................................................. 11

36 C.F.R. § 228.8 ............................................................................ 5, 23

36 C.F.R. § 228.8(b) ....................................................................... 16, 26

36 C.F.R. §§ 228.4 ........................................................................... 5, 13

36 C.F.R. § 251 ................................................................................... 30

36 C.F.R. § 251.50(a) ..................................................................... 11, 31

40 C.F.R. § 131.12 ............................................................................... 29

40 C.F.R. § 1502.1 ............................................................................... 32

40 C.F.R. § 1502.14(f) ......................................................................... 33

40 C.F.R. § 1502.9(c)(1)(i) .................................................................. 41

40 C.F.R. § 1503.4 ............................................................................... 41

43 C.F.R. § 3809.100 ............................................................................. 6

43 C.F.R. § 3809.5 ............................................................................... 14

43 C.F.R. § 3809.5(5) ........................................................................... 31

43 C.F.R. § 3862.1-1(a) ......................................................................... 6

**Other Authorities**

viii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EPA NPDES State Program Information,
    https://www.epa.gov/npdes/npdes-state-program-information ................................... 25

Revised Forest Plan,
    https://www.fs.usda.gov/detail/coronado/landmanagement/planning/?cid=fswdev7_018
    702. ...................................................................................................................... 21

ix

1

## <u>TABLE OF ACRONYMS</u>

2

APA          Administrative Procedure Act

3

ADEQ         Arizona Department of Environmental Quality

4

AGFD         Arizona Game and Fish Department

5

BiOp         Biological Opinion

6

CWA          Clean Water Act

7

DEIS         Draft Environmental Impact Statement

8

EIS          Environmental Impact Statement

9

EPA          Environmental Protection Agency

10

ESA          Endangered Species Act

11

FEIS         Final Environmental Impact Statement

12

FLPMA        Federal Land Policy and Management Act

13

FWS          U.S. Fish and Wildlife Service

14

IBLA         Interior Board of Land Appeals

15

LCNCA        Las Cienegas National Conservation Area Act

16

MPO          Mining Plan of Operations

17

NEPA         National Environmental Policy Act

18

NFMA         National Forest Management Act

19

NPDES        National Pollution Discharge Elimination System

20

ROD          Record of Decision

21

SRHA         Stock Raising Homestead Act

22

SSSR         Plaintiff Save the Scenic Santa Ritas

23

USFS         United States Forest Service

24

25

26

27

28

x

## NOTE ON ADMINISTRATIVE RECORD CITATIONS

Federal Defendants have lodged multiple Administrative Records corresponding to the various agency actions challenged in these consolidated cases.  For this brief, documents cited from the Forest Service March 16, 2018 (Corrected) Administrative Record are in the form "FSxxxxxxx," where "FS" signifies the Forest Service Administrative Record and "xxxxxxx" is the unique seven-digit Bates page number in the lower right hand corner of each page.  The Forest Service Administrative Record includes a locator tool into which the seven-digit Bates page number can be entered to pull up the cited document.  For clarity, Federal Defendants have added "FEIS" before Bates number citations to pages from the Final Environmental Impact Statement.  Additional instructions for using the Forest Service Administrative Record are provided with that Record.

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure, Federal Defendants hereby move this Court for summary judgment on the claims by Plaintiffs Save the Scenic Santa Ritas, *et al.* (collectively "SSSR"), in No. 4:17-cv-00576-TUC-JAS, challenging the actions of the Forest Service relating to the Rosemont Copper Project in southern Arizona. Federal Defendants respectfully request that this Court grant summary judgment in their favor and deny SSSR's motion for summary judgment (ECF No. 100) on the following grounds: (1) the Forest Service properly exercised its authority under federal mining law, (2) the Forest Service's decision protects public lands, water rights, and wildlife, (3) the Forest Service's decision complies with the Clean Water Act and the Organic Act, and (4) the Forest Service's decision complies with the National Environmental Policy Act. This motion is supported by the following Memorandum of Points and Authorities and the Administrative Record lodged with the Court in this case.

## INTRODUCTION

On June 6, 2017, the Forest Supervisor for the Coronado National Forest, Kerwin S. Dewberry, issued a decision approving the Rosemont Copper Project ("Project") in southern Arizona. Record of Decision ("ROD"), FS0259715–825. This decision was the culmination of more than a decade of study, environmental assessment, and public participation resulting in a massive 2,400-page environmental impact statement ("EIS") reviewing the Project's potential environmental impacts. FS236639–243075 (Final EIS). As part of this process, the Forest Service engaged in far-reaching analyses under the National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321, and other federal law, ensuring that the Project will be implemented so as to minimize and mitigate impacts on the environment and National Forest System lands and resources.[1]

---

[1] More factual background and detail on the Project and the Forest Service's decision is presented in Federal Defendants' and Intervenor-Defendant's accompanying October 26,

1

SSSR challenges several aspects of the Forest Service's decision.  SSSR contends that the Forest Service violated the Mining Law of 1872, 30 U.S.C. § 22 *et seq*.; NEPA; the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(1); the Clean Water Act ("CWA"), 33 U.S.C. § 1323(a); 36 C.F.R. § 228.8(b); and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1761.  SSSR's August 24, 2018 "Memorandum in Support of Motion for Summary Judgment," ECF No. 101 ("SSSR Memo.").  Contrary to SSSR's assertions, the Forest Service's decision is reasonable, supported by the Administrative Record, and entitled to deference.  *See e.g., Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) ("[W]e are to conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'").

SSSR cannot demonstrate that the Forest Service's actions are arbitrary, capricious, or otherwise contrary to law.  The Court should deny SSSR's motion for summary judgment and grant summary judgment in favor of Federal Defendants on all claims.

## STANDARD OF REVIEW

SSSR's claims are subject to the judicial review standards of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.  Under the APA, the Forest Service's final decisions must be upheld unless they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).  The Court's task "is to determine whether the [agency] had considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted).

Judicial review under the APA is "exceedingly deferential."  *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996); *see McNair*, 537 F.3d at 992–94

---

2018 "Separate Statement of Facts in Support of Motion for Summary Judgment in No. 4:17-cv-00576-TUC-JAS."

(emphasizing the courts' limited role in reviewing agency actions under the APA). Under this standard, "[a]n agency will have acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency] made a clear error in judgment.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (quoting *McNair*, 537 F.3d at 994); *see also Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 573 (9th Cir. 1998) (considerable deference must be accorded to the manner in which the agency examines the environmental consequences of a project). "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974) (citation omitted); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986) ("The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.") (citations omitted).

The APA does not allow a court to overturn an agency action because it disagrees with the agency's decision or even with its conclusions about the scope, breadth, or effect of the environmental impacts of the project at issue. *Vt. Yankee Nuclear Power Corp., v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978). Thus, the reviewing court's task is simply "to insure a fully informed and well-considered decision, not necessarily a decision [the court] would have reached had [it] been [a] member[] of the decisionmaking unit of the agency." *Id*. at 558. "The [agency's] action . . . need be only a reasonable, not the best or most reasonable, decision." *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

Agencies are accorded particular deference with respect to scientific questions within their expertise. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). "Because analysis of the

3

relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" *Id.* at 377 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976)).   A court is not required to weigh conflicting expert opinions or to consider whether the agency employed the best scientific methods. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985).

> We are to be most deferential when the agency is making predictions, within its area of special expertise, at the frontiers of science[, and] we are to conduct a particularly deferential review of an agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.

*McNair*, 537 F.3d at 993 (quotation marks and citations omitted).   "We may not impose ourselves 'as a panel of scientists that instructs the [agency] . . . chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty.'" *Tri-Valley CAREs*, 671 F.3d at 1124 (quoting *McNair*, 537 F.3d at 988).

## ARGUMENT

## I.   THE FOREST SERVICE PROPERLY EXERCISED ITS AUTHORITY UNDER MINING LAW AND THE FOREST SERVICE ORGANIC ACT

SSSR argues that the Forest Service took an overly narrow view of its authority to regulate, mitigate, and restrict Rosemont's mining operations, leading to a flawed decision-making process and approval of "unmitigated and severe impacts to public resources."  SSSR Memo. at 10–21.  SSSR's argument misrepresents the Administrative Record and the law.

### A.   Laws Governing Mining Operations On National Forest System Lands

Under the provisions of its Organic Act, the Forest Service is under a dual mandate to protect National Forests while allowing mineral exploration and development under federal mining law:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests * * *; and he may make such rules and regulations and establish such service as will insure the objects of such reservations,

4

namely, to regulate their occupancy and use and to preserve the forests thereon from destruction.

16 U.S.C. § 551.

Nothing in section[] * * * 551 of this title shall be construed as prohibiting * * * * any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof.  Such persons must comply with the rules and regulations covering such national forests.

16 U.S.C. § 478.

Using its Section 551 authority, the Forest Service has promulgated regulations to minimize adverse effects of operations authorized by federal mining law.  Those regulations, found in 36 C.F.R. Part 228, Subpart A, prohibit any person from conducting mining operations that will likely cause significant disturbance of National Forest System surface resources without a plan of operations approved by the Forest Service.  36 C.F.R. §§ 228.4, 228.5.  Specific requirements for environmental protection are found in 36 C.F.R. § 228.8.

The Mining Law of 1872 authorizes citizens to stake or "locate" mining claims upon "discovery" of a valuable mineral deposit and compliance with all other applicable statutory and regulatory requirements.  30 U.S.C. § 22; *Chrisman v. Miller*, 197 U.S. 313, 320-21 (1905).  The Mining Law recognizes two types of property rights in mining claims:  unpatented and patented.  The United States retains fee title in the federal lands encumbered by mining claims, although "an individual may patent the claim, thereby purchasing from the Federal Government the land and minerals and obtaining ultimate title to them."  *United States v. Locke*, 471 U.S. 84, 86 (1985) (citing 30 U.S.C. § 29).  Until a patent issues, the mining claim is "[a]n unpatented mining claim [which] vests in a claimant upon the discovery of a valuable mineral deposit and compliance with applicable regulations."  *Vane Minerals (US), LLC v. United States*, 116 Fed. Cl. 48, 56 (2014) (citing *Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 336 (1963)); *see also Locke*, 471 U.S. at 86 (citing 30 U.S.C. §§ 26, 28) (noting that discovery of a mineral

5

deposit on an unpatented mining claim, "followed by the minimal procedures required to formally 'locate' the deposit, gives an individual the right of exclusive possession of the land for mining purposes," and the individual "may continue to extract and sell minerals from the claim" which constitutes a "fully recognized possessory interest").

