Allison N. Melton (CO Bar No. 45088)
Center for Biological Diversity
128 Cascadilla St./#3024
Crested Butte, CO  81224
Phone (970) 309-2008
Email: amelton@biologicaldiversity.org
*Attorneys for Plaintiff in 17-cv-00475 (Lead)*
*(additional counsel of record on signature page)*

Roger Flynn (CO Bar # 21078)
Jeffrey C. Parsons (CO Bar #30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
Phone: (303) 823-5738
Email: wmap@igc.org
*Attorneys for Plaintiffs in 17-cv-00576 (C)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity,<br>        Plaintiff,<br>v.<br>United States Fish and Wildlife Service, et al.,<br>        Defendants,<br>and<br>Rosemont Copper Company,<br>        Defendant-Intervenor. | No. 4: 17-cv-00475-TUC-JAS (Lead)<br>No. 4: 17-cv-00576-TUC-JAS (C)<br>No. 4: 18-cv-00189-TUC-JAS (C)<br><br>**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY INJUNCTION BY CENTER FOR BIOLOGICAL DIVERSITY (17-cv-00475) AND SAVE THE SCENIC SANTA RITAS, ET AL. (17-cv-00576)** |
| Save the Scenic Santa Ritas, et al.,<br>        Plaintiffs,<br>v.<br>United States Forest Service, et al.,<br>        Defendants,<br>and<br>Rosemont Copper Company,<br>        Defendant-Intervenor. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF CONTENTS**

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

STANDARD OF REVIEW............................................................................................ 3

ARGUMENT ................................................................................................................. 4

   I.   The Rosemont Mine Project Will Result in Immediate and
      Irreparable Harm to Plaintiffs and the Santa Rita Mountains. ................................ 4

   II.  The Balance of Hardships and the Public Interest Tip
      Sharply in Favor of Plaintiffs. ................................................................................ 10

     A.   The Public Interest Weighs Heavily in Favor of a
         Preliminary Injunction...................................................................................... 11

     B.   The Interests of the Forest Service and Rosemont Are Not
         Sufficient to Override the Interests of Plaintiffs and the Public. ..................... 13

   III.  Plaintiffs Are Likely to Succeed on the Merits. ..................................................... 14

   IV.  No More Than a Nominal Bond Is Appropriate in this Case................................. 14

CONCLUSION ............................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Cases**