The Department of the Interior determines the validity of mining claims, even for mining claims on National Forest System lands. *Cameron v. United States*, 252 U.S. 450, 460 (1920); 43 U.S.C. § 2. There are few circumstances in which Interior *must* determine validity, *W. Shoshone Def. Project*, 160 IBLA 32, 56-57 (Aug. 21, 2003), including when a mining claimant is seeking to obtain a property right from the United States by patent, 43 C.F.R. § 3862.1-1(a); has proposed operations on withdrawn lands, *id.* § 3809.100; or has alleged a "taking" under the Fifth Amendment. *Freeman v. U.S. Dep't of the Interior*, 83 F. Supp. 3d 173, 179 (D.D.C. 2015). If Interior determines that a mining claim does not meet the Mining Law's validity requirements, the United States can seek to invalidate the claim in an administrative proceeding called a "contest." *Id.* at 180. Unless and until a contest is resolved in favor of the government (including any appeals), the contested mining claim cannot be declared invalid. *Collord v. U.S. Dep't of the Interior*, 154 F.3d 933, 937 (9th Cir. 1998).

In 1955, Congress passed the Surface Resources and Multiple Use Act ("Multiple Use Act"), 30 U.S.C. § 612, governing the use of lands containing unpatented mining claims. "Congress did not intend to change the basic principles of the mining laws when it enacted the Multiple Use Act," but intended the Act as "corrective legislation, which attempted to clarify the law and alleviate abuses that had occurred under the mining laws." *United States v. Curtis-Nevada Mines, Inc.*, 611 F.2d 1277, 1280 (9th Cir. 1980) (citation omitted). The Multiple Use Act amended the Mining Law's grant of exclusive possession of lands subject to mining claims to ensure that mining-claim holders do not use their claims to exclude others from accessing federal lands, and in part to prohibit the use of any unpatented mining claim located after its enactment "for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto."

6

30 U.S.C. § 612(a).  At the same time, Congress ensured the scales did not tip too far toward non-mining uses by prohibiting the United States from engaging in or authorizing uses that "endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto."  30 U.S.C. § 612(b).

**B.      While The Forest Service May "Reasonably Regulate" Mining Operations, Its Authority Is Not Unlimited**

The Forest Service may and does regulate the disturbance of National Forest System surface resources resulting from operations conducted under the United States' mining laws.  *See* 36 C.F.R. Part 228, Subpart A; *United States v. Weiss*, 642 F.2d 296, 297-99 (9th Cir. 1981).  Nonetheless, under the Mining Law and Multiple Use Act, the Forest Service's authority to regulate mining claims or to approve uses that may conflict with mining claims is not without limitation.

While Forest Service is charged with protecting National Forests from "destruction" and "depredations," 16 U.S.C. § 551, National Forests "are not parks set aside for nonuse, but have been established for economic reasons."  *United States v. New Mexico*, 438 U.S. 696, 708 (1978) (citation omitted).  Nowhere is this more true than in the case of mining, for which Congress expressly restricted the Forest Service from applying 16 U.S.C. § 551 in a way that effectively "prohibit" entry on National Forests for lawful "prospecting, locating, and developing the mineral resources thereof."  16 U.S.C. § 478.  Thus, under this legal regime, "the Forest Service may regulate use of National Forest lands by holders of unpatented mining claims, . . . but only to the extent that the regulations are 'reasonable' and do not impermissibly encroach on legitimate uses incident to mining and mill site claims."  *United States v. Shumway*, 199 F.3d 1093, 1106–07 (9th Cir. 1999).  While "the Secretary may adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment of placer claims for mining purposes," nonetheless "prospecting, locating, and developing of mineral resources in the national forests may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition."  *Weiss*, 642 F.2d at 299.  The

7

1   Ninth Circuit, moreover, has flatly rejected SSSR's position, holding that the Organic Act

2   "does not support Plaintiffs' assertion that, when the Forest Service is forced to choose

3   between project alternatives, environmental interests always trump mining interests."

4   *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 478 (9th Cir. 2000).

5           In accordance with these standards, the Forest Service did not "take[] the position

6   that it *had no choice* but to authorize all of these severe impacts" as SSSR asserts.  *See*

7   SSSR Memo. at 10.  On the contrary, the Forest Service correctly determined, based on

8   applicable law, that it could reasonably regulate Rosemont's proposed mining operations

9   to minimize adverse impacts to National Forest System lands and surface resources to the

10  extent required to meet the agency's regulatory standards.  For instance, in the FEIS the

11  Forest Service explained that in making its decision on Rosemont's proposal the agency

12  "will consider the beneficial and adverse impacts of each alternative in determining

13  reasonable measures to impose on the [mining plan] for the protection of Coronado

14  National Forest resources."  FEIS at 10, FS0236722; *see also id.* ("The Forest Service

15  can reasonably regulate mining activities to protect surface resources, but . . . cannot

16  categorically prohibit mining or deny reasonable and legal mineral operations under the

17  law.").

18          Not only are these statements of the Forest Service's "decision space" consistent

19  with the law discussed above, but the agency put these standards into practice.  Contrary

20  to SSSR's contentions, a central aspect of the NEPA decision-making process was to

21  develop alternatives to Rosemont's proposal that would minimize impacts to resources on

22  National Forest System lands.  *See, e.g.*, FEIS at 27, FS0236739 (stating that the

23  alternatives were developed to address resources impacts and to resolve "environmental

24  conflicts" identified during the NEPA review process).  Indeed, the Forest Service

25  ultimately approved the alternative offering the most protections for the environment and

26  the National Forest.  *See, e.g.*, ROD at 13, FS0259739 (stating that the Forest Service

27  chose the Barrel Alternative because it "incorporates a wide array of mitigation and

28  conservation measures that will minimize or avoid impacts on [National Forest System]

8

1  lands to the extent practicable," and includes "a comprehensive monitoring program" to

2  ensure these protections are being met "with the least amount of adverse impacts"); FEIS

3  at 70-80, FS0236790-92 (identifying Barrel Alternative as the "Preferred Alternative"

4  because it was "developed to respond to significant issues regarding potential impacts on

5  biological resources, cultural resources, and the surface water component of water

6  resources").

7      The Forest Service also appropriately considered the Multiple Use Act provision

8  allowing the agency to authorize other land uses on active mining claims that do not

9  "endanger or materially interfere with prospecting, mining, or processing operations or

10  uses reasonably incident thereto." 30 U.S.C. § 612(b).  On National Forest System lands,

11  these "other land uses" are governed by the National Forest Management Act ("NFMA")

12  which requires Forest Service land use authorizations to be consistent with "Forest Plans"

13  or "land and resource management plans."  16 U.S.C. §§ 1604(a), (i).  As the Supreme

14  Court explained in another Forest Service mining case, NFMA's establishment of Forest

15  Plans indicates Congress' "understanding of land use planning and environmental

16  regulation as distinct activities."  *Cal. Coastal Com'n v. Granite Rock Co.*, 480 U.S. 572,

17  585, 587 (1987).[2]  Indeed, as the Ninth Circuit stated in *National Mining Association v.*

18  *Zinke*, "[m]inerals are not renewable resources and are not directly within the Forest

19  Service's purview" under NFMA.  877 F.3d 845, 877 (9th Cir. 2017).

20      The Forest Service found that Rosemont's mining proposal, even as modified

21  under the selected Barrel Alternative, would be inconsistent with standards and

22  guidelines for land uses set forth in the Forest Plan.  ROD at 31, FS025957.  Under

23  NFMA, when a proposed action is inconsistent with the land use standards and guidelines

24  _____

25  [2] Consistent with this distinction, and in contrast to the land use planning regulation set
    forth in the Forest Plans, "[t]he stated purpose of part 228, subpart A of the Forest
26  Service regulations, is to 'set forth rules and procedures' through which mining on
27  unpatented claims in national forests 'shall be conducted so as to minimize adverse
    *environmental impacts* on National Forest System surface resources.'"  480 U.S. at 587-
28  88 (quoting 36 C.F.R. § 228.1) (emphasis added).

in a Forest Plan, the Forest Service has discretion "to amend existing [Forest Plans] 'in any manner whatsoever.'"  *Forest Guardians v. Dombeck*, 131 F.3d 1309, 1312 (9th Cir. 1997) (quoting 16 U.S.C. § 1604(f)(4)).  The Forest Supervisor's goal of achieving consistency thus satisfies NFMA requirements.  Moreover, in light of the Multiple Use Act's recognition that other Forest Service authorized land uses shall not "endanger or materially interfere" with mining operations and "uses reasonably incident thereto," 30 U.S.C. § 612(b), the Forest Supervisor rationally decided in his discretion to amend the Forest Plan to reflect Rosemont's mining operations and ensure future "other uses" would be consistent with both the Forest Plan and the Forest Service's obligations under the Multiple Use Act.  Notably, SSSR does not bring any claim that the Forest Service violated NFMA in amending or choosing to amend the Forest Plan.

### C.    A Validity Determination Is Not Required For The Forest Service To Approve A Mining Plan Of Operations

SSSR's argues at length that the Forest Service's decision was flawed by the agency's alleged assumption that Rosemont's mining claims were valid.  SSSR Memo. at 11-15.  SSSR's argument depends entirely on two erroneous premises:  first, that the Forest Service regulates mining under the Mining Law differently on mining claims that have been determined to be valid than on mining claims of unknown validity; and second, that the Forest Service's regulations at 36 C.F.R. Part 228 Subpart A apply only to valid mining claims.  Neither finding is supported by the applicable regulations.  The only question at issue here is whether the Forest Service's approval of Rosemont's mine plan is consistent with the applicable regulations and NEPA.  As shown below, SSSR's validity argument is a red herring, and contrary to the law and regulations.

The purpose of the Forest Service's regulations is "to set forth rules and procedures through which use of the surface of National Forest System lands in connection with operations authorized by the United States mining laws[.]"  36 C.F.R. § 228.1.  The regulations define "operations" as "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral

10

1    resources and all uses reasonably incident thereto, including roads and other means of

2    access on lands subject to the regulations in this part, regardless of whether said

3    operations take place on or off mining claims." *Id.* § 228.3(a).

4         The Forest Service's regulations governing approval of mining plans of operations

5    do not contain different environmental or mitigation requirements for lands subject to

6    valid mining claims. *See id.* § 228.5. Put differently, proposed mining operations on

7    valid mining claims must still comply with the requirement in the Part 228 Subpart A

8    regulations "to minimize adverse impacts" before the Forest Service can grant approval.

9    *See id.* § 228.1. The Forest Service's regulations do not provide any authority to waive

10   or reduce mitigation requirements on valid mining claims. Thus, even if were true that

11   the Forest Service assumed that Rosemont's mining claims were valid, which it did not,[3]

12   SSSR has failed to show that the Forest Service's approval of Rosemont's plan of

13   operations, including the required mitigation, fails to meet the regulatory standards.

14        To the extent that SSSR is arguing that the Forest Service's decision was flawed

15   because only operations on valid mining claims are subject to the Part 228 Subpart A

16   regulations—while all other mining operations are governed instead by the agency's

17   "special uses" regulations at Part 251—this argument also has no basis in law. First, the

18   Part 228 Subpart A regulations contain no such requirement, but rather apply to all

19   "reasonably incident" operations involving "locatable" minerals. *See* 36 C.F.R.