Alliance for the Wild Rockies v. Cottrell,

    632 F.3d 1127 (9th Cir. 2011) ........................................................ 4, 12, 14

Amoco Prod. Co. v. Vill. of Gambell, Alaska,

    480 U.S. 531 (1987). ................................................................................ 4

Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency,

    766 F.2d 1319 (9th Cir. 1985) ............................................................... 15

Cascadia Wildlands v. Scott Timber Co.,

    715 Fed. Appx. 621 (9th Cir. 2017) ....................................................... 9

Davis v. Mineta,

    302 F. 3d 1104 (10th Cir. 2002) .............................................................. 4

FCC v. Rosboro Lumber,

    50 F.3d 781 (9th Cir. 1995) .................................................................... 9

Friends of the Earth v. Brinegar,

    518 F.2d 322 (9th Cir. 1975) ................................................................. 15

L.A. Mem'l Coliseum Comm. v. NFL,

    634 F.2d 1197 (9th Cir.1980). ............................................................... 13

Lands Council v. McNair,

    537 F.3d 981 (9th Cir. 2008). .................................................................. 4

League of Wilderness Defenders v. Zielinski,

    187 F. Supp. 2d 1263 (D. Ore. 2002) .................................................... 15

N. Alaska Envtl. Ctr. v. Hodel,

    803 F.2d 466 (9th Cir. 1986) ……………………………………...…13

Nat'l Wildlife Fed'n . Nat'l Marine Fisheries Serv.,

    886 F.3d 803 (9th Cir. 2018) .............................................................. 9, 11

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,

    235 F.Supp.2d 1143 (W.D. Wash. 2002) ............................................. 12

Republic of the Phil. v. Marcos,

  862 F.2d 1355 (9th Cir. 1988)..................................................................... 14

S. Fork Band Council of W. Shoshone v. Dep't of Interior,

  588 F.3d 718 (9th Cir. 2009)................................................................... 4, 11

San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.,

  657 F. Supp. 2d 1233 (D. Colo. 2009) ......................................................... 5

Save Our Sonoran v. Flowers,

  408 F.3d 1113 (9th Cir. 2005)......................................................... 4, 8, 11, 13

Save Strawberry Canyon v. Dep't of Energy,

  613 F. Supp. 2d 1177 (N.D. Cal. 2009)......................................................... 5

Se. Alaska Conservation Council v. U.S. Army Corps of Engr's,

  472 F.3d 1097 (9th Cir. 2006). ................................................................... 11

Seattle Audubon Soc'y v. Evans,

  771 F. Supp. 1081 (W.D. Wash. 1991) ....................................................... 12

Sierra Club v. Marsh,

  872 F.2d 497 (1st Cir. 1989) ........................................................................ 4

Sierra Club. v. Bosworth,

  510 F.3d 1016 (9th Cir. 2007). ................................................................... 11

Sierra On–Line v. Phoenix Software,

  739 F.2d 1415 (9th Cir.1984). ...................................................................... 7

Tenn. Valley Auth. v. Hill,

  437 U.S. 153 (1978) .................................................................................... 10

Winter v. Natural Res. Def. Council,

  555 U.S. 7 (2008) .......................................................................................... 3

**Other Authorities**

F.R.C.P. 65 .......................................................................................................... 1

F.R.C.P. 65(c) ................................................................................................... 14

1

2

**INTRODUCTION**

3

Pursuant to F.R.C.P. 65, Plaintiff Center for Biological Diversity in case 17-cv-

4

00475 (Lead) and Plaintiffs Save the Scenic Santa Ritas, Arizona Mining Reform

5

Coalition, Center for Biological Diversity, and the Sierra Club Grand Canyon Chapter

6

(collectively "SSSR") in case 17-cv-00576 (C) hereby submit this Memorandum in

7

Support of their Joint Motion for Preliminary Injunction.

8

Plaintiffs in these cases challenge federal agency decisions and approvals for the

9

Rosemont Mine, a massive open-pit copper mine in the Santa Rita Mountains of southern

10

Arizona.  This mine proposal was strongly opposed throughout the administrative process

11

by conservation groups, the affected Tribes, and Pima County, with serious concerns

12

expressed repeatedly by the U.S. Environmental Protection Agency ("EPA"), as well as

13

other federal and state agencies.  This widespread opposition stems from (1) the

14

immense, permanent environmental and cultural impacts that would occur at the Mine

15

site, including the construction of a mile-wide, 2,900 foot-deep mine pit (that would

16

eventually become a toxic pit lake), and dumping of mountains of toxic waste rock and

17

mine tailings, all in the heart of the endangered jaguar's designated critical habitat; and

18

(2) the severe, irreparable harm caused by the mine pit's dewatering and permanent

19

reversal of groundwater flow that sustains down-gradient seeps, springs, streams, and

20

wetlands, and provides important habitat for endangered aquatic and riparian species.

21

22

The Center's and SSSR's legal claims in these two cases assert that the U.S. Fish

23

and Wildlife Service ("FWS") and U.S. Forest Service, in issuing the 2016 Biological

24

Opinion[1], 2017 Record of Decision, and 2013 Environmental Impact Statement ("EIS")

25

for the Rosemont Mine, violated the Endangered Species Act ("ESA"), National

26

27

28

[1] The Center also challenges FWS' 2013 Biological Opinion for the Rosemont Mine, to the extent FWS relies on or incorporates it by reference in the 2016 Biological Opinion.

Environmental Policy Act ("NEPA"), Forest Service Organic Administration Act of 1897, Clean Water Act ("CWA"), Federal Land Policy Management Act ("FLPMA"), Administrative Procedure Act, and other laws and regulations.  ECF 101 at 1; ECF 107 at 1-2.  Both cases have been fully briefed on cross motions for summary judgment.