20   §§ 228.1–228.15. Conversely, the Part 251 regulations expressly state that "special uses"

21   covered by those regulations do *not* include uses "authorized by the regulations

22   governing . . . minerals (part 228)." *Id.* § 251.50(a). In addition, the Supreme Court has

23   made clear that the Mining Law gives citizens permission to enter federal lands to

24   _____

25   [3] The Forest Service may contest validity, but Interior makes final determinations

26   regarding the validity of mining claims on federal lands. *Grand Canyon Tr. v. Williams*,
     98 F. Supp. 3d 1044, 1052 (D. Ariz. 2015) ("The Forest Service does not have

27   responsibility for determining the validity of mining claims on federal lands."), *aff'd sub
     nom. Havasupai Tribe v. Provencio*, 876 F.3d 1242 (9th Cir. 2017). SSSR has presented

28   no cognizable basis for the Forest Service to initiate a contest here.

11

1   explore for and develop minerals, including while working to establish a valid mining

2   claim.  *Union Oil Co. v. Smith*, 249 U.S. 337, 346 (1917).  SSSR's position that Part 228

3   Subpart A does not apply to Rosemont's mining operations until verification of mining

4   claim validity is contrary to the law and the Forest Service's regulations.

5        Moreover, nothing in the Mining Law or the Forest Service's regulations requires

6   a completed validity determination before the Forest Service may approve a mining plan

7   of operations.  *See, e.g.*, *Clouser v. Espy*, 42 F.3d 1522, 1535-36 (9th Cir. 1994)

8   (upholding Forest Service's approval of plan of operations while validity proceedings

9   were pending); *Great Basin Res. Watch & W. Shoshone Def. Project*, 182 IBLA 55, 67-

10  68 (Feb. 7, 2012) (rejecting argument that BLM must determine validity of claim before

11  approving a plan of operations); *W. Shoshone Def. Project*, 160 IBLA at 55-58 (same).

12  The Interior Department's Solicitor issued a 2005 Opinion examining this issue in detail

13  and found nothing in federal mining law requiring a validity determination prior to

14  approval of a mining plan of operations on lands open to location under the Mining Law.

15  *See* Solicitor's Opinion, M-37012, Legal Requirements for Determining Mining Claim

16  Validity Before Approving a Mining Plan of Operations, 2005 WL 7139266, at *1-2

17  (Nov. 14, 2005); *see also id.* at *2 ("Decisions of [Interior] and the U.S. Forest Service

18  recognize that no law requires that [Interior] determine mining claim or mill site validity

19  before approving a plan of operations on lands open to entry under the Mining Law.")

20  (citations omitted).[4]

21        Forest Service regulations required Rosemont to submit a proposed mining plan of

22  operations to develop its unpatented mining claims, which it did, and the Forest Service

23  properly evaluated that plan under applicable law, including NEPA and the Part 228,

24  Subpart A regulations.  SSSR's assertion that the Forest Service was required to

25  ────────────────

26  [4] Solicitor Opinions on mining claims are entitled to deference.  *See McMaster v. United*

27  *States*, 731 F.3d 881, 896 (9th Cir. 2013) (holding a Solicitor Opinion's interpretation of

28  "valid existing rights" for mining claims in Wilderness Areas was entitled to deference
    under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

1  determine whether Rosemont's mining claims were based on a "valid" discovery of

2  valuable mineral deposit is without merit.

3        **D.**      **The Forest Service May Approve Operations Related To Mining On**
                 **And Off Mining Claims**

4

5        SSSR also argues that the Forest Service erred in approving the use National

6  Forest System lands for waste and tailings operations for Rosemont's mine without

7  determining whether Rosemont's unpatented mining claims on those lands "contain

8  valuable locatable minerals."  SSSR Memo. at 19–21.  This argument misconstrues the

9  Forest Service's decision, which is consistent with federal mining law and agency

10  regulations.

11        The Part 228, Subpart A mining regulations apply to "operations . . . conducted

12  under the United States mining laws of May 10, 1872, as amended (30 U.S.C. § 22 *et*

13  *seq.*)."  36 C.F.R. § 228.2.  Under these regulations, any mining operations which "will

14  likely cause a significant disturbance of surface resources" are regulated through a plan

15  of operations delineating both the operations to be conducted and the "measures to be

16  taken to meet the requirements for environmental protection in § 228.8."  *Id.* § 228.4.

17        Importantly, the regulations define "operations" as "[a]ll functions, work, and

18  activities in connection with prospecting, exploration, development, mining or processing

19  of mineral resources and all uses reasonably incident thereto, . . . *regardless of whether*

20  *said operations take place on or off mining claims*."  *Id.* § 228.3(a)  (emphasis added).

21  There is no dispute that "operations" as defined in the Forest Service mining regulations

22  includes waste rock and tailings operations.  As the Forest Service explained in

23  responding to SSSR's objections during the decision-making process, "[t]he placement of

24  waste rock and mill tailings on the Forest are considered to be activities connected to

25  mining and mineral processing as per 36 CFR 228 subpart A, and as such they are

26  authorized activities regardless of whether they are on or off mining claims."

27  FS0033193.

28

1    The Forest Service's interpretation is entitled to controlling deference.  *See Forest*

2    *Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1097 (9th Cir. 2003) ("[J]udicial review

3    of an agency's interpretation of its own regulations is limited to ensuring that the

4    agency's interpretation is not plainly erroneous or inconsistent with the regulation.").

5    The Forest Service's determination that the placement of waste rock and mine tailings

6    operations are ancillary uses to the mining of the ore body on Rosemont's mining claims,

7    and that these ancillary uses may occur on lands adjacent to those claims, is plainly

8    consistent with 36 C.F.R. § 228.3(a).  "The Forest Service interpretation in its regulations

9    implements a longstanding policy of the Forest Service to efficiently administer locatable

10   mineral operations including their ancillary uses whether or not they are on mining

11   claims."  FS0033194.

12       The Forest Service's approach to allowing ancillary uses outside claims supporting

13   actual mine development is consistent with BLM's approach as well.  As with the Forest

14   Service's mining regulations, BLM's regulations define "operations" means "all

15   functions, work, facilities, and activities on public lands in connection with prospecting,

16   exploration, discovery and assessment work, development, extraction, and processing of

17   mineral deposits locatable under the mining laws" as well as "all other reasonably

18   incident uses, *whether on a mining claim or not*."  43 C.F.R. § 3809.5 (emphasis added).

19   Because nothing in the Mining Law or the Multiple Use Act confines ancillary uses or

20   reasonably incident uses to the actual surface above the mining claim being developed,

21   the Forest Service reasonably concluded that "[t]he application of 36 CFR Part 228 to the

22   authorization of all reasonably incidental and ancillary uses of Forest Service lands,

23   whether on or off mining claims, is consistent with applicable law."  FS0033194.

24       SSSR's argument that the areas identified for locating the waste rock and tailings

25   operations must also contain mining claims for "valuable locatable minerals" to be

26   governed by "the Mining Law," SSSR Memo. at 19, is contrary to the Forest Service's

27   (and BLM's) regulations.  For the reasons stated above, the Forest Service reasonably

28   considered and approved Rosemont's proposal to conduct these ancillary uses on federal

14

1    lands adjacent to the mining claims for development of Rosemont's ore body, regardless
2    of whether these adjacent lands supported additional mining claims. SSSR's mining law
3    authority claims are without merit, and must be rejected.

4    **II.    THE FOREST SERVICE'S DECISION REGARDING WATER IMPACTS**
         **PROTECTS PUBLIC LANDS, FEDERAL WATER RIGHTS AND**
5        **WILDLIFE**

6            SSSR argues that the Forest Service failed to analyze or prevent dewatering to
7    Cienega Creek, Empire Gulch, and BLM's springs in the area, SSSR Memo. at 21–22,
8    and that it improperly limited its own authority with regard to impacts on BLM lands. *Id.*
9    As discussed in Sections II.A, II.B, and VIB.1 below, the Forest Service analyzed
10   predicted dewatering, discussed mitigation measures, and partnered with BLM in
11   evaluating potential mitigation measures.

12           **A.    The Effect On Groundwater From Operations Under The Mine Plan**
                     **Of Operations Does Not Violate The Organic Act**
13

14           SSSR argues that the Forest Service's approval of the ROD for Rosemont's
15   Project violates the Organic Act by not "securing favorable water flows." SSSR Memo.
16   at 22–25. This argument fails because it misapplies the Organic Act and ignores the
17   Forest Service's mining regulations.

18           As an initial matter, the Organic Act provides that "[n]o national forest *shall be*
19   *established*, except to improve and protect the forest . . . , or for the purpose of securing
20   favorable water flows, and to furnish a continuous supply of timber for the use and
21   necessities of citizens of the United States." 16 U.S.C. § 475 (emphasis added). As the
22   plain text of the statute reflects, it identifies the purposes for *establishing* National
23   Forests. SSSR does not challenge the establishment of the Coronado National Forest,
24   and this claim under the Organic Act fails on its face.

25           *New Mexico v. United States*, 438 U.S. 696 (1979), does not support a different
26   conclusion. Recognizing the limited purposes of the Organic Act, the Supreme Court in
27   *New Mexico* held the United States had not reserved water rights for instream flow *in*
28   *establishing* the Gila National Forest. *Id.* at 705-09 (1979); *cf. Agua Caliente Band of*

15

*Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1268-72 (9th Cir. 2017) (examining purposes for establishing tribal reservation to determine reserved rights to groundwater).  But the case does not suggest that the use of groundwater for mining purposes can somehow violate the Organic Act.

To the contrary, in addition to identifying the purposes for reserving National Forest System lands, the Organic Act states that it does not "prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof."  16 U.S.C. § 478. The Organic Act further provides that "[a]ll waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated or under the laws of the United States and the rules and regulations established thereunder."  *Id.* § 481.  As such, far from proscribing or limiting the use of groundwater on National Forest System lands for mining operations, the Organic Act expressly provides for such use.

The Organic Act further directs the Forest Service to "make such rules and regulations" as necessary to regulate the "occupancy and use" of the forests, and requires any mining entrants to comply with those rules and regulations.  16 U.S.C. §§ 478, 551. As discussed above, mining operations for locatable minerals on National Forest System lands are governed by 36 C.F.R. Part 228, Subpart A.  *See supra* Argument I.  These regulations provide that such operations "shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources."  36 C.F.R. § 228.1. Under those regulations, operators must, among other things, adhere to federal and state water quality standards and "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations."  36 C.F.R. § 228.8(b), (e).  Any Organic Act challenge to the effect of operations on groundwater therefore must arise from these implementing regulations.  And, for the reasons stated in section IV below, the Forest Service satisfied those requirements.  SSSR's claim under 36 C.F.R. Part 228 fails.