Following the completion of the summary judgment briefing, the Forest Service completed its authorization for the entire Rosemont Mine Project (ECF 176) and Rosemont intends to begin mining related activities as early as July, 2019.  ECF 177; ECF 188; Fink Dec., Exh. B.  Without issuance of a preliminary injunction, the status quo will be up-ended as Rosemont begins ground-disturbing activities including 36 drilling operations, the excavation and installation of a water delivery pipeline and high-voltage electrical transmission line, and road construction and reconstruction.  Fink Dec., Exh. A at 10-15, Exh. B at 2.  In the fall of 2019, the company intends to substantially ramp up Mine construction, with clearing, grubbing, and grading hundreds of acres of public lands, including jaguar critical habitat.  Id., Exh. A at 11, 17.

These cases are two of five cases challenging the proposed Rosemont Mine.  In addition to this motion, Plaintiffs Tohono O'odham Nation, Pascua Yaqui Tribe, and Hopi Tribe in case 18-cv-00189 (C) are also filing a motion for a preliminary injunction in their case challenging the Forest Service's decisions approving the Rosemont Mine.  Additionally, the Plaintiffs in the two consolidated cases challenging the U.S. Army Corps of Engineers' ("Corps") issuance of the CWA Section 404 Permit (19-cv-00177 and 19-cv-00205) are also filing motions for preliminary injunctions.

1

## FACTUAL BACKGROUND

2    The factual background for the Center's challenge to the 2016 Biological Opinion

3    is provided at ECF 107 at 3-8, and ECF 108; and the background for SSSR's challenge to

4    the 2013 EIS and 2017 Record of Decision is found at ECF 101 at 2-10, and ECF 102.

5    For a brief summary, the Rosemont Mine would include a 955-acre open pit

6    (6,500 feet in diameter), with a final depth of nearly 3,000 feet.  ECF 108, ¶¶ 5, 7.  The

7    Mine would leave behind over a billion tons of waste rock covering 1,460 acres, and

8    mine tailings covering 987 acres.  Id., ¶ 7.  The Mine would fill approximately 18 miles

9    of streams, and the Mine pit would "permanently reverse the natural direction of

10   groundwater flow toward and into the mine pit, and away from the sensitive aquatic

11   habitats in the Las Cienegas [National Conservation Area] and Cienega Creek Natural

12   Preserve."  Id.,¶¶ 10-13.  The Forest Service issued the Draft EIS for public comment in

13   2011, the Final EIS was completed in 2013, and the Record of Decision was signed in

14   2017.  FSAR Doc. 050161 at 0259797-98.  Because the Mine would adversely affect

15   numerous threatened and endangered species, the Forest Service consulted with FWS

16   pursuant to the ESA, resulting in the 2016 Biological Opinion.  FWSAR Doc. 520.

17

18

19   ## STANDARD OF REVIEW

20   To obtain preliminary relief, a plaintiff "must establish that he is likely to succeed

21   on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

22   relief, that the balance of equities tips in his favor, and that an injunction is in the public

23   interest."  Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008).  When irreparable

24   harm is likely and the public interest favors a stay, "[a] preliminary injunction is

25   appropriate when a plaintiff demonstrates . . . that serious questions going to the merits

26   were raised and the balance of hardships tips sharply in the plaintiff's favor."  Alliance

27

28

for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011), *quoting* Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008).

Here, both cases have been fully briefed on cross-motions for summary judgment, and Plaintiffs rely on their summary judgment briefing to demonstrate that they are likely to succeed on the merits of their claims.  This Memorandum therefore focuses on the irreparable harm to Plaintiffs and the environment that would occur in the absence of an injunction, the balance of harms, and the public interest.

## ARGUMENT

**I.      The Rosemont Mine Project Will Result in Immediate and Irreparable Harm to Plaintiffs and the Santa Rita Mountains.**

The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often . . . irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 545 (1987).  This is particularly true where the activities would occur in a desert ecosystem, as "once the desert is disturbed, it can never be restored." Save Our Sonoran v. Flowers, 408 F.3d 1113, 1126 (9th Cir. 2005).