**B.      The ROD Does Not Affect Water Rights**

In Arizona, surface water rights are typically acquired "subject to the doctrine of prior appropriation" in which "[a]n appropriator acquires a legal right to water by putting it to a beneficial use." *In re General Adjudication of All Rights to Use Water in Gila River Sys. & Source ("Gila River")*, 35 P.3d 68, 71 (Ariz. 2001) (en banc) (citing Ariz. Rev. Stat. § 45-141(A), (B)). The person first appropriating the water has the better right to the water than later beneficial users. *Id.* "This chronological staging becomes important in times of shortage because preference is given according to the appropriation date, allowing senior holders to take their entire allotments of water before junior appropriators receive any at all." *Id.* The Arizona Department of Water Resources is responsible for administering water rights under State law. The federal government can acquire water rights under state law in the same manner as any other appropriator.

"Federal reserved water rights are different from those acquired under state law." *Id.* When Congress withdraws land from the public domain and reserves it for a federal purpose, it also impliedly "reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976). That reserved right "vests on the date of the reservation and is superior to the rights of future appropriators." *Id.*

Most water sources in Arizona are over-appropriated and adjudication of the priority and scope of "conflicting rights is being handled by the Superior Court under the Arizona General Stream Adjudication." FEIS at 407, FS0237149. The Forest Service has eleven surface water rights within the project area. FEIS at 420, FS0237162 (Table 86 summarizing onsite surface water rights associated with the project area). In addition, outside of the project area but within the area of groundwater drawdown associated with mining operations, the Forest Service has eighty surface water rights and BLM has twenty-one. FEIS at 421, FS0237163 (Table 87 summarizing offsite surface water rights within the area of groundwater drawdown). Those rights have yet to be adjudicated in the Gila River general stream adjudication. FEIS at 407, FS0237149.

17

1    SSSR maintains that approval of the Mine Plan of Operations ("MPO") was

2    contrary to law because it failed to protect surface water rights held by the BLM and

3    Forest Service by allowing groundwater depletions that may affect future surface water

4    flows.  SSSR Memo. at 25–28.[5]  But this argument conflates water *rights* with water

5    supply.  Nothing approved by the ROD affects the Forest Service's or BLM's surface

6    water *rights*.  As such, the cases cited by SSSR are inapposite, and approval of the ROD

7    was not contrary to law.

8    SSSR relies principally on *High Country Citizens' Alliance v. Norton*, 448 F.

9    Supp. 2d 1235 (D. Colo. 2006), to argue that the ROD unlawfully disposed of water

10   rights.  SSSR Memo. at 26.  But unlike here, the agency in that case contracted away its

11   federal reserved water right.  *High Country*, 448 F. Supp. 2d at 1248 ("[I]t is evident that

12   the federal Defendants contracted to give up what Congress specifically authorized: a

13   1933 reserved water right to the quantity of water needed by the canyon.").  Similarly,

14   *Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts v. United*

15   *States*, 832 F.2d 1127, 1131 (9th Cir. 1987), addressed the actual adjudication of "the

16   priorities of the water rights of the competing claimants."

17   Those cases say nothing about a duty for the federal government to ensure

18   sufficient water flow to permit the exercise of water rights.  Instead, the exercise of such

19   rights is subject to the same adjudication as any other water-rights holder.  And if a

20   dispute arises over the priority or volume of those federal water rights, that dispute can be

21   resolved through litigation such as the ongoing Gila River general stream adjudication.

22   *See, e.g.*, *Gila River*, 35 P.3d at 70–71 (citing cases documenting history of Gila River

23   general stream adjudication); *cf. High Country*, 448 F. Supp. 2d at 1247 (noting Colorado

24   water court will determine amount of water necessary for reserved purpose).  But the

---

[5] The FEIS analyzed "the physical impact to the water sources" from the mining operations, acknowledging long-term (*i.e.*, 1,000 years after mine closure) drawdown of the regional aquifer could that affect or eliminate flow to certain springs and streams. FEIS at 431, FS0237173.

18

1  simple fact remains that the ROD does not dispose of or otherwise affect any federally-

2  held water rights.[6]  As such, SSSR's water rights claim fails.

3  **C.  The Forest Service Complied With The ESA**

4  There is no merit to SSSR's allegations that the Forest Service violated obligations

5  under ESA Section 7(a)(1).  SSSR Memo. at 28–30.  The Forest Service fully complied

6  with the requirement to utilize its authorities to promote the conservation of threatened

7  and endangered species that may be affected by the Project.

8  Section 7(a)(1) requires agencies to "utilize their authorities . . . by carrying out

9  programs for the conservation of" listed species.  16 U.S.C. § 1536(a)(1).  Agencies have

10  discretion in deciding how to fulfill their Section 7(a)(1) duties. *Pyramid Lake Paiute*

11  *Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1418 (9th Cir. 1990).  When resolving claims

12  under Section 7(a)(1) "the Court must determine whether there has been more than an

13  insignificant undertaking by an agency to conserve an endangered species, amounting to

14  total inaction." *Def. of Wildlife v. U.S. Fish & Wildlife Serv.*, 797 F. Supp. 2d 949, 953

15  (D. Ariz. 2011).

16  Here, the Administrative Record demonstrates that the Forest Service fulfilled its

17  duties under Section 7(a)(1) on multiple levels.  While consulting under ESA Section

18  7(a)(2) in 2013 and 2016, the Forest Service and U.S. Fish and Wildlife Service ("FWS")

19  also engaged in ESA Section 7(a)(1) consultation.  Indeed, in the 2013 Biological

20  Opinion ("BiOp"), FWS provided specific ESA Section 7(a)(1) conservation

21  recommendations for numerous species.  FS0098319–20, FS0098374, FS0098417–18,

22  FS0098445, FS0098496–97, FS0098516–17, FS0098529–30, and FS0098559–60.  In the

23  2016 BiOp, FWS acknowledged the Forest Service's ongoing conservation actions and

24  _____

25  [6] The FEIS states that "[w]hether surface water rights associated with these water sources
would be impacted is not possible to determine from a regulatory standpoint; both
26  priority and validity of these surface water rights have not yet been . . . adjudicated."
27  FEIS at 431, FS0237173.  Read in context, the use of "water rights" in the first clause
clearly refers to the exercise of those rights.  It does not indicate that the actual rights will
28  be affected.

19

recommended that the Forest Service continue implementing several conservation recommendations from the 2013 BiOp.  FS0108679–80; FS0108693; FS0108737; FS0108794–96.  FWS also recommended that the Forest Service continue its ongoing conservation actions with respect to the desert pupfish, FS0108711–12, and the yellow-billed cuckoo, FS0108834.  Despite the Forest Service's concerns concerning the scope of its authority to impose mitigation measures for potential project effects on riparian species located outside the geographic boundaries of National Forest System surface resources, *see, e.g.*, FEIS at 546, FS0237288, it is clear from the Administrative Record that such effects were considered in the Section 7(a)(1) process.

The Section 7(a)(1) consultation resulted in Project modifications to conserve riparian resources for the benefit of species.  The Forest Service worked with Rosemont to develop revised conservation measures associated with several species, including specific measures to implement conservation recommendations from the 2013 and 2016 BiOps.  For example, Revised Conservation Measure 2 incorporates some of the 2016 BiOp's conservation recommendations for removal of nonnative vegetation to benefit the Huachuca water umbel, among other measures to conserve riparian resources.  Compare FS0108593-94 (Revised Conservation Measure 2) and FS0108796 (Recommendation 10).  These and other conservation recommendations will be incorporated into the final MPO.  FS0259777 ("Consistent with the FEIS (FEIS at B-3), mitigation and monitoring items required by the [BiOp] are considered mandatory by the Forest Service, are hereby required as a component of this ROD, and will be incorporated into the final MPO.").

Prospectively, the Section 7(a)(1) conservation recommendations in the 2016 BiOp will inform monitoring plans to be submitted by Rosemont for inclusion in the final MPO with details for habitat monitoring protocols such as timing, frequency, duration, and location.  FS0259769.  The Section 7(a)(1) conservation recommendations may also inform riparian mitigation requirements imposed by the U.S. Army Corps of Engineers pursuant to the project Habitat Mitigation and Monitoring Plan ("HMMP") submitted by Rosemont as part of the CWA Section 404 permitting process.  FS0259774.  Rosemont

1    must obtain from the Corps a CWA Section 404 permit (which will include an HMMP)

2    before it can begin construction of the mine on National Forest System lands.

3    FS0259765–66.  The Forest Service will require submittal of the MPO incorporating all

4    requirements from the ROD by Rosemont prior to providing written approval to operate

5    the mine.  FS0259727

6         To the extent SSSR suggests that the Forest Service has duties to further the

7    purposes of the ESA and develop a program for the conservation of species outside the

8    context of its decision whether to authorize the Rosemont mining project, *see* ECF No. 24

9    at ¶ 150, the Forest Service completed additional ESA consultation with FWS in

10   conjunction with the development of the Revised Land and Resource Management Plan

11   for the Coronado National Forest ("Revised Forest Plan").  FWS issued a BiOp including

12   ESA Section 7(a)(1) conservation recommendations on April 13, 2017, and the Forest

13   Service began implementing the Revised Forest Plan on July 22, 2018.  *See*

14   https://www.fs.usda.gov/detail/coronado/landmanagement/planning/?cid=fswdev7_0187

15   02.  Forest Service actions at the Revised Forest Plan level are relevant to the extent that

16   "section 7(a)(1) applies to agency programs, not individual agency actions."  *Protect Our*

17   *Water v. Flowers*, 377 F. Supp. 2d 844, 870 (E.D. Cal. 2004).

18        Although SSSR may not agree with specific conservation measures implemented

19   by the Forest Service, SSSR is plainly incorrect in asserting that the Forest Service's

20   response to its Section 7(a)(1) obligations "was to do nothing."  SSSR Memo. at 28.

21   Over the course of a years-long ESA consultation, FWS provided specific conservation

22   recommendations that informed not only the Forest Service's ongoing actions but also the

23   revised conservation measures incorporated in the ROD.  FS0259777–80.  Therefore, the

24   facts here are readily distinguished from *Center for Biological Diversity v. Vilsack*, 276

25   F. Supp. 3d 1015, 1032 (D. Nev. 2017), where the court found that the agency failed to

26   undertake any ongoing conservation actions.

27        Lastly, SSSR mistakenly contends that the Forest Service violated Section 7(a)(1)

28   by failing to propose mitigation measures that would directly offset impacts predicted to

21

1   occur to riparian resources along Empire Gulch.  SSSR Memo. at 30.  To the contrary, an

2   agency satisfies its duty where (as here) it implements conservation recommendations

3   obtained through consultation with FWS, whether or not related to other measures that

4   SSSR may prefer.  *Pyramid Lake Paiute Tribe*, 898 F.2d at 1418; *Nw. Envtl. Advocates v.*

5   *E.P.A.*, 268 F. Supp. 2d 1255, 1273 (D. Or. 2003); *Washington Toxics Coal. v. EPA*, No.