Moreover, SSSR's case against the Forest Service includes NEPA claims, where "[t]he likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high."  S. Fork Band Council of W. Shoshone v. Dep't of Interior, 588 F.3d 718, 728 (9th Cir. 2009).  If agency action is allowed to proceed prior to compliance with federal environmental laws, "a bureaucratic steam roller" might be unleashed, making it difficult to alter the outcome of analyses retroactively.  Davis v. Mineta, 302 F. 3d 1104, 1115 (10th Cir. 2002) *citing* Sierra Club v. Marsh, 872 F.2d 497, 504 (1st Cir. 1989); *see also* San Luis Valley Ecosystem Council

v. U.S. Fish & Wildlife Serv., 657 F. Supp. 2d 1233, 1241 (D. Colo. 2009) ("the Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [Rosemont is] permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking."). Accordingly, NEPA compliance must occur *before* implementation otherwise the public "will have been deprived of the opportunity to participate in [the] NEPA process at a time when such participation . . . is calculated to matter."  Save Strawberry Canyon v. Dep't of Energy, 613 F. Supp. 2d 1177, 1189 (N.D. Cal. 2009).

As explained in prior briefing and declarations, the Rosemont Mine will result in severe, irreparable environmental impacts at both the Mine site and downgradient in the Cienega Creek watershed.  *See* ECF 107 at 7-8; ECF 107-1; ECF 107-2; ECF 101 at 2-10; ECF 101-1; ECF 101-4.  The severity and extent of these impacts drew serious concerns from other agencies, Pima County, and the affected Tribes throughout the administrative process.  *See e.g.*, FWSAR Doc. 342 at FWS076122 (EPA explaining that the "[f]illing [of] streams, constructing the massive mine pit (2,900 feet deep), and land clearing disturbance will dramatically alter in perpetuity the topography and surface and subsurface hydrology within the Cienega Creek watershed."); FSAR Doc. 46523 at 032113 (Pima County, commenting that the "proposed Rosemont action irreversibly impacts Waters of the United States (Waters) and seeps and springs that will be lost forever."); FSAR Doc. 048490 (Tohono O'odham Nation, explaining that the Mine "will have a disastrous impact on the Nation," and the affected cultural and environmental resources "are irreplaceable and an integral part of our heritage.").

The beginning of this irreparable environmental harm is imminent, as Rosemont intends to move forward with ground-disturbing, mining-related activities as early as July, 2019, with more substantial activities beginning as early as the fall of 2019.  Fink

5

Dec., Exh. A at 10-15, Exh. B at 1-3.  The initial activities beginning in the summer include "a drilling program," which would include drilling at 36 locations, the "pioneer[ing]" of "some new roadways," the construction of "new intersections off State Route 83" and at "Rosemont Junction," and the construction of a 20-inch water pipeline and a high voltage transmission line "from Sahuarita across over the Santa Rita Mountains."  Fink Dec., Exh. A at 11-15, Exh. B at 2.

Counsel for Rosemont has attempted to characterize these initial activities as causing "relatively minor impacts," however, the construction of the water pipeline would admittedly cause "some impacts to washes that are considered to be waters of the US," and the water pipeline and transmission line "will impact some archaeological sites."  Fink Dec., Exh. A at 14-15.[2]  Additionally, as explained by Julia Fonseca[3], Environmental Planning Manager for Pima County, for its drilling program Rosemont will need to "clear drill pads at each borehole and construct access roads, where required."  Fonseca Dec. ¶ 10 (ECF 201-10).  The clearing of drill pads "will directly remove native vegetation cover and destroy soil structure."  Id. ¶ 11.

Furthermore, the drilling of boreholes of any kind "irreparably alters the movement of air and water in geological formations to some degree."  Id. ¶ 12.

> Boreholes in the Rosemont area can also allow water to discharge from the aquifer . . . Boreholes can also allow water to move much more quickly from one geological stratum to another, draining perched aquifers where they exist, or allowing upward movement of some groundwaters.

---

[2] The Center supports the Tribes' arguments and Declarations showing that, of all the immediate and irreparable harms that will occur, damage to Tribal cultural resources is the most profound.

[3] Ms. Fonseca has worked in the Cienega Creek watershed as a hydrologist and in other related positions for over two decades, and with Pima County a cooperating agency in the NEPA process for the Rosemont Mine proposal, Ms. Fonseca has been reviewing information concerning this proposal since 2006.  Fonseca Dec., ¶¶ 3-5.