6   C01-132C, 2002 WL 34213031, at *11 (W.D. July 2, Wash. 2002).  Considering the

7   discretion afforded an agency in instituting conservation measures under the ESA, the

8   Administrative Record demonstrates that the Forest Service amply fulfilled its Section

9   7(a)(1) duties.

10  **III.   THE FOREST SERVICE CONSIDERED MANY PIT LAKE MITIGATION**
11  **         MEASURES AND REASONABLY SELECTED A MONITORING**
    **         PROGRAM**

12       The Forest Service selected a mitigation measures for the pit lake to protect

13  wildlife.  The Forest Service analyzed the various possible mitigation measures to

14  consider whether any particular measures could prevent pit lake formation.  FEIS at 101–

15  05, FS0236813–17.  The Forest Service discussed many options that would partially or

16  fully prevent a pit lake, but determined each to be impractical or not feasible.  *See, e.g.*,

17  FEIS at 101–02, FS0236813–14 (discussing pit size options) FEIS at 102–03,

18  FS0236814–15 (in situ and high temperature/high pressure leaching not technically

19  feasible for several minerals and poses risk of inadvertent migrations into aquifer); FEIS

20  at 104–105, FS0236816–17 ("backfill" mitigation measures determined to pose too great

21  a safety risk); FEIS at 101, FS0236813 (mining in other locations not feasible); *id.*

22  (discussing use of shafts, adits, or other underground methods that were determined to be

23  impractical).

24       Once the likelihood that a pit lake would form became clear, the Forest Service

25  engaged in extensive predictive groundwater modeling to understand the lake's formation

26  process.  FEIS at 339, FS0237081.  Pumping will prevent the pit lake from forming

27  during mine operations, but it will likely begin developing after operations cease.  FEIS

28

                                                22

1   at 387, FS0237129.  The fill will be gradual, reaching only 75 percent of the predicted

2   ultimate depth after approximately 200 years.  FEIS at 387, FS0237129.

3         Experts assisting the Forest Service warned that modeling water quality more than

4   200 years into the future would yield unreliable results.  FS0203937.  Considering the

5   limitations of modeling, and the many decades before the pit lake will begin to form, *see*

6   FEIS at vii, FS0236647 (mine operations will continue up to 30 years), the Forest Service

7   determined that it should begin monitoring prior to the mine's closure so that adopted

8   mitigation measures will be based on data from the lake itself.  FEIS Appendix B at B-

9   21-22, FS0238443–44 (monitoring will "ensure the most accurate prediction of mine pit

10  lake water quality is available at closure. . . and used to develop . . . plans for protection

11  of wildlife if possible harm exists from exposure to [the] pit lake").  This measure was

12  developed partly in response to comments from the Arizona Game and Fish Department

13  ("AGFD").  FS0133098.  These analyses and discussions demonstrate that, contrary to

14  SSSR's assertions, the Forest Service analyzed several substantive mitigation measures

15  for the pit lake and that monitoring is an effective mitigation.  *See* SSSR Memo. at 31.[7]

16        SSSR is also wrong in its application of 36 C.F.R. 228.8.  First, SSSR insists that

17  the Forest Service has not required sufficient mitigations measures.  SSSR Memo at 31.

18  Aside from the fact that this is contradicted by the Record, as described above, SSSR

19  ignores an important standard in the regulation.  The regulation requires the Forest

20  Service to take "all *practicable* measures to maintain and protect . . . wildlife . . . which

21  may be affected by the operations."  36 C.F.R. 228.8(e) (emphasis added).  As discussed

22  above, many proposed mitigation measures were considered and eliminated as

23  impractical.  FEIS at 101–05, FS0236813–17.  SSSR's reliance on *Rock Creek Alliance*,

24  703 F. Supp. 2d at 1152, is misplaced because that case involved sediment that threatened

25

26

27  [7] Following FEIS completion, the Forest Service again consulted FWS to assess six other
    potential pit lake mitigation measures.  *See e.g.*, FS0204499–500 (grouting of pit walls or

28  fractures); FS0204500 (use of injection wells); FS0204501 (use of shade balls);
    FS0204501–02 (water fill); FS0204502–03 (stormwater fill).

an existing waterbody inhabited by an endangered fish species. Here, the pit lake is not a reservoir or stream that supports wildlife; it is a pit that will fill with water in the future. Demanding that the Forest Service put in place detailed pit lake mitigation measures now is premature. FS9237139 ("Periodically rerunning the pit lake model . . . would allow for the best predictions of pit lake water quality changes over time, in order to inform future management decisions after closure."); FEIS Appendix B at B-21-22, FS0238443–44. Monitoring during the approximately 20–30 years of active mining, and using the data collected to consider appropriate mitigation measures, is an effective and practicable mitigation to protect wildlife.

SSSR's reclamation arguments are similarly flawed. While SSSR correctly states that satisfactory reclamation is a priority, it fails to acknowledge that reclamation must be technically feasible and economically attainable. As discussed above, measures to prevent or backfill the mine pit were excluded as impracticable. FEIS at 101–05, FS0236813–17. The adopted mitigation and monitoring plan, however, is an effective mitigation because it provides that Rosemont will provide funding "to complete reclamation . . . and necessary monitoring for as long as required to return the site to stable and acceptable condition." FEIS at 97, FS0236809. The Forest Service's analysis and adopted mitigation measures protect wildlife and comply with applicable Forest Service regulations. Federal Defendants are entitled to summary judgment on these claims.

## IV. THE FOREST SERVICE COMPLIED WITH THE CWA AND ORGANIC ACT

### A. The Clean Water Act

The Clean Water Act ("CWA") establishes a "partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)). Under the CWA, states adopt water quality standards and submit them for EPA approval, 33 U.S.C.

1  § 1313; EPA has approved Arizona's water quality standards.  Applicants for federal

2  licenses or permits, such as licenses to construct on federal land, must provide "a

3  certification from the State" that any discharges to navigable waters comply with state

4  water quality standards.  *Id*. § 1341(a)(1).

5   The CWA generally requires all dischargers to obtain and operate in accordance

6  with permits. 33 U.S.C. § 1311(a) (prohibiting unauthorized "discharge of any

7  pollutant"); *id*. § 1342 (program to permitting certain discharges).  National Pollutant

8  Elimination Discharge System ("NPDES") permits ensure compliance with all necessary

9  and applicable requirements, including state water quality standards.  *Id*. § 1342(a)(5).

10  Federal facilities are "subject to, and [must] comply with, all Federal, State, interstate,

11  and local requirements . . . respecting the control and abatement of water pollution" in the

12  same manner and extent as nongovernmental entities, and must obtain NPDES permits if

13  necessary.  *Id*. § 1323.  Any state can obtain EPA authorization to issue NPDES permits,

14  and EPA approved Arizona's NPDES permit program in 2002.  *See id*. § 1342(b); EPA

15  NPDES State Program Information, https://www.epa.gov/npdes/npdes-state-program-

16  information (last visited October 26, 2018).

17
18   **B. The Forest Service's Conclusion That the Project Complies With State Water Quality Standards Is Reasonable And Supported By The Record**
19

20   SSSR argues the Forest Service violated the CWA and the Organic Act's Part 228

21  regulations by failing to ensure compliance with state water quality standards.  SSSR

22  Memo. at 33–38.  The Administrative Record refutes this argument, as the Forest Service

23  reasonably relied on Arizona's determination that the Project complies with state water

24  quality standards.

25   When a party seeks to undertake mining operations on National Forest System

26  lands, the Forest Service confirms that the mine operator has obtained the proper permits

27  and certifications to demonstrate compliance with applicable federal and State water

28  quality standards.  33 U.S.C. § 1323(a); 36 C.F.R. § 228.8(b).  Here, the Arizona

1  Department of Environmental Quality ("ADEQ") issued a water quality certification

2  under 33 U.S.C. § 1341 that imposes conditions on Rosemont's mining operations to

3  decrease water quality impacts.  ADEQ Conditional Water Quality Certification (Feb. 4,

4  2015), FS0106707–16.  ADEQ's certification states that "[s]ubject to the conditions,"

5  "the activities proposed for the Rosemont Copper Project will not violate applicable

6  surface water quality standards."  *Id*.

7      ADEQ also issued a NPDES stormwater discharge permit, which imposes

8  conditions on stormwater discharges from the mine. *See* 33 U.S.C. § 1342; FS0105378;

9  FS0105539.  Like the Water Quality Certification, the NPDES stormwater discharge

10  permit requires permittees to control discharge from the facility as necessary to avoid

11  exceedances of applicable water quality standards.  Rosemont submitted to the State, and

12  will update and implement, a Stormwater Pollution Prevention Plan to ensure compliance

13  with these conditions.  FS0197589–787.

14      Before signing the ROD, the Forest Service reasonably determined that because

15  Rosemont received its required Water Quality Certification and stormwater discharge

16  permit, the Project would comply with applicable State water quality standards.  In a

17  similar case, while dismissing a CWA claim for lack of jurisdiction, the court held that

18  the Forest Service complied with the Organic Act by relying on a State permit to

19  determine that water quality standards would not be violated.  *Rock Creek All. v. U.S.*

20  *Forest Serv.*, 703 F. Supp. 2d 1152, 1169 (D. Mont. 2010).  The discharge permit "is the

21  means by which" the State "enforces state water quality standards, and the Forest Service

22  is allowed to rely on" the State "to issue and enforce a valid permit."  *Id*. (citing *Great*

23  *Basin Mine Watch v. Hankins*, 456 F.3d 955, 965–66 (9th Cir. 2006).  In *Great Basin*, the

24  Ninth Circuit similarly held that BLM's approval of mining permits satisfied water

25  quality requirements because the project proponent obtained a permit from the State, and

26  plaintiffs did not show that the project proponent significantly violated the terms of the

27  permit.  *Id*.  Here too, the Forest Service was allowed to rely on the Arizona Water

28

26

Quality Certification and stormwater discharge permit to conclude that the Project met applicable water quality and discharge limits.

SSSR's argument rests on a misreading *Save Our Cabinets v. U.S. Department of Agriculture*, in which the Forest Service issued a ROD spanning all four phases of a mining project. 254 F. Supp. 3d 1241, 1251 (D. Mont. 2017). The State, however, had approved a water quality permit only for the first phase of the project and "explicitly refused to approve permitting for future stages of the Project." *Id.* at 1254. The court held that the Forest Service erred in relying on the state permit issued for the first phase in issuing a ROD spanning all phases. *Id.* Notably, the same judge authored both the *Rock Creek Alliance* and *Save Our Cabinet*s opinions, explaining that *Rock Creek Alliance* did not govern *Save Our Cabinet*s because the State had specifically decided that the remaining phases "would not comply with Montana law." *Id.*

The current case is similar to *Rock Creek Alliance* and is governed by the general rule that federal agencies can rely on State permits to conclude that the project complies with state water quality requirements. ADEQ's certification and permit are not for one particular phase of Rosemont's mining operation, but the entire operation, and ADEQ concluded that the operation would meet the State's water quality standards. The Forest Service reasonably relied on Arizona's decisions.