Id.  Moreover, "[b]oreholes provide long-lasting conduits for pollutants to move much more easily into aquifers from the land surface as well."  Id.

A preliminary injunction is intended not only to prevent immediately impending harms, but also preserve the *status quo* pending full judicial review on the merits.  "A preliminary injunction . . .  is not a preliminary adjudication on the merits but rather a device for preserving the status quo and preventing the irreparable loss of rights before judgment."  Sierra On–Line v. Phoenix Software, 739 F.2d 1415, 1422 (9th Cir.1984). Accordingly, the question is not whether the damage from the initial couple of months of Project related work over the summer is "minor" (which is not the case regardless), the issue is whether *all* the damage that would be inflicted on the environmental and cultural resources until the case is fully resolved on the merits is irreparable.

Here, beginning in "roughly October," Rosemont intends to "get into more serious land-clearing activities in connection with mine construction."  Fink Dec., Exh. A at 17. This includes "going in and conducting . . . major clearing and grubbing of the area."  Id. at 11.[4]  These "land-clearing activities" include the "removal of trees and other aboveground vegetation," while the grubbing "is the removal of stumps and roots." Fonseca Dec., ¶ 14.   "After clearing and grubbing, Rosemont will remove topsoil and subsoil, which will destroy soil structure and horizonation."  Id.  "Soil horizons and other structures are the result of soil-forming processes that take thousands to tens of thousands of years," and mine reclamation "cannot replicate the time-dependent soil features that are destroyed by the permitted activities."  Id. ¶ 15.  Additionally, "[s]ome 23,000 cords of merchantable timber" would also be removed from these drainages, and there "is no

---

[4] Rosemont also intends to begin major ground-disturbing activities at the Sonoita Creek Ranch mitigation site "sometime in the fall" of 2019.  Fink Dec., Exh. A at 36.

practicable way to restore" these plants once destroyed.  Id. ¶ 21; *see also* id. ¶ 22 (explaining additional irreparable harm to habitat features on the site).  Thus, this harm would be irreparable, particularly in this desert ecosystem.  Save Our Sonoran, 408 F.3d at 1126.

Declarations from Plaintiffs' members further highlight the immediate and irreparable harms that would occur to Plaintiffs' interests and the environment unless the Court grants the requested preliminary injunction.  *See e.g.* Serraglio Dec. ¶ 26 ("The impacts that would commence with preliminary activities this summer and the beginning of construction this fall would immediately and irreparably harm my use and enjoyment of the project area, . . . by impeding access to some areas, ruining scenic vistas and drives, degrading and destroying habitat, and reducing the chances for recovery of a number of protected species"); Hartmann Dec. ¶ 13 ("Rosemont's commencement of Project construction, from June-August, and into the fall and 2020 and beyond, will absolutely and immediately preclude my uses and enjoyment of these lands and waters"); Featherstone Dec. ¶ 8 ("More specifically regarding Rosemont's proposed operations in the coming months . . . represent a severe and immediate intrusion into the unspoiled resources of the area that I use and value.").  Both the initial activities and their resulting scars to the desert, as well as the substantial activities that would begin this fall, would be a permanent reminder of the destruction that the Mine will cause to lands and watershed that Plaintiffs' members know, love, and routinely enjoy for recreation, solitude, photography, birdwatching, educational, spiritual, professional, and aesthetic purposes. Serraglio Dec. ¶ 20; Hartmann Dec. ¶¶ 7, 9; Featherstone Dec. ¶ 9.

Additionally, the Center and SSSR also face the threat of likely, irreparable harm to ESA-listed species and their critical habitat at the Mine site if the project is not enjoined while this case is heard.  For species and habitat protected by the ESA, harm to

individual members of an endangered species is considered irreparable.  *See* Cascadia
Wildlands v. Scott Timber Co., 715 Fed. Appx. 621, 624 (9th Cir. 2017) (in evaluating
irreparable harm, "the district court correctly required harm to [plaintiffs'] interest in
individual members of the . . . species as opposed to harm to the entire species itself.").
"Harm to those members is irreparable because '[o]nce a member of an endangered
species has been injured, the task of preserving that species becomes all the more
difficult.'"  Nat'l Wildlife Fed'n . Nat'l Marine Fisheries Serv., 886 F.3d 803, 818 (9th
Cir. 2018), *quoting* FCC v. Rosboro Lumber, 50 F.3d 781, 785 (9th Cir. 1995).