Moreover, SSSR incorrectly asserts that the Administrative Record contradicts ADEQ's determination. The Forest Service studied water quality impacts in its NEPA analysis and modeled a range of scenarios, potential impacts, and mitigating factors. ADEQ applied its expertise in selecting likely scenarios before certifying that, under prescribed conditions to mitigate impacts, "the Rosemont Copper Project should not cause or contribute to exceedances of surface water quality standards nor cause water quality degradation in the downstream receiving waters." FS0106477.

SSSR incorrectly contends that the Forest Service Record demonstrates violations of three state water quality standards: 1) dissolved metals standards in Barrel Canyon and Davidson Canyon; 2) antidegradation standards in Cienega Creek and a portion of

27

1    Davidson Canyon; 3) Arizona's wadeable/perennial stream standards in Upper Cienega

2    Creek and Empire Gulch at/below Empire Spring.  SSSR Memo. at 33-37.

3              First, SSSR selectively quotes from the FEIS to suggest that discharges of

4    dissolved metals, particularly, silver, would cause exceedances of state water quality

5    standards in any scenario.  SSSR Memo. at 35.  The Forest Service studied a "range of

6    possible outcomes," which included outcomes where dissolved silver would exceed

7    standards.  FEIS at 473, FS0237215.  But the Forest Service noted that "two mitigation

8    measures" would reduce the likelihood of exceedances.  *Id.* at 472, FS0239214.  The

9    "most important" measure would require Rosemont to segregate waste rock with the

10   "potential to cause water quality problems," *id.*, which Rosemont agreed to do.

11   FS0188165–70 (Waste Rock Segregation Plan); FS0101208 (including of waste rock

12   segregation in Aquifer Protection Permit application); FS0105210 (waste rock

13   segregation requirement within the Aquifer Protection Permit); FS0259772–73 (ROD

14   requirement to implement waste rock segregation mitigation measures).  ADEQ

15   accounted for waste rock segregation and specifically stated it "does not find it likely that

16   dissolved silver will exceed surface water quality standards in runoff from the waste rock

17   facility.  In fact, based on the limited data collected to date, it is unlikely that runoff from

18   the waste rock facility will exceed any surface water quality standard."  FS0106481.

19   ADEQ further required monitoring to ensure that waste rock segregation will be effective

20   at protecting water quality.  *See* FEIS at B-84, FS0238506 (measure OA-GW-02

21   requiring waste rock segregation); B-87, FS0238509–10 (measures OA-GW-06 requiring

22   groundwater quality and aquifer-level monitoring); B-88, FS0238510–11 (measure OA-

23   SW-01 requiring detention and testing of stormwater).  Beyond the State measures, the

24   Forest Service required three additional measures to monitor waste rock segregation

25   effectiveness and water quality.  *See* FEIS at B-16-21, FS0238438-43 (measures FS-GW-

26   01 requiring waste rock seepage monitoring; FS-GW-02 requiring water quality

27   monitoring beyond the Aquifer Protection Permit wells; and FS-GW-03 requiring

28   additional waste rock characterization testing).  SSSR argument that dissolved metals

1    standards would be exceeded does not account for these mitigation and monitoring

2    requirements, and the Forest Service reasonably relied on Arizona's determination.

3          Second, on state antidegradation standards, SSSR again ignores mitigation

4    measures.  ADEQ cited Rosemont's agreement to implement mitigation measures in its

5    document finding that the Project will not cause "water quality degradation in the

6    downstream receiving waters."  FS0106477.  Specifically, Rosemont agreed to monitor

7    waters and to maintain aquatic and riparian resources at pre-project levels in the

8    Outstanding Waters portions of Davidson Canyon Wash and Lower Cienega Creek

9    through responsive measures.  *Id.*, FS0106485, FS0106479; *see also* FS0106532 (Surface

10   Water Mitigation Plan).  The Forest Service reasonably relied on ADEQ's determination

11   that these measures were sufficient to meet state water quality standards.

12         SSSR further alleges a violation of a federal antidegradation rule based on a

13   regulation requiring that the "State shall develop and adopt a statewide antidegradation

14   policy."  40 C.F.R. § 131.12.  SSSR Memo. at 37.  Arizona has adopted the referenced

15   antidegradation policy, and no violation of the federal regulation is at issue in this case.

16         Finally, SSSR waived their third argument that the Forest Service unreasonably

17   failed to find that dewatering will cause the violation of Arizona wadeable/perennial

18   standards.  SSSR has not cited a single comment raising this argument; thus, they have

19   "waived their right to judicial review" of this issue because it was "not made before the

20   administrative agency."  *Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1249 (9th Cir. 2000).

21   The nature of SSSR's arcane argument underscores the applicability of waiver.  In its

22   brief, SSSR references modeling that suggests that some perennial streams will lose

23   enough water flow to become intermittent and then ephemeral at some point in the distant

24   future after the mine closes.  More specifically, the Forest Service's best-fit models in the

25   FEIS indicate that Empire Gulch could become intermittent by 50–150 years after the

26   mine closes and ephemeral by 1,000 years, and that Upper Cienega Creek could become

27   intermittent by 150-1,000 years after the mine closes or will never become intermittent.

28

FEIS at 539, FS0237281; *see also*, FS0260634–36, FS0260590 (2015 SIR refined analysis indicating even more prolonged timelines).

SSSR now argues that these changes to water flow violate the state's "wadeable/perennial" water quality standard. Arizona does not consider long-term changes to water flow to violate this water quality standard, and certified the project as in compliance with all "surface water quality standards." FS0106477. The novel and unlikely interpretation of State law advanced by SSSR reaffirms the probity of the Forest Service's deference to Arizona's decision.

At bottom, the Forest Service's decision complies with the CWA, and thus complies with the Organic Act's Part 228 regulations. Federal Defendants are entitled to summary judgment on this claim.

## V.    THE FOREST SERVICE PROPERLY APPROVED RIGHTS OF WAY

The Forest Service approved use of National Forest System lands for utility and water lines through its approval of the MPO under 36 C.F.R. Part 228, Subpart A. SSSR asserts that the Forest Service instead should have used its authority to grant easements under 36 C.F.R. Part 251, Subpart B, and applied FLPMA's Subchapter V requirements, 43 U.S.C. § 1701 *et seq*. SSSR's assertions are misplaced.

The Organic Act and its implementing regulations are the proper statutory authority for use of National Forest System lands associated with mining operations. *See* 36 C.F.R. Part 228, Subpart A; *supra* Argument I. FLPMA provides supplemental authority to the Forest Service for its management of National Forest System lands but by its own terms provides that "no provision of this section or any other section of this Act shall in any way amend the Mining Law of 1872 or impair the rights of any locators or claims under that Act, including, but not limited to, rights of ingress and egress." 43 U.S.C. 1732 (b). Thus, mining operations on National Forest System lands are properly regulated under the Organic Act. The Organic Act's implementing regulations define "operations" to include "[a]ll functions, work, and activities in connection with . . . mining . . . including roads and other means of access on lands . . . regardless of whether

30

1  said operations take place on or off mining claims."  36 C.F.R. § 228.3(a).  This broad

2  definition necessarily includes roads and utility lines.[8]  *See id.*  Thus, using the same

3  authority that enables it to approve an MPO, the Forest Service appropriately approved

4  the use of National Forest System lands for the utility lines because they are use in

5  connection with Rosemont's Project and part of the MPO.

6      SSSR attempts to sidestep this authority by pointing to two cases addressing

7  FLPMA right-of-way authority decided by the Interior Board of Land Appeals ("IBLA").

8  First, the IBLA does not have the authority to hear challenges to or interpret Forest

9  Service regulations.  *See Robert N. Shanahan et al.*, 120 IBLA 187 (1991).  Rather,

10 FLPMA provides supplemental authority that enables the Forest Service to authorize

11 easements on National Forest System lands.  43 U.S.C. § 1761 (providing the Forest

12 Service is "authorized to grant, issue, or renew rights-of-way over, upon, under, or

13 through [National Forest System] lands" for roads, pipelines or other necessary facilities).

14 The language is permissive, not mandatory, and nothing in this section supplants the

15 Forest Service's existing authorities or regulations.  *Id.*  Therefore, SSSR's argument that

16 the Forest Service failed to authorize the utility lines through issuance of easements fails.

17 Federal Defendants are entitled to summary judgment on this claim.[9]

18 **VI.   THE FOREST SERVICE COMPLIED WITH NEPA**

19      NEPA is a procedural statute that requires analysis and public disclosure of

20 significant environmental effects to ensure informed decision-making; it does not require

21 that agencies reach a particular result.  42 U.S.C. § 4321; 40 C.F.R. § 1502.1; *Robertson*

22 *v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  "NEPA merely prohibits

23 ───────────────

24 [8] BLM's parallel regulation also defines "operations" broadly and expressly mentions
   "transmission lines, pipelines, and other means of access across public lands for support
25 facilities."  43 C.F.R. § 3809.5(5)

26 [9] SSSR also argues that the Forest Service failed to consider "public interest" in violation
   of 36 C.F.R § 251.54(e)(5)(ii).  SSSR Memo. at 41.  As with SSSR's other arguments in
27 this section, it misapplies the law.  The cited regulation does not apply to mineral
   extraction activities authorized under the Forest Service's 36 C.F.R Part 228 authority.
28 36 C.F.R. § 251.50(a) (excepting uses authorized by "part 228").

1    uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351.  A court

2    is charged only with ensuring that the agency has presented a "'full and fair discussion of

3    significant environmental impacts' so as to 'inform decisionmakers and the public of the

4    reasonable alternatives which would avoid or minimize adverse impacts or enhance the

5    quality of the human environment.'" *McNair*, 537 F.3d at 1001 (quoting 40 C.F.R.

6    § 1502.1).  In reviewing the adequacy of an EIS, the court should employ a "'rule of

7    reason' that asks whether an EIS contains a reasonably thorough discussion of the

8    significant aspects of the probable environmental consequences." *Great Basin Res.*

9    *Watch*, 844 F.3d at 1101.  Once the court determines the agency took a "hard look" at

10   those possible consequences "the review is at an end."  *Id.*

11          SSSR alleges several sweeping violations of NEPA's requirements.  The detailed

12   and comprehensive Administrative Record contradicts SSSR's arguments.  Federal

13   Defendants are entitled to summary judgment on SSSR's NEPA claims.

14          **A.      The FEIS Discusses Compliance With All Environmental Laws**

15          SSSR argues that the FEIS fails to analyze the Project's compliance with

16   applicable environmental laws, but the Administrative Record contradicts this assertion.