 The FWS acknowledged in the 2016 Biological Opinion that immediate harm to
the jaguar and its critical habitat will occur upon the commencement of Project activities:

> the proposed project will result in degradation of jaguar habitat and disturbance to
> jaguars.  Construction and operations of the mine, including the associated roads,
> will result in removal, destruction, and degradation of jaguar habitat and jaguar
> prey habitat and is likely to disturb jaguars, causing changes in, among other
> things, their habitat use and movement patterns.

FWSAR Doc. 520 at FWS049624.  These expected impacts to jaguar and jaguar habitat
will range from "long-term" (defined as 30 years) to "permanent."  Id. at FWS049624-25.
FWS also determined that impacts to Chiricahua leopard frogs "are reasonably certain to
occur," and "are mostly likely to be heavily weighted towards the beginning phase of
project implementation."  FWS AR Doc. 340 at FWS046505.

> Specifically, *the majority of adverse effects are likely to result from the 18-month
> initial period of construction* which will include the use of heavy earth-moving
> equipment to clear vegetation, build roads, construct infrastructure, manipulate
> area drainage patterns, [and] build power lines and their access roads.

Id. at FWS046505-06 (emphasis added).  Rosemont's intention to commence clearing,
grubbing, grading, and filling of washes throughout the Mine site as soon as this fall are

the very activities that will have these adverse impacts on the jaguar's critical habitat and Chiricahua leopard frogs found at the Mine site.  Serraglio Dec. ¶ 16.

Additionally, construction of the utility line, which would result in 899 acres of "permanent effects" (FWS AR Doc. 520 at FWS049625), would cause the "direct removal of 67 Pima pineapple cactus and permanent or temporary effects to approximately 33.2 acres" of this cactus' habitat.  FWS AR Doc. 520 at FWS049691. "Although some areas of temporary disturbance may recover, it may take many years before full recovery is achieved," as researchers have "found that desert vegetation is fragile and easily destroyed, but does have a long-term potential (probably measured in centuries) to recover from substantial disturbance such as that associated with the construction of a utility corridor."  Id.  These anticipated impacts to federally-listed species, beginning with the initial construction, would significantly impair Plaintiffs' members use and enjoyment of this site.  *See e.g*., Serraglio ¶¶ 14-16, 18, 24.

As the Court noted at the April 18, 2019 status conference, the pending cases against FWS and the Forest Service are complex, raise serious legal issues, and involve an extensive and voluminous administrative record.  Fink Dec., Exh. A at 6-7.  While the Court stated its intention is to issue a ruling on the motions for summary judgment by the end of the summer (id. at 39), Rosemont's construction operations would be ongoing at that time and would, according to the company, significantly ramp-up this fall.  The issuance of a temporary injunction would protect Plaintiffs' interests by preventing irreversible environmental harm prior to the resolution of this case on the merits.

## II.    The Balance of Hardships and the Public Interest Tip Sharply in Favor of Plaintiffs.

The Supreme Court explained in Tenn. Valley Auth. v. Hill, 437 U.S. 153, 194 (1978), that "Congress has spoken in the plainest of words, making it abundantly clear

that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution.'" Thus, for the Center's ESA claims, the Court is to "presume that remedies at law are inadequate, that the balances of interests weigh in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." Nat'l Wildlife Fed'n., 886 F.3d at 817.  Moreover, for both cases, the balance of hardships and public interest tip sharply in favor of the Plaintiffs and support the issuance of an injunction.