17   First, SSSR asserts that the FEIS improperly deferred water quality determinations to

18   ADEQ.  SSSR Memo. at 43.  As discussed above however, ADEQ is the proper authority

19   under the CWA's regulatory scheme.  *See, e.g.*, FS0133379 (ADEQ comment describing

20   Forest Service antidegradation conclusions as "premature because [ADEQ] . . . must find

21   [that] the ability to meet surface water quality standards . . . has been demonstrated");

22   FS0133380 (comment from ADEQ asserting "ADEQ must evaluate water quality and

23   quantity changes from all sources . . .").  In response to these and other interactions with

24   ADEQ, the Forest Service modified the FEIS to properly reflect ADEQ's authority.  *See*

25   FEIS at 512, FS0237254; *see supra* Argument IV.  Second, SSSR asserts that the FEIS

26   does not determine if water rights will be protected from dewatering but, as discussed

27   above, this is also incorrect.  *See supra* Argument II.B.  The State of Arizona has not yet

28

32

fully adjudicated the federal water rights relevant to this project but has analyzed those rights to the extent possible.  FEIS at 421, FS0237163; FEIS at 407, FS0237149.

Finally, SSSR states that "Arizona wildlife laws would be violated" by the pit lake, but does not state to which laws it refers or in what manner those laws would be violated.  SSSR's blanket statement waives this claim because it fails to present any argument or legal authorities.  Even if this statement were sufficient to constitute an argument, the Forest Service more than adequately examined the Project's impacts to wildlife.  *See e.g.*, FEIS at 570–651, FS0237312–93 (biological resources analysis); FS0259811–14) (ROD, wildlife findings).  Therefore, Federal Defendants are entitled to summary judgment as to these claims.

## B.   The Decision Discusses Mitigation Measures And Includes Supporting Analysis

NEPA requires that an EIS discuss "appropriate mitigation measures not already included in the proposed action or alternatives."  40 C.F.R. § 1502.14(f).  This requires that the EIS include a "discussion of steps that can be taken to mitigate adverse environmental consequences."  *Robertson*, 490 U.S. at 351.  The discussion must be "reasonably complete," but NEPA does not impose any substantive requirement to adopt or implement specific mitigation measures.  *Id.* at 352–53.  Nor does NEPA require a "fully developed plan that will mitigate environmental harm before an agency can act."  *Id.* at 353.

### 1.   The FEIS Analyzes And Discusses Mitigation Measures For Potential Dewatering On BLM Lands

SSSR incorrectly asserts that the Forest Service failed to discuss mitigation measures for potential dewatering of streams on BLM Land.  The Administrative Record contains ample discussion of possible mitigation measures on BLM land specific to Empire Gulch and other streams.  First, the alternatives considered in the FEIS include mitigation measures that "are integral components of the design of" both of the proposed action and its alternatives.  FEIS at 94, FS0236806.  *See* FS0236805–09 (Mitigation and Monitoring).  The FEIS also forthrightly discusses that predictive models show at least

33

some drawdown to Empire Gulch and other streams, albeit with high levels of uncertainty in some cases.  FEIS at 528–39, FS0237270–81.  A refined analysis conducted in part to support ESA re-consultation with FWS disclosed similar results.  FS0260634–36 (2015 SIR summary of findings for streamflow and standing pools); FS0260590 (2015 SIR table 20 showing results of stream flow analysis).  More to the point, however, are the detailed dewatering mitigation measures found in Appendix B to the FEIS.  *See* FEIS Appendix B at B-26, FS0238448–49 (FS-SSR-02 – Spring, seep, and constructed/enhanced waters monitoring); FEIS Appendix B at B-43, FS0238465 (FS-BR-16 – Establishment of the Cienega Creek Watershed Conservation Fund, to be used for future mitigation in the Cienega Creek watershed (note that Empire Gulch is within the Cienega Creek Watershed)); FEIS Appendix B at B-48–49, FS0238470–71 (FS-BR-22 – Monitoring to determine impacts from pit dewatering on downstream sites in Barrel and Davidson Canyons).  In particular, mitigation FS-BR-16 contemplates future input from BLM as to "location and design of projects . . . designed to preserve and enhance aquatic and riparian ecosystems."  *Id.*

These discussions plainly refute SSSR's claim of a "complete failure of the FEIS to analyze mitigation for the dewatering impacts to Empire Gulch and other waters." SSSR Memo. at 45; *Robertson*, 490 U.S. at 351 (the discussion of mitigation measures need only be "reasonably complete").  Thus, because SSSR does not challenge the content of these discussions, but instead only asserts, incorrectly, that the discussions did not occur, Federal Defendants are entitled to summary judgment on this claim.[10]

_____

[10] SSSR also ignores the "Post-FEIS Consideration of Mitigation for Impacts to Riparian Areas."  *See* FS0204496–505.  This memorandum "largely focused on . . . Cienega Creek and Empire Gulch . . . [and] a variety of mitigation measures related to reducing or eliminating riparian impacts."  FS0204497.  The memorandum includes evidence of mitigation discussions about BLM land, and what mitigation measures were considered for those areas, that took place over several years.  *See e.g.*, *id.*; FS0204500 (discussing possible injection wells); FS020504–05 (discussing sources of pumping groundwater but noting that BLM "never identified" any such wells); FS0204505 (discussing backfilling but noting BLM would be required to provide the resources).

1

2        **2.      The FEIS Analyzes Substantive Mitigation Measures For The**
         **Pit Lake**

3        SSSR argues that the Record lacks any analysis of mitigation measures regarding

4    the formation of the pit lake or for the protection of wildlife that may come into contact

5    with the pit lake. SSSR Memo. at 46–48. The Administrative Record contains ample

6    evidence contradicting this argument. The Forest Service considered several possible

7    mitigation measures to prevent or minimize the creation of a pit, *see e.g.*, FEIS 101–05,

8    FS0236813–17, but those options proved to be unworkable. *Supra* Section III (listing

9    some of the many considered options to prevent or minimize the pit lake). In fact, the

10   Forest Service continued to consider various mitigation suggestions until just prior to the

11   ROD's completion. *See* FS0204496–505 (post-FEIS mitigation analysis). Thus, SSSR's

12   claim that the FEIS lacks any analysis of options to prevent pit formation must be

13   rejected.

14       SSSR also claims that the Forest Service failed to consider mitigation measures to

15   protect wildlife that will come into contact with the pit lake. SSSR Memo. at 43–44.

16   Again, the Administrative Record directly contradicts this assertion. First, SSSR's

17   characterization of the pit lake as "toxic" is misleading. The FEIS predicts that the water

18   in the pit lake may exceed some water quality standards, not that the lake itself will be

19   "toxic" to wildlife. FEIS at 389–90, FS0237131–32; *see* FEIS at 387–93, FS0237129–35

20   (pit lake geochemistry analysis). Further, the predicted water quality exceedances are

21   merely a tool to predict possible impact to wildlife, not to demonstrate that impact is

22   certain. FS0237131. Further, no pit lake exists today and all of the water quality

23   discussions are predictions, FEIS at 389, FS0237131, that by definition will remain

24   uncertain until the pit lake itself can be analyzed. FEIS Appendix B at B-21-22,

25   FS0238443–44. As noted in the FEIS "it is nearly impossible to quantify this component

26   reliably because there is a wide range in possible conditions . . . and there are no

27

28

35

1    monitoring data that can inform the monitoring." FS0188700.[11]  Therefore, the Forest

2    Service's monitoring plan is an effective wildlife mitigation measure because it will

3    entail informed decisionmaking based on actual pit lake monitoring data.

4         The Forest Service will monitor the pit lake from the beginning of active mining to

5    closure of the mine to address the many uncertainties about the pit lake's future impacts

6    and water composition.  *See* FEIS at 389, FS0237081 (describing three separate

7    groundwater models, a range of effects from all three, and discussing that the pit lake will

8    form over a period of 700–7000 years).  The mine's anticipated operational period is 20

9    to 25 years.  FS0259761.  The pit lake will likely form after closure, and 200 years later

10   its volume will be at approximately 75 percent.  FEIS at 387, FS0237129.  Modeling for

11   water quality predictions that far out is necessarily subject to uncertainty, but predictions

12   become "excessively speculative" for any period beyond 200 years.  FS0203937; *see also*

13   FEIS at xxxi, FS0236671 (timeframe over which modeling is required results in a "high

14   degree of uncertainty").  Given the uncertain nature of creating effective mitigation

15   measures for a pit lake that will only begin to form decades from now, the Forest Service

16   rationally determined that monitoring during active mining until mine closure, before the

17   pit lake begins to form, is the appropriate method of determining effective mitigation

18   measures.  *See San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449

19   F.3d 1016, 1030 (9th Cir. 2006) (the agency "need not discuss remote and highly

20   speculative consequences").

21        SSSR relies upon two cases to challenge the Forest Service's monitoring

22   plan.  First, *Save Our Cabinets*, in which the court remanded a ROD because "the data

23   before the Court show[ed] [water quality] noncompliance for future stages of the

24   Project."  *Id.* 254 F. Supp. 3d at 1254–55.  The situation here is distinct from *Save Our*

---

[11] SSSR asserts that the pit lake water quality will "exceed wildlife standards and be . . . lethal to wildlife."  SSSR Memo. at 47.  SSSR provides no support for this assertion and does not clarify to what "wildlife standards" it refers to or how those "standards" would be exceeded.  *Id.*

36

*Cabinets* because the pit lake has no predicted water quality exceedances.  FEIS at 389–90, FS0237131–32.  The pit lake is not a navigable water, nor will the pit lake flow into any surface water bodies.  FEIS at 372, FS0237114 ("the mine pit lake is neither a navigable water subject to surface water standards nor a discharging facility subject to aquifer water quality standards").  Similarly, the pit lake will likely lose water through evaporation and groundwater will perpetually replenish it; thus the lake, instead of leaking into groundwater, will actually draw groundwater to it protecting the aquifer.  FEIS at 339, FS0237081; FS0188700–01.  The significance of each of these points is that ADEQ will not regulate this waterbody because it meets none of the definitions of a water over which it has jurisdiction.  *See* FEIS at xxx, FS0236670 ("neither the aquifer water quality standards nor surface water quality standards are applicable to the pit lake").  Because ADEQ will not regulate the pit lake, the lake is legally incapable of water quality exceedances.  The analyses of projected water quality were done not to show possible violations but as a surrogate to estimate possible impacts to wildlife.  FEIS at 389, FS0237131 (water quality standards are "useful solely as a tool for assessing the potential impacts to wildlife").  Because water quality standards do not apply, the pit lake cannot have any water quality exceedances.