A.    The Public Interest Weighs Heavily in Favor of a Preliminary Injunction.

The public interest weighs heavily in favor of preserving the *status quo* and preventing irreparable harm until this Court has fully reviewed the merits.  "The public interest strongly favors preventing environmental harm.  Although the public has an economic interest in the mine, there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce significantly any future economic benefit that may result from the mine's operation." Se. Alaska Conservation Council v. U.S. Army Corps of Engr's, 472 F.3d 1097, 1101 (9th Cir. 2006).

The public interest in favor of a preliminary injunction is especially acute when faced with violations of environmental laws.  As the Ninth Circuit held in considering a preliminary injunction against a large mining project:

> Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward.  Suspending a project until that consideration has occurred thus comports with the public interest.

S. Fork Band Council, 588 F.3d at 728; *see also* Save Our Sonoran, 408 F.3d at 1124, 1126.  "The preservation of our environment, as required by NEPA . . . is clearly in the public interest." Sierra Club. v. Bosworth, 510 F.3d 1016, 1033 (9th Cir. 2007).

Although issuing a preliminary injunction is not automatic, "[c]onsistent with *Amoco Production Company,* we have held that the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits of their underlying claim." Alliance for the Wild Rockies, 632 F.3d at 1138 (irreparable harm from logging on public lands).

As indicated above, the affected Tribes, other agencies, the local government, and the public strongly voiced opposition to the proposed Rosemont Mine throughout the administrative process. *See e.g.* FSAR Doc. 048490 (Tohono O'odham Nation's objection to the project); FSAR Doc. 46523 (Pima County opposition); FSAR Doc. 048492 (Arizona Game and Fish Department's objection to the project); FWSAR Doc. 342 (EPA's detailed concerns that the project will cause "significant, persistent degradation of the regional aquatic environment."); FSAR Doc. 046525 (BLM's concerns about the impacts to the Las Cienegas National Conservation Area). The overwhelming support for keeping the Santa Rita Mountains free from these permanent impacts shows that the public interest favors an injunction.

Lastly, the public has a strong interest in ensuring that federal agencies comply with laws designed to protect the public waters, lands, and public participation. This case "invokes a public interest of the highest order: the interest in having government officials act in accordance with law." Seattle Audubon Soc'y v. Evans, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991); *see also* Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 235 F.Supp.2d 1143, 1162 (W.D. Wash. 2002) (injunction against Corps and other agencies). Here, the public interest in lawful decisionmaking and the Santa Rita Mountains' and downgradient habitat and wildlife weighs heavily in favor of an injunction.

12

B.     <u>The Interests of the Forest Service and Rosemont Are Not Sufficient to Override the Interests of Plaintiffs and the Public.</u>

The Forest Service's and FWS' interests in this Motion are negligible and do not outweigh the Plaintiffs' interest in preventing irreparable environmental harm.  The temporary economic impacts to Rosemont are also not irreparable.

> "[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . .The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . .are not enough."  <u>Sampson v. Murray</u>, supra, 415 U.S. 61, 90 (1974).

<u>L.A. Mem'l Coliseum Comm. v. NFL</u>, 634 F.2d 1197, 1202 (9th Cir.1980).

As the Ninth Circuit stated in upholding an injunction against a large-scale land development in Arizona:

> The district court determined that the balance of hardships tipped in [Plaintiff's] favor because, if wrongfully restrained, Lone Mountain "may suffer financial harm," but if an injunction does not issue, unlawful disruption to the desert is likely irreparable.  The district court's analysis is a classic, and quite proper, examination of the relative hardships in an environmental case.

<u>Save Our Sonoran</u>, 408 F.3d at 1125.  Thus, where there is a threat of irreparable environmental harm, "more than pecuniary harm must be demonstrated" in order to avoid a preliminary injunction, even though mining interests may face a "real financial hardship."  <u>N. Alaska Envtl. Ctr. v. Hodel</u>, 803 F.2d 466, 471 (9th Cir. 1986).

At bottom, as a for-profit-foreign mining company, Hudbay/Rosemont made a business decision betting on a copper mine when it purchased the mining claims and properties at the site.  As with any business decision, there is potential that investments do not pay off.  Because Plaintiffs face irreparable environmental harm and Hudbay/Rosemont face only reparable and speculative monetary harm—a risk willingly assumed—the balance of hardships tips sharply in the Plaintiffs' favor.