Second, the data here are far more speculative than they were in *Save Our Cabinets*.  There, the Forest Service had deemed the data "'sufficient' 'to make a reasoned choice among alternatives.'"  *Save Our Cabinets*, 254 F. Supp. 3d at 1253.  Here, the Forest Service has reached no such conclusion and instead has repeatedly disclosed the uncertainty in the predictive modeling and the need for more information from the pit lake itself.  *See, e.g.*, FEIS at 296–302, FS0237038–44; FS0204130–74.  Thus, the Forest Service reasonably concluded that monitoring of the pit lake during active mining, before it forms, is the best manner in which to fashion effective mitigation measures.

SSSR's reliance on *Great Basin* is inapt, and that case actually supports the Forest Service's decision on this Project.  In *Great Basin*, the Forest Service confronted

37

1    questions about potential poor water quality in a pit lake and adopted a "wait and see"

2    approach to mitigation.  *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d

3    1095, 1107 (9th Cir. 2016).  The court held that although a "wait and see" approach is

4    sometimes impermissible under NEPA, the "low probability and temporal remoteness of

5    adverse impacts to ground water" coupled with speculative "future water users"

6    supported the reasonableness of the Forest Service's decision.  *Id.*  The situation here is

7    very similar.  Temporally, the formation of the pit lake is decades away.  FS0237081 (the

8    pit lake will take 700–1000 years to reach equilibrium).  There are no anticipated surface

9    or groundwater quality issues and there are no predicted future human users.  FS0237131;

10   FS0236751 (area will be fenced off from access).  The Forest Service's modeling does

11   predict possible impact to wildlife but reasons that effective mitigation measures,

12   including treatment options, should be determined once it can meaningfully analyze the

13   pit lake itself.  FS0204130–74.  Therefore, as in *Great Basin*, the Forest's approach to

14   adopting effective mitigation measures is "reasonable in the circumstances."  *Id.*; *see San*

15   *Luis Obispo Mothers for Peace*, 449 F.3d at 1030 ("an impact statement need not discuss

16   remote and highly speculative consequences").

17        The Forest Service's monitoring plan is reasonable based on the predictive

18   modeling and long time frames at issue.  *Great Basin*, 844 F.3d at 1107.  SSSR's

19   mitigation claims are without merit.

20   **C.    The Forest Service Was Not Required To Obtain Additional**
21   **        Information About Smelting Locations Or Water Quality**

22        NEPA does not require the Forest Service to obtain information that does not

23   exist; rather it need only conduct a reasonable analysis of anticipated impacts with

24   available information.  *Great Basin*, 844 F.3d at 1101 ("An agency need not conduct

25   measurements of actual baseline conditions in every situation—it may estimate baseline

26   conditions using data from a similar area, computer modeling, or some other reasonable

27   method.").  As some courts have held, a violation of NEPA occurs only the court finds

28   that the agency ignored information.  *See All. for the Wild Rockies v. Brazell*, 3:12-cv-

38

1    466-MHW, 2013 WL 6200199, at *27 (D. Idaho Nov. 27, 2013) (plaintiff must show

2    agency ignored existing data); *cf. Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d

3    1192, 1197 (D. Or. 2012) ("The Forest Service had more recent baseline data available to

4    it, but stated that the older data was adequate and that newer data was measured at

5    different points.").

6           The locations for the transport, processing, and smelting of the concentrated ore

7    that will be extracted from the mine are unknown.  *See* FS0283140 (letter from Rosemont

8    stating, "there are neither contracts nor plans in place" for transporting or processing the

9    ore).  Nonetheless, the Forest Service used the information it did have, the likely routes

10   along State Route 83 to Interstate 10, to consider possible impacts.  *See id.*; FEIS at 922–

11   23, FS0237693–94 (transportation analysis); FEIS at 934–58, FS0237705–29 (same).

12   The Forest Service also considered possible air quality impacts and disclosed impacts

13   based on distance from the mine.  *See e.g.*, FEIS at 221, FS0236963 (map illustrating area

14   of potential impacts); FEIS at 219–288, FS0236961–0237030 (detailed discussion of the

15   mine's potential impact on air quality including, among other things, regional analysis,

16   particulate matter, climate change, prevailing winds, and the National Ambient Air

17   Quality Standards).  SSSR cannot show that the agency ignored information about

18   transportation or air quality impacts, and in fact, the Administrative Record reflects that

19   the Forest Service requested information but Rosemont does not yet know the final routes

20   or smelting locations and thus the information does not exist.  *See* FS0137512.

21          SSSR's assertion that the Forest Service failed to obtain water quality information

22   fails for similar reasons.  SSSR seeks information that the Administrative Record

23   acknowledges did not exist at the time the FEIS was finalized.  FEIS at 548–49,

24   FS0237290–91.  Thus, as with the ore-transportation argument, SSSR does not argue that

25   the Forest ignored or failed to disclose missing information, it simply insists that the

26   Forest was required to obtain the non-existent information.  NEPA does require an

27   agency to do that which cannot be done.  *Wild Rockies*, 2013 WL 6200199, at *27.

28   Further, SSSR does not acknowledge that after the FEIS's finalization the Forest Service

1  received water quality information from lower Davidson Canyon and immediately
2  completed a Supplemental Information Report analyzing and disclosing that information.
3  *See* FS0260528–32 (analysis of new stormwater samples with respect to surface water
4  quality), and FS0260631–32 (analysis of new stormwater samples with respect to
5  Outstanding Arizona Waters).
6        The cases relied upon by SSSR to demand non-existent information are cases
7  where the court found the agency ignored available information.  In *South Fork Ban*
8  *Council of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, the court found that BLM
9  did not properly analyze the known air quality impacts of transporting five million tons of
10  ore 70 miles, two times per day between the mine and the mine's processing facility.  588
11  F.3d 718, 725 (9th Cir. 2009).  Here, the routes, frequency, and destination of the ore are
12  unknown making it reasonable for the agency to use approximations for purposes of its
13  analysis.  Similarly, in *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, a case that
14  primarily discusses a land exchange, the court points out that "BLM know[s] a great deal
15  about Asarco's mining plans for the selected lands" and that its decision not to analyze
16  that information therefore constituted a failure to take the requisite "hard look."  623 F.3d
17  633, 646 (9th Cir. 2010) ("BLM has averted its eyes from what is in plain view before
18  it.").  Lastly, in *Mid States Coal. for Progress v. Surface Transp. Bd.*, the court ruled
19  against the Surface Transportation Board because it failed to include analysis about the
20  nature of environmental effects even though it was aware of them before completing its
21  EIS.  345 F.3d 520, 550 (8th Cir. 2003).  Here, the Forest Service did not ignore
22  information, nor Rosemont did not refuse to provide the requested information; the
23  information simply is does not exist.  FS0137512.  The Forest Service conducted
24  reasonable analysis with the information available to it and NEPA requires nothing more.
25  *Great Basin*, 844 F.3d at 1101.  Federal Defendants are entitled to summary judgment on
26  this claim.
27        The Forest Service appropriately disclosed and analyzed the available information
28  and Federal Defendants are entitled to summary judgment on this claim.

40

1

2

**D.      The Forest Service Provided Opportunity For Public Comment On Transportation Routes**

3        The Forest Service provided opportunity for comment on the Draft Environmental

4   Impact Statement ("DEIS") for potential transportation routes.  In its FEIS, in response to

5   public comment, the Forest Service included analysis of additional routes; this in no way

6   violated NEPA.  *See* FEIS at 922–23, FS0237693–94.  NEPA's implementing regulations

7   require an agency to supplement a draft or final EIS if "[t]he agency makes substantial

8   changes in the proposed action that are relevant to environmental concerns."  40 C.F.R. §

9   1502.9(c)(1)(i).  NEPA's implementing regulations allow the agency to modify and

10  develop alternatives as well as supplement, improve, or modify its analyses without

11  triggering the requirement for a supplement.  40 C.F.R. § 1503.4.

12       Here, the new information, additional routes expanding on already analyzed

13  routes, did not involve a substantial change to the proposed action.  *Mid States Coal. for

14  Progress*, 345 F.3d, at 548 ("NEPA does not require an additional round of public

15  comments every time an agency revises, supplements, or improves its analysis in

16  response to the public comments on a DEIS.  Incremental changes are expected and in

17  fact encouraged").  The Forest Service included this additional analysis to be responsive

18  to public comments to the DEIS.  *See* FS0195533.  This additional analysis demonstrates

19  that the Forest Service is fulfilling its NEPA obligations by engaging in informed

20  decisionmaking; it should not be penalized for its responsiveness to public comments.

21  The FEIS contained the same caveat as the DEIS; the routes remain uncertain and that the

22  ultimate transportation manner and routes are unknown.  *Id.*  SSSR's attempt to use this

23  incremental additional analysis to undermine the FEIS fails.  Federal Defendants are

24  entitled to summary judgment on this claim.

25                              **CONCLUSION**

26       For the foregoing reasons, Federal Defendants respectfully request the Court to

27  deny SSSR's motion for summary judgment and grant Federal Defendants' cross-motion

28  for summary judgment.

41

1

2      Respectfully submitted this 26th day of October, 2018,

3

4                              JEFFREY H. WOOD
                               Acting Assistant Attorney General
5                              U.S. Department of Justice
                               Environment and Natural Resources Division
6

7                              */s/ Andrew A. Smith*
                               ANDREW A. SMITH (NM Bar 8341)
8                              Senior Trial Attorney
9                              Natural Resources Section
                               c/o United States Attorney's Office
10                             201 Third Street, N.W., Suite 900
11                             P.O. Box 607
                               Albuquerque, New Mexico 87103
12                             Phone: (505) 224-1468
13                             andrew.smith@usdoj.gov

14                             LILA C. JONES (NM Bar 149098)
15                             SHAUN PETTIGREW (CA 254564)
                               Trial Attorney
16                             Natural Resources Section
17                             PO Box 7611
                               Washington, DC 20044-7611
18                             Phone: (202) 514-9859
19                             lila.jones@usdoj.gov

20                             NICOLE SMITH (CA Bar 303629)
21                             MARK BROWN (FL Bar 0999504)
                               Trial Attorney
22                             Wildlife and Marine Resources Section
23                             601 D. St. NW
                               Washington, D.C. 20004
24                             Phone: (202) 305-0368
25                             Fax: (202) 305-0275
                               nicole.m.smith@usdoj.gov
26

27                             *Attorneys for Federal Defendants*

28

                                       42

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on October 26, 2018, I filed the foregoing with the Court's electronic filing system, which will serve all counsel by electronic means.  I also certify that the brief in support of Federal Defendants' cross-motion for summary judgment, inclusive of footnotes and excluding the motion, table of contents, table of authorities, note on Administrative Record and signature block is less than the Court's limit of 14,000 words for opening briefs (ECF No. 90).

/s/      *Lila C. Jones*
LILA C. JONES
U.S. Department of Justice