**III.    Plaintiffs Are Likely to Succeed on the Merits.**

When irreparable harm is sufficiently likely and the public interest favors a stay, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  <u>Alliance for the Wild Rockies</u>, 632 F.3d at 1134-35.  "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."  <u>Id</u>. at 1131.  Under this test, "serious questions going to the merits" is defined as:

> Serious questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."  Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits."

<u>Republic of the Phil. v. Marcos</u>, 862 F.2d 1355, 1362 (9th Cir. 1988).

Because the merits of these cases, along with the merits of the consolidated case filed by the Tribes, have been fully briefed, Plaintiffs do not believe that further briefing on the merits is needed here.  At a minimum, Plaintiffs have raised in those briefs "serious questions" regarding the legality of FWS' and the Forest Service's actions warranting issuance of the requested preliminary injunction.  *See* ECF 101; ECF 107; ECF 141; ECF 147.

**IV.    No More Than a Nominal Bond Is Appropriate in this Case.**

Under F.R.C.P. 65(c), in order to obtain a preliminary injunction, a plaintiff must generally post a bond in such sum as the court deems proper.  However, the "court has discretion to dispense with the security requirement, or to request a mere nominal

security, where requiring security would effectively deny access to judicial review." <u>Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency</u>, 766 F.2d 1319, 1325-26 (9th Cir. 1985) (no bond where plaintiffs were public interest organizations seeking to protect the environment); *see also* <u>Friends of the Earth v. Brinegar</u>, 518 F.2d 322, 323 (9th Cir. 1975) ($1,000 bond);  <u>League of Wilderness Defenders v. Zielinski</u>, 187 F. Supp. 2d 1263, 1272 (D. Ore. 2002) (no bond in NEPA case).

Here, Save the Scenic Santa Ritas and Arizona Mining Reform Coalition are small local nonprofit organizations with little financial resources.  *See* Hartmann Dec. ¶ 15 (SSSR); Featherstone Dec. ¶ 16 (AMRC).  Although the Sierra Club and Center for Biological Diversity are larger nonprofit organizations, for all Plaintiffs, a requirement of more than nominal bond would represent a real financial hardship and prevent Plaintiffs from vindicating their rights and frustrate legitimate judicial review.  Suckling Dec. ¶¶ 8-11 (Center for Biological Diversity); Hartman Dec. ¶ 15 (SSSR); Isherwood Dec. ¶¶ 8-11 (Sierra Club); Featherstone Dec. ¶ 16 (AMRC).

## CONCLUSION

Plaintiffs Center and SSSR satisfy the test for a preliminary injunction, and the Court should immediately enjoin Federal Defendants, FWS and Forest Service, from authorizing or allowing any ground disturbance, construction, operation, or any other activity approved by the Forest Service in its March 20, 2019 approval of the revised Mine Plan of Operations (referenced in ECF 176), including its reliance on the challenged Biological Opinion and Final Environmental Impact Statement, and immediately enjoin Defendant-Intervenor Rosemont from conducting or commencing any activity authorized or approved in the above-noted Record of Decision or revised Mine Plan of Operations, pending the final resolution of these cases on the merits.

Respectfully submitted this 15th day of May 2019.

*Allison N. Melton*
Allison N. Melton (CO Bar No. 45088)
Center for Biological Diversity
128 Cascadilla St./#3024
Crested Butte, CO  81224
Phone (970) 309-2008
Email: amelton@biologicaldiversity.org

Brendan Cummings (CA Bar No. 193952)
Center for Biological Diversity
1212 Broadway #800
Oakland, CA 94612
Phone: 510-844-7100
Email: bcummings@biologicaldiversity.org

Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, MN 55805
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org
*Attorneys for Plaintiff in 17-cv-00475 (Lead)*

Roger Flynn (CO Bar # 21078)
Jeffrey C. Parsons (CO Bar #30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
Phone: (303) 823-5738
Fax: (303) 823-5732
wmap@igc.org
*Attorneys for Plaintiffs in 17-cv-00576 (C)*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2019, I electronically transmitted the foregoing to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all parties.

<u>*/s/Allison N. Melton*</u>
Allison N. Melton