1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8

9 Center for Biological Diversity, et al.,  No. CV-17-00475-TUC-JAS (L)
10              Plaintiffs,  No. CV-17-00576-TUC-JAS (C)
                            No. CV-18-00189-TUC-JAS (C)
11 v.                       **CONSOLIDATED**

12 United States Fish and Wildlife Service, et  **ORDER**
   al.,
13
              Defendants.
14

15

16          Pending before the Court are motions for summary judgment filed by Plaintiffs and

17 Defendants,[1] and motions for preliminary injunction filed by Plaintiffs. The litigation in

18 these cases stems from the evaluation and ultimate approval of the Rosemont Mine by

19 various agencies of the federal government. These motions are discussed below.

20 **PART ONE: OVERVIEW OF THE LITIGATION RELATING TO THE
   ROSEMONT MINE**
21

22          The United States Forest Service ("Forest Service") gave final approval to

23 Rosemont Copper Company ("Rosemont") to conduct a large-scale pit-mining operation

24 within the boundaries of the Coronado National Forest. The Santa Rita Mountains lie to

25 the south of Tucson, Arizona and are within the Coronado National Forest, which is

26 managed by the Forest Service. Rosemont's proposed mining operation is projected to

27 impact thousands of acres of the Santa Rita Mountains.

28 ───────────────────
[1] References to Defendants throughout this Order include the Intervenor-Defendant (i.e.,
Rosemont).

The open-pit mine itself, which contains the valuable minerals (primarily copper) that Rosemont proposes to extract, will directly impact approximately 955 acres of land.[2] After Rosemont has completed extraction of material from the pit over the next 20 to 25 years, the circular pit will measure approximately 3,000 feet in depth and 6,000 feet in diameter.[3] In the course of digging through 3,000 feet of geologic material, Rosemont will penetrate the wall of the groundwater table lying beneath the Santa Rita Mountains and will need to pump groundwater out of the pit to continue their mining operations. After Rosemont ceases its mining operations in 20 to 25 years, Rosemont will turn off the pumps, and the pit will then act as a hydraulic sink such that the pit will fill with groundwater. To gain access to the valuable copper, molybdenum, and silver in the ore, Rosemont will have to extract approximately 1.2 billion tons of waste rock (i.e., geologic material without economic value) and approximately 700 million tons of tailings (i.e., waste material left over after extracting the valuable fraction from the uneconomic fraction of the ore) (collectively "1.9 billion tons of waste"). The Rosemont Mine will impact approximately 3,653 acres of the Coronado National Forest. Outside of the 955-acre pit, Rosemont will dump approximately 1.9 billion tons of its waste on approximately 2,447 acres[4] of the Coronado National Forest.

The Forest Service found that the Rosemont Mine would not be consistent with the Forest Service's "Coronado National Forest Land and Resource Management Plan" ("Forest Plan"). *See* Forest Service's Final Environmental Impact Statement for the Rosemont Copper Project ("FEIS") at 114. The Forest Service found that the Rosemont

---

[2] The 955 acres is a combination of private and public land. This would include 590 acres of private land and 365 acres of the Coronado National Forest (i.e., comprising a total of 955 acres).

[3] Rosemont estimates that the pit will produce 5.3 billion tons of copper, 142 million tons of molybdenum, and 79 million ounces of silver; at full production, Rosemont estimates that the mining project will produce 10% of the nation's domestic copper supply.

[4] The 1.2 billion tons of waste rock will be dumped on approximately 1,460 acres of the Coronado National Forest, and the 700 million tons of tailings will be dumped on approximately 987 acres of the Coronado National Forest (i.e., comprising a total of approximately 2,447 acres). The Court notes that the numbers cited throughout this Order (i.e., acres, weight, volume, areas of land, locations and volumes of minerals and mineral formations, etc.) are approximations; for ease of reference, the Court will omit constant references to "approximately." Unless otherwise noted by the Court, the numbers discussed herein are approximations.

Mine would be:

> Inconsistent with standards and guidelines [of the Forest Plan] related to the following:
>> Maintenance, rehabilitation, and enhancement of visual resources
>> Protection of cultural resources
>> Maintenance and improvement of wildlife habitat
>> Maintenance and protection of existing riparian resources
>> Maintenance of wildlife and plant diversity
>> Maintaining buffers around watering and feeding areas
>> Retention of riparian area
>> Amount of riparian area
>> Diversity of riparian species
>> Maintenance of riparian area productivity
>> Minimizing soil damage
>> . . .
>> Maintenance of vegetative structure
>> Loss of horizonal structure
>> Loss of vertical structure
>> Delisting threatened and endangered species and reoccupying historic habitat

*See* FEIS at 115 ("Table 8. Coronado National Forest Plan consistency considerations").

As recognized by the Forest Service, among the cultural resources impacted by the Rosemont Mine would be the disturbance and desecration of 33 ancient Native American burial grounds containing, or likely containing, the human remains of ancestors of the Tohono O'odham Nation, Pasqua Yaqui Tribe, and Hopi Tribe (collectively "Tribes"); there is also the potential for additional disturbance and desecration of unmarked and unrecognized graves outside known cemetery areas. *See* FEIS at 1036-1040. The Forest Service further acknowledged that the Rosemont Mine would adversely impact the Tribes': "historic properties, human burials, sacred sites . . . villages and graves of ancestors and traditional resource gathering areas, would be destroyed . . . These impacts are severe, irreversible, and irretrievable . . . [The Rosemont Mine] would destroy this historical and cultural foundation [of the Tribes], diminish tribal members' sense of orientation in the world, and destroy part of their heritage." *See* FEIS at 1036-1037.

As referenced above, as the Rosemont Mine would be inconsistent with the preexisting Forest Plan, the Forest Service changed the Forest Plan to accommodate

Rosemont's mining plan ("Rosemont Plan"). *See* Forest Service's Record of Decision ("ROD") at 32 ("[The Forest Service] determined that modifying [Rosemont's Mining Plan] to comply with the current Coronado [Forest Plan] would materially interfere with [Rosemont's] mineral operations . . . [therefore, the Forest Service amended the Forest Plan] contemporaneously with the approval of [Rosemont's Mining Plan] so that [Rosemont's mining] project or activity will be consistent with the [Forest Plan] as amended."); *see also* FEIS at 115 (Table 8: discussing how the Rosemont Plan was inconsistent with the preexisting Coronado National Forest Plan).

Due to the extensive impact of the Rosemont Mine on the Coronado National Forest, numerous parties have filed lawsuits arguing that the approval of the Rosemont Mine violates the law. All of these lawsuits have been consolidated with this Court.

In CV 17-475-TUC-JAS ("Case 1"), the Center for Biological Diversity ("CBD") filed suit against the U.S. Fish and Wildlife Service ("FWS") and the Forest Service. CBD argues that the Forest Service's consultation and reliance on the FWS's Biological Opinion as to the Rosemont Mine is erroneous as the FWS violated the Endangered Species Act ("ESA") in analyzing the adverse impacts of the mine on threatened and endangered species (including the jaguar, ocelot, Gila chub, Gila topminnow, desert pupfish, Chiricahua leopard frog, northern Mexican garter snake, southwestern willow flycatcher, western yellow-billed cuckoo, lesser long-nosed bat, Huachuca water umbel) and their remaining habitat. Rosemont brought a cross-claim against FWS. In the cross-claim Rosemont argues that FWS exceeded its statutory authority when designating portions of the Santa Rita Mountains as a critical habitat for the jaguar species and that FWS also violated the Endangered Species Act ("ESA") by failing to review the designation of the jaguar as an endangered species.

In CV 17-576-TUC-JAS ("Case 2"), Save the Scenic Santa Ritas, Arizona Mining Reform Coalition, Center for Biological Diversity, and the Grand Canyon Chapter of the Sierra Club (collectively "SSSR") filed suit against the United States, the Forest Service, and several supervisory officials of the Forest Service.

In CV 18-189-TUC-JAS ("Case 3"), the Tohono O'odham Nation, Pasqua Yaqui Tribe, and Hopi Tribe (collectively "Tribes") filed suit against the Forest Service, the U.S. Secretary of Agriculture, and several supervisory officials of the Forest Service. In Cases 2 and 3, SSSR and the Tribes both argue that the Forest Service misapplied various statutes and regulations relating to mining and management of federal lands (such as the Mining Law of 1872, the Organic Act of 1897, and the Multiple Use Act of 1955), and therefore failed to properly exercise its broad discretion and authority (and consider project alternatives) to protect the Coronado National Forest from depredations. In Case 2, SSSR also argues that the Forest Service erroneously evaluated its authority, impacts, and mitigation relating to: the mine pit lake (which will form when mining ceases), dewatering of the groundwater table which will dry up surrounding streams, springs, and seeps, and the impact these water issues will have on wildlife that depend on the water. In Case 3, the Tribes also argue that the Forest Service failed to comply with the National Historic Preservation Act ("NHPA") in failing to protect historic and archaeological treasures that form a core part of the cultural legacy of the Tribes; the NHPA claims are closely connected to the Tribes claims referenced above inasmuch as the Tribes argue that the Forest Service misapplied its discretion and authority from the inception of its analysis of the Rosemont Mine.

Cases 1, 2, and 3 have been consolidated ("Consolidated Case A") as they partially share a common administrative record and some factual and legal issues overlap (especially Cases 2 and 3). Shortly after the summary judgment motions became fully briefed in Consolidated Case A, two new cases related to the Rosemont Mine were filed with this Court. In CV 19-177-TUC-JAS ("Case 4"), Save the Scenic Santa Ritas, Center for Biological Diversity, Arizona Mining Reform Coalition, and the Grand Canyon Chapter of the Sierra Club (collectively "SSSR") filed suit against the U.S. Army Corps of Engineers ("Corps") and a U.S. Army Brigadier General with the Corps. In CV 19-205-TUC-JAS ("Case 5"), the Tohono O'odham Nation, Pasqua Yaqui Tribe, and Hopi Tribe (collectively "Tribes") filed suit against the same Defendants in Case 4. Plaintiffs in Cases 4 and 5 both

argue that the Corps improperly issued a permit for the Rosemont Mine to discharge "dredged or fill material" into the "Waters of the United States" ("WOTUS"). Plaintiffs argue that the discharges contain toxic pollutants that will seriously degrade numerous waterways connected to, and running like capillaries through, thousands of acres of the Coronado National Forest impacted by the Rosemont Mine. Cases 4 and 5 were consolidated as they implicate a common administrative record and have some overlapping factual and legal issues ("Consolidated Case B").[5]

Although the Forest Service is the lead agency in charge of evaluating and ultimately issuing the final approval for the Rosemont Mine to commence operations, the Forest Service would not issue a final approval for the mine until the Corps issued a permit for discharges into the WOTUS. The Corps issued their permit to Rosemont in March of 2019, and shortly thereafter, the Forest Service issued its final approval for Rosemont to commence mining activities in the Coronado National Forest. Rosemont filed a notice in these cases indicating that ground-disturbing activities would start in the near future, and after holding a status conference with the parties, Rosemont indicated that such activities would begin on August 1, 2019. In light of these circumstances, all of the Plaintiffs in Consolidated Cases A and B filed separate motions for preliminary injunction. All of the preliminary injunction motions became fully briefed in approximately the second week of July 2019.

The Court estimates that just the briefing pertaining to the summary judgment and preliminary injunction motions (i.e., memoranda, responses, replies) exceed a thousand pages (exclusive of the lengthy statements of fact). The administrative record in Consolidated Case A includes more than 50,000 documents, and the administrative record in Consolidated Case B also includes thousands of documents. In all, Plaintiffs argue that Defendants violated numerous laws, including: the Administrative Procedures Act

---

[5] While the focus and legal rulings in this Order only pertain to Consolidated Case A, the Court has included a brief discussion of Consolidated Case B to give a fuller picture of the Rosemont Mine Litigation. From the inception of Consolidated Cases A and B, Rosemont has been an intervenor-defendant in all five cases. The Court will be issuing a separate Order as to the pending motions in Consolidated Case B.

("APA"), the National Environmental Policy Act ("NEPA"), the Mining Law of 1872, the Organic Act of 1897, the National Historic Preservation Act ("NHPA"), the Clean Water Act ("CWA"), and the Endangered Species Act ("ESA"). Oral arguments as to Consolidated Cases A and B were held before this Court on July 23, 2019. Given the important interests and exigent circumstances involved, the Court informed the parties that it would issue an Order by August 1, 2019.

**PART TWO: SUMMARY OF THE DISPOSITIVE ISSUES IN CASES 2 AND 3 ("DISPOSITIVE CASE")**

In light of the extensive briefing, voluminous record, and time constraints, the Court does not address every single argument sprawled across all five cases in this Order. Rather, this Order only focuses on several dispositive issues raised in similar arguments made by both the Tribes and SSSR in Cases 2 and 3 (hereinafter, "Dispositive Case"). Given the sheer volume of information in the Dispositive Case, and the arcane areas of law at issue, Part Two summarizes this Court's view of the most significant issues and rulings as to the Dispositive Case, and then Part Three goes into a much deeper, extensive discussion of many of these issues. As Part Two is meant to briefly summarize the issues to serve as a roadmap for Part Three, the Court purposely omits legal citations and detailed discussion of language from statutes, cases, regulations, and manuals; this is covered in Part Three.

The focus of the Dispositive Case is the arbitrary and capricious actions of the Forest Service. The Court is granting summary judgment in favor of the Tribes and SSSR in the Dispositive Case and vacating and remanding the Forest Service's ROD and FEIS such that the Rosemont Mine cannot begin operations at this time. As there are no longer exigent circumstances justifying immediate injunctive relief, the Court is denying without prejudice all of the preliminary injunction motions filed in Consolidated Cases A and B.[6] While this Order grants relief in the Dispositive Case, the Court will issue a separate Order as to Case 1 on a future date.

---

[6] As referenced above, the Court will issue a separate Order in Consolidated Case B. The Court notes that Consolidated Case B is in its early stages, and no other motions were filed other than the motions seeking injunctive relief. An Order setting the briefing schedule for Consolidated Case B will be filed later in the week.

As to the Dispositive Case, the Court will often collectively refer to the Tribes and SSSR as the Plaintiffs, and all of the Federal Defendants and Rosemont as Defendants. Unless otherwise noted by the Court, all further discussions in this Order pertain only to the Dispositive Case.

Pertinent statutory authority[7] in this case includes: (1) the Mining Law of 1872 (30 U.S.C. §§ 22, 23, 26, 29, 42) ("Mining Law"); (2) the Organic Act of 1897 (16 U.S.C. §§ 478, 482, 551) ("Organic Act"); (3) the Surface Resources and Multiple Use Act of 1955 (30 U.S.C. § 612) ("Multiple Use Act"); (4) 30 U.S.C. § 611 ("Common Varieties Act"); (5) the APA and NEPA. Pertinent Forest Service regulatory authority in this case includes: (1) Part 228 (36 C.F.R. §§ 228.1, 228.2, 228.3, and 228.5(d)) ("Mining Regulations"); (2) 36 C.F.R. §§ 261.1(a) and (b), 261.9, and 261.10 ("General Prohibition Regulations"); (3) 36 C.F.R. §§ 251.50, 251.56(a), 251.54(e)(1), (e)(2), and (e)(5) ("Special Use Regulations"). Lastly, instructive Forest Service Manual provisions include: §§ 2813.2(2) and (7), and 2819.1(1).

As noted above, all of this statutory and regulatory authority, along with the relevant case law, is discussed in detail in Part Three of this Order. However, a summary of the issues at this point will streamline a fuller understanding of the discussion in Part Three.

The primary errors the Forest Service made in this case relate to Rosemont dumping 1.9 billion tons of its waste on 2,447 acres of the Coronado National Forest. As Rosemont had unpatented mining claims covering those 2,447 acres, the Forest Service accepted, without question, that those unpatented mining claims were valid. This was a crucial error as it tainted the Forest Service's evaluation of the Rosemont Mine from the start.

The Mining Law of 1872 grants exclusive property rights to miners who have valid unpatented mining claims. To have a valid unpatented mining claim, there must be a valuable mineral deposit[8] underlying the claim. If there is a valuable deposit underlying

_____

[7] The Court has included citations to the most relevant provisions of the statutes, regulations, and Forest Service Manual.
[8] Generally, a mineral deposit is considered valuable if a reasonable person would conclude that the minerals could be sold at a profit considering the costs of extraction, processing, transportation, and other related costs in bringing the mineral to market.

the claim, the miner has the exclusive right to extract and profit from those minerals, and the right to use the surface above those minerals for purposes of mining (even if the minerals and surface are located on federal lands such as the Coronado National Forest). As a practical matter, the process of obtaining unpatented mining claims has been a historically low bar; a miner could simply enter upon federal land, put up some stakes marking the land above a purported valuable mineral deposit (along with some "no trespassing" signs proclaiming the rights to the valuable minerals within the stakes), and record a notice with local authorities setting out the parameters of the purported deposit. However, having a piece of paper reflecting that one has unpatented mining claims does not show that one actually has *valid* unpatented mining claims. If there is no valuable mineral deposit beneath the purported unpatented mining claims, the unpatented mining claims are completely *invalid* under the Mining Law of 1872, and no property rights attach to those invalid unpatented mining claims.

The administrative record before the Forest Service reflected that there was no location of a valuable mineral deposit underlying the unpatented mining claims covering the 2,447 acres in question; as such, the record reflected that the unpatented claims were invalid.

Nonetheless, the Forest Service assumed that the claims were valid, assumed that Rosemont had the right to use those 2,447 acres to support its mining operation (i.e., by dumping 1.9 billion tons of its waste on that land), and from those assumptions attempted to minimize the environmental and cultural impacts stemming from Rosemont's purported rights connected to their invalid unpatented mining claims.

Defendants argue that the Forest Service (which is within Department of Agriculture) had no jurisdiction to issue a final decision as to the validity of Rosemont's unpatented mining claims; rather, jurisdiction over such claims lies with the Bureau of Land Management ("BLM", which is within the Department of the Interior). While Defendants are correct as to jurisdiction, that does not mean that the Forest Service had no obligation to assess Rosemont's surface rights. The Forest Service had no factual basis to

determine that Rosemont had valid unpatented mining claims giving them property rights over those 2,447 acres of land. Rather, the record strongly indicated the opposite. As a threshold matter, Rosemont's proposal to bury its 2,447 acres of unpatented mining claims under 1.9 billion tons of its own waste was a powerful indication that there was not a valuable mineral deposit underneath that land. Furthermore, geological studies and geological maps in the record before the Forest Service indicate there is primarily common sand, stone, and gravel beneath the land at issue; this does not constitute a valuable mineral deposit. Despite no jurisdiction to issue a final ruling as to validity, the Forest Service certainly was not powerless. The Forest Service's regulations and the Forest Service Manual specifically allow for the Forest Service to consult and request analysis from the BLM as to mining claims on Forest Service land, and the Forest Service can also have its own mineral examiner assess purported mining claims. In addition, there is case law in the Ninth Circuit reflecting that the Forest Service has pursued such options, initiated administrative complaints with the Department of the Interior to successfully declare mining claims on Forest Service land invalid, and these administrative decisions were ultimately affirmed via judicial review on appeal.

Relying on the Organic Act of 1897 and the Multiple Use Act of 1955, Defendants further argue that the Forest Service correctly recognized the limits of its authority, and therefore properly determined that Rosemont had the right to use those 2,447 acres of the Coronado National Forest to dump its 1.9 billion tons of waste (with the caveat that the Forest Service properly exercised its duties by attempting to limit the adverse environmental and cultural impacts of the waste site). Defendants correctly argue that the Organic Act states that mining cannot be prohibited on National Forest lands, and the Multiple Use Act states that mining and reasonably incidental mining activities are permitted and cannot be materially interfered with on federal lands. As such, Defendants argue that since Rosemont clearly has valuable mineral deposits underlying the 955 acre mine pit, Rosemont therefore has a right to dump 1.9 billion tons of its waste on the 2,447 acres of the Coronado National Forest because it is reasonably incident to its valid mining

claims. Thus, Defendants claim that it is irrelevant if Rosemont's unpatented mining claims on the 2,447 acres are completely invalid for lack of any valuable mineral deposit. These arguments are unpersuasive, however, as the Organic Act and Multiple Use Act did not create freestanding mining rights outside of the specific parameters of the Mining Law of 1872. The Organic Act simply recognized that the Forest Service could not prohibit mining activities on Forest Service land allowed by the Mining Law. Likewise, as relevant here, the Multiple Use Act also simply recognized that the United States could not prohibit mining activities allowed by the Mining Law on federal lands; in fact, the Multiple Use Act was specifically passed to curb abuses of the Mining Law (i.e., individuals and companies using fraudulent mining claims to monopolize federal land at no cost for non-mineral extraction purposes; in a report submitted to Congress related to the proposed Multiple Use Act, the Department of Agriculture estimated that likely no more that 40% of unpatented mining claims on Forest Service lands were valid). As the Organic Act and Multiple Use Act did not create rights independent of the Mining Law, and the record before the Forest Service reflects that Rosemont's mining claims on the 2,447 acres in question are invalid under the Mining Law, the Forest Service improperly found that Rosemont had the right to dump 1.9 billion tons of its waste on that land.

Lastly, Defendants argue that the Forest Service regulations allow Rosemont to use the 2,447 acres to dump its 1.9 billion tons of waste. However, the regulations state that mining activities on Forest Service land are permitted only as specifically authorized by the Mining Law of 1872. As Rosemont has no rights under the Mining Law as to the land at issue, it follows that the regulations certainly do not create independent rights that do not exist under the Mining Law.

As referenced above, the issues summarized in Part Two of this Order are discussed in extensive detail below.

**PART THREE: DETAILED ANALYSIS OF THE DISPOSITIVE ISSUES**

**I. Patented and Unpatented Mining Claims, the Location of Minerals, and the Administrative Process with the Forest Service Leading to Approval of the Mine**

Rosemont owns 132 patented mining claims within the boundaries of the Coronado

National Forest. *See* Conrad Huss, NI 43-101 Technical Report, 1 (2009). Rosemont owns these claims in fee simple and they do not belong or attach to the National Forest land. Additionally, Rosemont owns 949 unpatented claims located upon Forest Service land. *Id.* The parties dispute the legal rights as to this land as described in the Forest Service's FEIS.

As referenced above, to access and develop the copper ore within its claims, Rosemont plans to dig an open-pit mine that will unearth 1.2 billion tons of waste rock and 700 million tons of tailings. The FEIS defined waste rock as rock that "contains no ore metals or contains ore metals at levels below the economic cutoff value and must be removed to recover the ore." FEIS at 1344. Additionally, the FEIS described the amount of waste rock removed by rock type and the formation in which it lay. *Id.* at 173 (Table 15). Rosemont proposed to dump this 1.9 billion tons of waste to the east and southeast of the mine pit on Forest Service lands. *Id.* at 81 (Figure 17); ROD at 31.

Several rock formations underlie the areas Rosemont proposes to use for ore processing, and tailings and waste rock storage. Beneath the ore processing facilities area lies mainly Willow Canyon Formation as well as a strip of Mafic Lava. FEIS at 157. Beneath the tailings pile lies mainly Willow Canyon Formation and Apache Canyon Formation as well as some Gila Conglomerate, Mount Fagan Rhyolite and Schellenberger Formation to the east. *Id.* at 159. Finally, beneath the waste rock pile area lies mainly Gila Conglomerate with a strip of Older Alluvium that runs through the tailings pile area as well. *Id.* at 157.

Rosemont purports to maintain an interest in copper sulfide and copper oxide within their claims. *Id.* at 155-56. The sulfide ores exist "in potentially economic concentrations" as "Horquilla Limestone, Colina Limestone, quartz monzonite porphyry, and the Earp Formation." *Id.* (relative percentages and citation omitted). The copper oxide appears "in potentially economic concentrations" within "Willow Canyon arkose, quartz monzonite porphyry, and quartz latite porphyry and andesite. *Id.* at 156 (relative percentages omitted). Rosemont intends to extract over 641 million tons of copper oxide located primarily within the Willow Canyon Formation and 156 million tons of "Tertiary Gravels." *Id.* at 156, 166,

173 (Table 15). The FEIS alternatively described this copper oxide as existing in "potentially economic concentrations" and then later as "waste rock." *Id.* Moreover, within the Willow Canyon Formation, "[p]rimary copper mineralization is confined to rare localized areas of weak quartz veining that contain sparse very-fine grained bornite and chalcopyrite." William J. Daffron et. al., Arizona Geological Society, Rosemont Mine Tour, 6 (2007).

Regarding the tertiary gravels, under a subsection entitled "Rosemont Deposit Geology," the FEIS describes four rock formations as pertaining to the tertiary period. FEIS at 156. Among these it describes the Gila Conglomerate as "[l]ight brown, medium- to thick-bedded, conglomerate, pebbly sandstone, and sandstone with a calcareous matrix." *Id.* This section also acknowledges the conglomerate contains clasts of limestone, along with four other minerals. *Id.* The abundance of these clasts "varies, depending on the composition of nearby upslope areas." *Id.* The administrative record contains no information regarding whether the limestone within the Gila Conglomerate exists at economic concentrations.

Mount Fagan Rhyolite and Schellenberger Canyon Formation underlie the Gila Conglomerate to the east of the tailings pile. *Id.* at 159. Neither formation lists any of the host rocks purported to contain copper sulfide or oxide in potentially economic quantities. *Id.* at 160-01. The Schellenberger Formation contains a thin layer of "Mural limestone" less than 20 feet thick. *Id.* at 160. This limestone exists in the lower half of a formation that runs 2,500 feet deep, and which underlies two other layers that run at least 1000 ft. deep. *Id.* at 159-61. Rosemont does not contend that this limestone appears in potentially economic quantities. *Id.* at 155-56.

Likewise, the Apache Canyon Formation does not contain any of the minerals Rosemont contends host copper sulfide or oxide in potentially economic quantities. *Id.* at161. The FEIS describes the formation as "dominated by mudstone and arkosic-lithic sandstone" and "distinguished by its . . . dark, typically laminated, nonfossiliferous, fetid, micritic limestone." *Id.* The FEIS does not posit that any mineralization appears within

this formation. *Id.* Neither do the Defendants contend that this limestone hosts any economically viable mineralization. *Id.* at 155-56.

The administrative record shows no evidence of any mineralization within the Mafic Lava, nor the Older Alluvium. *Id.* at 156, 161. The Mafic Lava "are calcite and quartz and typically very fine grained." *Id.* at 161. Whereas the Older Alluvium contains "medium- to thick-bedded, sandy, pebble-cobble gravel with rare boulders, deried from upslope or upstream units." *Id.* at 156. Again, the Defendants do not contend that these formations host any economically viable mineralization. *Id.* at 155-56.

In addition to the Rosemont deposit, located at the site of the proposed mine pit, Rosemont claims two other "identified deposits or potential deposits at Peach-Elgin and Broadtop Butte." Rosemont Resp. ¶ 60. The Broadtop Butte deposits lies to the north of the Rosemont deposit while the Peach-Elgin deposit lies to the north west. *See* Rosemont Mine Tour at Claim Map, Sec. 4(c). Both deposits lie in patented land owned in fee simple by Rosemont. *Id.* The Willow Canyon and Gila Conglomerate Formations lie to the east and southeast. FEIS at 158.

In February of 2008, Rosemont submitted to the Forest Service a Mining Plan of Operations ("MPO"). ROD at 3. n. 4. In October of 2011, the Forest Service published a Draft Environmental Impact Statement ("DEIS"). *See* FEIS at i. From October 11, 2011 to January 31, 2012, the Forest Service received 24,845 public comments in connection with the DEIS. *Id.* at G-3. In December of 2013, the Forest Service published the FEIS. *See* ROD at 1. In June of 2017, the Forest Service issued a final ROD approving one of the alternatives considered in the FEIS. *See* ROD at 33-37.

## II. Relevant Statutory and Regulatory Law

As referenced above, numerous statutes and regulations are relevant to understanding the dispute in this case; this authority is discussed below.

### A. The Administrative Procedures Act ("APA")

The APA provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant

statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." *Id.* § 706(2)(A). Furthermore, the APA grants the Court authority to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706

A court may invalidate agency action as arbitrary and capricious if the agency: 1) bases its decision "on factors which Congress has not intended it to consider"; 2) entirely ignored or "failed to consider an important aspect of the problem"; 3) proffers "an explanation for its decision that runs counter to the evidence" considered; or 4) proffers an explanation "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").[9]

Generally, the Court must treat agency decisions with deference, particularly "when the agency is making predictions, within its special expertise, at the frontiers of science . . ." *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1099 (9th Cir. 2003). However, when an agency's actions are inconsistent with its own policies, the Court will examine first "whether the agency has actually departed from its policy," and second, "whether the agency has offered a reasoned explanation for such departure." *Bahr v. EPA*, 836 F.3d 1218, 1229 (9th Cir. 2016). Furthermore, the Court cannot sustain an agency action founded upon "an erroneous view of the law" rather than "the agency's own judgment . . ." *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985), *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (declaring "an order may not stand if the agency has misconceived the law").

Moreover, before deferring to an agency's interpretation of its own regulations, a "court must carefully consider the text, structure, history, and purpose of a regulation" as this practice "will resolve many seeming ambiguities out of the box" without a need for

---

[9] Unless otherwise noted by the Court, internal quotes and citations have been omitted when citing case law throughout this Order.

- 15 -

deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). These inquiries "establish the outer bounds of permissible interpretation" and help cabin any question as to the interpretation's reasonableness. *Id.* at 2416. Additionally, the Court must consider whether the "character and context of the agency interpretation entitles it to controlling weight" as well as whether the interpretation "in some way implicate[s] its substantive expertise." *Id.* Lastly, courts need not defer to an agency interpretation when "an agency interprets a rule that parrots the statutory text." *Id.* at 2417 n. 5.

### B. The National Environmental Policy Act ("NEPA")

NEPA mandates federal agencies prepare an environmental impact statement before engaging in a "major Federal action[]" that will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA instructs the Forest Service to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Under NEPA, an agency must take a "hard look" at the environmental consequences of a proposed action. *Nat. Res. Def. Council v. U.S. Forest Service*, 421 F.3d 797, 813-14 (9th Cir. 2005).

As part of this procedural duty, an agency must "study, develop, and describe appropriate alternatives" to any proposed action. 42 U.S.C. § 4332(2)(E). In doing so, an agency should "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). Among these, an agency must include a "no action" alternative. *Id.* § 1502.14(d). These considerations comprise "the heart of the environmental impact statement." *Id.* § 1502.14. Through this process, an agency decisionmaker will "have before them and take into proper account all possible approaches to a particular project (*including total abandonment of the project*) which would alter the environmental impact and the cost-benefit balance" before issuing a final decision. *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) (emphasis in the original) (alternations omitted).

In discussing these alternatives, the Forest Service must state how the alternatives "will or will not achieve the requirements of . . . other environmental laws and policies."

40 C.F.R. § 1502.2(d). A failure to consider viable alternatives or "present complete and accurate information to decision makers and to the public" regarding these alternatives will not meet the requirements of the NEPA. *See Nat. Res. Def. Council*, 421 F.3d at 813-14.

### C. Mining Law of 1872

The Mining Law of 1872 granted citizens the right to enter upon public land to prospect and, upon discovery, locate a mining claim. *See* 30 U.S.C. §§ 22, 23; *Davis v. Nelson*, 329 F.2d 840, 844-45 (9th Cir. 1964). A mining claim "is a parcel of land containing precious metal in its soil or rock." *St. Louis Smelting & Ref. Co. v. Kemp*, 104 U.S. 636, 649 (1881). Such a claim grants a claimant an alienable property interest. *See U.S. v. Shumway*, 199 F.3d 1093, 1099 (9th Cir. 1999). Furthermore, a valid mining claim grants its locator with an "exclusive right of possession and enjoyment of all the surface *included within the lines of their locations*." 30 U.S.C. § 26 (emphasis added). These rights "are not *conferred* by agency action; they are acquired by the miner's own actions of location and discovery." *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1162 (9th Cir. 2018) (emphasis in original).

### i. Discovery and Location

A claimant must first discover a valuable mineral deposit to assert a mining claim. *See* 30 U.S.C. §§ 22, 23 (no location of a mining claim shall be made until discovery of the vein or lode); *Davis*, 329 F.2d at 845 (explaining "discovery of [a] valuable mineral is the *sine qua non* of an entry to initiate vested rights against the United States"). This statutory prerequisite arose out of unregulated mining customs in the early to mid-1800s where "the finder of valuable minerals on government land [was] entitled to exclusive possession of the land for purposes of mining and to all the minerals he extracts." *Shumway*, 199 F.3d at 1097-99.

To determine whether a claim contains valuable minerals, courts use a "prudent-man test" and complimentary "marketability test." *U.S. v. Coleman*, 390 U.S. 599, 602 (1968). The prudent-man test asks whether "a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect

of success, in developing a valuable mine . . ." *Castle v. Womble*, 19 L.D. 455, 457 (1894). The marketability test helps refine this question by asking whether the minerals may be "extracted, removed and marketed at a profit." *Coleman*, 390 U.S. at 600.

Discoveries of "common varieties of sand, stone, gravel, pumice, pumicite, or cinders" do not qualify as valuable mineral deposits and therefore do not confer validity upon a mining claim. *See* 30 U.S.C. § 611. Through section 611, Congress intended to remove the disposition of lands containing only common minerals from the Mining Laws. *See Coleman*, 390 U.S. at 604. As Senator Clair Engle explained:

> The reason we have done that is because sand, stone, gravel, pumice, and pumicite are really building materials, and are not the type of material contemplated to be handled under the mining laws, and that is precisely where we have had so much abuse of the mining laws, because people can go out and file mining claims on sand, stone, gravel, pumice, and pumicite taking in recreational sites and even taking invaluable stands of commercial timber in the national forests and on the public domain.

*See* 101 Cong.Rec. 8743.

After discovery, a claimant must locate their claim. *See* 30 U.S.C. § 23. The act of location entails "staking the corners of the claim, posting a notice of location thereon and complying with the state laws concerning the filing or recording of the claim in the appropriate office." *United States v. Curtis-Nev. Mines, Inc.*, 611 F.2d 1277, 1281 (9th Cir. 1980). An individual claim may run "one thousand five hundred feet in length along the vein or lode" and extend no more than "three hundred feet on each side of the middle of the vein at the surface, . . . ." 30 U.S.C. § 23. While a claimant may "locate, mark and record the boundaries of the claim," before discovery, their rights are good against only a "forcible, fraudulent or clandestine intrusion upon" the location. *See Davis*, 329 F.2d at 455. The Government treats such locators as licensees or tenants at will. *See id.*

A claimant may not use the deposit present in one location to lend validity to an adjacent location. *See Waskey v. Hammer*, 223 U.S. 85, 91 (1912) ("A discovery without the limits of the claim, no matter what its proximity, does not suffice."); *Lombardo Turquoise Milling & Mining Co. v. Hemanes*, 430 F. Supp. 429, 443 (D. Nev. 1977).

Likewise, a claimant may not draw the lines of their claim so large as to encompass both the deposit and land beyond the acreage allowable by statute. *See Walton v. Wild Goose Min. & Trading Co.*, 123 F. 209, 218 (9th Cir. 1903) (approving a jury instruction that excised land from mining claim larger than 20 acres); *Belk v. Meagher*, 104 U.S. 279, 284 (1881) ("The right of location upon the mineral lands of the United States is a privilege granted by Congress, but it can only be exercised within the limits prescribed by the grant.")

### ii. Unpatented and Patented Claims

Possessory rights to an unpatented mining claim vest with a claimant upon discovery and completion of the minimum requirements of location. *See Davis*, 329 F.2d at 845. An unpatented claim confers upon the locator a unique possessory interest in which the United States may hold title to the land while the locator retains a right to the minerals beneath. *See Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 335-36 (1963). So long as a claimant complies with the mining laws, "their right to the unpatented claim . . . is vested even though the Department of the Interior has as yet taken no action at all on their application for a patent." *Shumway*, 199 F.3d at 1103. The Government does not retain plenary power over such a claim, even in the absence of an application for patent. *See id.* However, "no right arises from an invalid claim of any kind." *Best*, 371 U.S. at 337. Therefore, discovery and location of a mining claim entitles the claimant to a possessory right "unless their claim was a sham or otherwise invalid or they failed to observe Forest Service regulations in such a way as to invalidate their claim." *Shumway*, 199 F.3d at 1103.

Subject to the 1955 Multiple Use Act, the United States retains the right "to manage surface resources and for the Government and whomever it permits to do so to use the surface, so long as they do not endanger or materially interfere with prospecting, mining, or processing." *Shumway*, 199 F.3d at 1101; *see* 30 U.S.C. § 612. Thus, mining law limits a claimant's use of an unpatented mining claim to "activities that are reasonably incident to prospecting, mining and processing operations, and subject to the right of the United States to manage surface resources." *U.S. v. Backlund*, 689 F.3d 986, 991 (9th Cir. 2012).

In enacting the Multiple Use Act, Congress "did not intend to change the basic principles of the mining laws." *Curtis-Nevada Mines, Inc.*, 611 F.2d at 1280. Before enacting the Multiple Use Act, Congress emphasized that the United States "would be authorized to manage and dispose of surface resources, or to use the surface for access to adjacent lands, so long as and to the extent that these activities do[] not endanger or materially interfere with mining, or related operations or activities *on the mining claim*." H.R. Rep. No. 730, 84th Cong., 1st Sess. 1955, Reprinted in 1955 U.S.C.C.A.N. 2474, 2483 (emphasis added).

Upon discovery and location, a claimant may prove the validity of their claim through an application with the Department of the Interior and subsequent administrative procedures. *See* 30 U.S.C. § 29; *Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993). If approved, the claimant holds a fee simple interest (i.e., a patented mining claim) in both the surface of the claim and the minerals beneath. *See McMaster v. U.S.*, 731 F.3d 881, 885 (9th Cir. 2013).

### D. Organic Act of 1897

The Organic Act of 1897 delegates to the Secretary of Agriculture the ability to "make provisions for the protection against destruction by fire and depredations upon the public forests and national forest." 16 U.S.C. § 551. In exercising this power, the Secretary may "make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." *Id.* Congress limited this power by proscribing the Secretary from prohibiting "any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof." *Id.* § 478. Therefore, "the Secretary may adopt reasonable rules and regulations which do not impermissibly encroach upon the right to the use and enjoyment" of valid mining claims. *U.S. v. Weiss*, 642 F.2d 296, 299 (9th Cir. 1981). However, "prospecting, locating, and developing of mineral resources in the national forests may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition." *Id.*

**E. Forest Service Mining and Special Use Regulations**

**i. Part 228 - Mining Regulations**

In its Part 228 regulations, the Forest Service "set forth rules and procedures through which use of the surface of National Forest System lands *in connection with <u>operations</u> authorized by the United States mining laws (30 U.S.C. 21–54[Mining Law of 1872]), . . .* shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources."  36 C.F.R. § 228.1 (emphasis added).  The Forest Service emphasized that *"[t]hese regulations apply to <u>operations</u> hereafter conducted under the United States mining laws of May 10, 1872, as amended (30 U.S.C. 22 et seq.)*, as they affect surface resources on all National Forest System lands . . ." *Id.* § 228.2 (emphasis added).  The Forest Service defined "operations" as "[a]ll functions, work, and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and *all uses reasonably incident thereto*, including roads and other means of access on lands subject to the regulations in this part, *regardless of whether said <u>operations</u> take place <u>on or off mining claims</u>*." *Id.* § 228.3(a) (emphasis added).  The regulations further define a "mining claim" as "any unpatented mining claim or unpatented millsite *authorized by the United States mining laws of May 10, 1872, as amended (30 U.S.C. 22 et seq.)*." *Id.* § 228.3(d) (emphasis added).

Save for a few exceptions, the Forest Service must approve a plan of operations before a claimant may dispose of surface resources upon an unpatented mining claim in National Forest lands.  *See U.S. v. Doremus*, 888 F.2d 630, 633 (9th Cir. 1981); 36 C.F.R. § 228.4(a).  The Forest Service may prohibit conduct not reasonably necessary to mining, even assuming a claimant conducts their operation on a valid mining claim.  *See Backlund*, 689 F.3d at 996; *U.S. v. Richardson*, 599 F.2d 290, 295 (9th Cir. 1979).

Ordinarily, the Forest Service need not inquire into the validity of a mining claim before considering a plan of operations. *See* Solicitor's Opinion, M-37012, Legal Requirements for Determining Mining Claim Validity Before Approving a Mining Plan of Operations, 2005 WL 7139266, *1-2 (Nov. 14 2005).  The Forest Service does not make

determinations; it merely expresses "statements of belief" regarding validity. *See* Forest Service Manual, § 2819 – "Mining Claim Contests". However, the Forest Service requires a claimant "meet the requirements as specified or implied by the mining laws" to "use a claim for prospecting and mining." *See* Forest Service Manual, § 2813.2 – "Obligations". Forest service policy and mining law "require a claimant . . . [d]iscover a valuable mineral deposit" and "[b]e prepared to show evidence of mineral discovery." *Id.* Additionally, the Forest Service acknowledges an "obligation to ensure that unauthorized uses of mining claims are eliminated." *Id.* § 2814.23 – "Prevent Violations of Laws and Regulations". This obligation includes the "unlawful use of buildings and other structures and the taking of common varieties of mineral materials." *Id.*

Operations on National Forest lands must comply with all Federal and State air and water quality standards. *See* 36 C.F.R. § 228.8(a), (b). Furthermore, "[a]ll tailings, dumpage, deleterious materials, or substances and other waste produced by operations shall be deployed, arranged, disposed of or treated so as to minimize adverse impact upon the environment and forest surface resources." *Id.* § 228.8(c). The regulations further provide, where practicable, for the protection of scenic values, fisheries, and wildlife habitat. *See id.* § 228.8(d), (e).

Finally, and "at the earliest practicable time," the Forest Service requires that, where practicable, an operator must "reclaim the surface disturbed in operations by taking such measures as will prevent or control onsite and offsite damage to the environment and forest surface resources." *Id.* § 228.8(g). Unless otherwise agreed to, this includes the removal of "all structures, equipment and other facilities and clean up [of] the site of operations." *Id.* at § 228.10

**ii. Part 251 - Special Use Regulations**

Restrictions on operations are not limited to Part 228 of the Forest Service regulations merely because they relate to the extraction and development of minerals. *See Doremus*, 888 F.2d at 631-633. While the Part 228 regulations exclusively apply to mining operations, Part 261 prohibitions (which list prohibited activities on Forest Service land,

and when a "special use" permit may authorize such activities) apply to all surface uses, including mining operations. *See id.*; 36 C.F.R. § 261.10. Moreover, "all uses of National Forest System lands, improvements, and resources, except those *authorized* by the regulations governing . . . minerals (part 228) are designated 'special uses'" and require a "special use authorization." 36 C.F.R. § 251.50(a) (emphasis added); § 251.53(a) (permits governing occupancy and use).[10]

Initial screening of a special use request for use and occupancy of Forest System Lands must meet several minimum requirements including: that "the proposed use is consistent . . . with other applicable Federal law, and with applicable State and local health and sanitation laws; that the use must not "pose a serious or substantial risk to public health or safety"; that it must not "create an exclusive or perpetual right of use or occupancy"; and that it must not "involve disposal" of "other hazardous substances." *Id.* § 251.54(e)(1)(i), (iii), (iv), (ix). Should any proposed use not meet these minimum requirements, it "shall not receive further evaluation and processing." *Id.* § 251.54(e)(2).

After initial screening, the Forest Supervisor must conduct a second level of screening in which they "shall reject any proposal, including a proposal for commercial group uses, if . . . the proposed use would not be in the public interest." *Id.* § 251.54(e)(5)(ii). Any proposed use which cannot meet this standard "does not require environmental analysis and documentation." *Id.* § 251.54(e)(6).

### III. Discussion of the Dispositive Errors Made by the Forest Service

#### A. The Forest Service Abdicated Its Duty to Protect the Coronado National Forest from Depredation and Preserve the Forest from Destruction when It Failed to Consider Whether Rosemont Held Valid Unpatented Mining Claims

The Organic Act imposes upon the Forest Service a duty to "make provisions for the protection against . . . depredations upon the public forests and national forests." 16 U.S.C. § 551. The Forest Service cannot protect the forest from depredation without first determining who may, as a right, use the surface. Any determination of a claimant's

---

[10] The Court notes that there are other uses (i.e., grazing, etc.) that are also excepted from special uses, but have been omitted, as they are not relevant to this dispute.

surface rights upon Forest Service land must begin with a discussion of the validity of their claims. *See Best*, 371 U.S. at 337 ("[N]o right arises from an invalid [mining] claim of any kind. All must conform to the law under which they are initiated; otherwise they work an unlawful private appropriation in derogation of the rights of the public."); *Cameron v. United States*, 252 U.S. 450, 412 (1920) (same); *Waskey*, 223 U.S. at 90-91 ("The [Mining Law of 1872] make the discovery of mineral within the limits of the claim a prerequisite to the location of a claim . . . the purpose being to reward the discoverer and to prevent the location of land not found to be mineral. A discovery without the limits of the claim, no matter what its proximity, does not suffice."); *Lara v. Secretary of the Interior*, 820 F.2d 1535, 1537 (9th Cir. 1987) ("A mining claimant has the right to possession of a claim only if he has made a mineral discovery on the claim."). This discussion necessarily must include whether the claimant discovered a valuable mineral deposit within the boundaries of their claim. *See Best*, 371 U.S. at 337; *Waskey*, 223 U.S. at 91; *Lara*, 820 F.2d at 1537; *see also Davis*, 329 F.2d at 845.[11] Any decision made without first establishing a factual basis upon which the Forest Service could form an opinion on surface rights would entirely ignore an important aspect of this problem. *See State Farm*, 463 U.S. at 43. Likewise, a grant to use the surface when the administrative record shows such a right does not exist would contravene the Forest Service's duty to protect the forest from depredations and offer an opinion that runs contrary to the evidence. *See id.*

The Mining Law of 1872 explicitly authorizes several federal land uses pursuant to a valid claim. These rights may be grouped according to where they may occur. For ease of reference, the Court uses the term "intralimital" rights to refer to those activities the Mining Law authorizes within the boundaries of a claim and uses the term "extralimital"

---

[11] As previously referenced, while the Forest Service's 1897 Organic Act directs the Forest service to protect the forest from depredations, it also recognizes that the Forest Service cannot prohibit preexisting mining rights created by the Mining Law of 1897. *See* 16 U.S.C. § 478 ("Nor shall anything in [the Organic Act] *prohibit* . . . entering upon such national forests for . . . prospecting, locating, and developing the mineral resources *thereof.*"); 16 U.S.C. § 482 ("[A]ny mineral lands in any national forest . . . subject to entry under the existing mining laws [i.e., the Mining Law of 1872] . . . shall continue to be subject to such location and entry . . ."). The Organic Act did not create new mining rights outside of the Mining Law of 1872.

- 24 -

rights to refer to actions a claimant may take outside the boundaries of a mining claim.

Surface rights pursuant to the Mining Law of 1872 begin with exploration and prospecting on public lands not withdrawn. *See* 30 U.S.C. § 22. Upon discovery of a valuable mineral deposit, the Mining Law authorizes the occupation and purchase of federal land. *See id.* A claimant may then stake out 1500 feet along the length of the vein or lode and 300 feet on either side from the center of the same, an amount equal to about 20 acres. *See id.* § 23. After a claimant sets the boundaries of their location, they may claim "possession and enjoyment of all the surface included *within the lines of their locations.*" *Id.* § 26 (emphasis added). Additionally, a claimant may locate and patent five acres of "nonmineral land not contiguous to the vein or lode" which they may use or occupy "for mining or milling purposes." *Id.* § 42. Furthermore, in connection with the Forest Service's Organic Act, a claimant retains a right of ingress to and egress from their mining claim. *See* 16 U.S.C. § 478.

Intralimital rights include the right to exclusive possession and enjoyment of the surface of a valid mining claim. *See* 30 U.S.C. § 26. Pursuant to this right, a claimant may use the surface of their claim to access the mineral deposit located beneath. This right must include the ability to perform reasonably necessary mining activities upon the surface.

The Multiple Use Act makes this point abundantly clear. In enacting the Multiple Use Act, Congress meant to clarify the types of uses it intended to permit upon unpatented mining claims. *See Curtis-Nevada Mines, Inc.*, 611 F.2d at 1280. As explained in *Curtis-Nevada Mines, Inc.*, "Congress did not intend to change the basic principles of the mining laws when it enacted the Multiple Use Act." *Id.*

The plain language of the Multiple Use Act illustrates that Congress did not intend to expand reasonably incidental uses beyond the boundaries of a claim. First, it clarifies "[a]ny *mining claim* . . . shall not be used, prior to issuance of patent therefor, for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto." 30 U.S.C. § 612(a) (emphasis added). Nothing in this subsection expands the right of occupancy and enjoyment of the surface to lands beyond the claim

boundaries. This subsection references only the mining claim itself.

Moreover, pursuant to the Multiple Use Act, "[r]ights under any mining claim . . . shall be subject, prior to issuance of patent therefor, to the right of the United States to manage and dispose of the *vegetative surface resources thereof* and to manage *other surfaces resources thereof*." *Id.* § 612(b) (emphasis added). Here, "thereof" refers to the surface resources upon a mining claim. This language appears again in subjecting "[a]ny such mining claim . . . to the right of the United States, its permittees, and licensees, to use so much of the *surface thereof* as may be necessary for such purposes or for access to adjacent land." *Id.* (emphasis added). Once again, "thereof" refers only to the surface of the mining claim. Finally, the Multiple Use Act provides "any use of the surface of any such mining claim by the United States, its permittees or licensees, shall be such as not to endanger or materially interfere with prospecting, mining or processing operations or uses reasonably incident thereto." *Id.* Again, the act refers explicitly to "the surface of any such mining claim." *Id.* Nothing within the Multiple Use Act grants an implied right to use the surface outside of a claim. It merely clarifies allowable uses of the surface of an unpatented mining claim and balances competing uses of the same.[12]

---

[12] As referenced above, the Multiple Use Act was passed to curb abuses of the Mining Law of 1872. *See Curtis-Nevada Mines*, 611 F.2d at 1280-1282 ("The Multiple Use Act was corrective legislation, which attempted . . . to alleviate abuses that occurred under the [Mining Law of 1872]. . . . As a practical matter, mining claimants could remain in exclusive possession of [mining] claim[s] without ever proving a valid [mineral] discovery . . . It was to correct this deficiency in the mining law that Congress in 1955 enacted the Multiple Use Act."). Examples of these abuses included purported mining claimants staking fraudulent mining claims on federal land, asserting exclusive possession by posting "no trespassing" signs to their claims, and using the area to obtain free timber, or a free private fishing or hunting camp. *See id.* at 1282. Reports from the Department of Agriculture (which encompasses the Forest Service) when the Multiple Use Act legislation was being considered by Congress highlighted the rampant level of abuse of the Mining Law of 1872. *See id.* at 1286 n. 7 ("A report from the Department of Agriculture. . . concerning the proposed [Multiple Use Act] stated that as of January 1, 1952 there were 84,000 unpatented claims, covering 2.2 million acres of national forest . . . [P]robably no more than 40% [of these unpatented mining claims] could be considered valid. As of January 1, 1955 there were an estimated 166,000 claims covering 4 million acres [i.e., the number of unpatented mining claims and acres covered thereby nearly doubled in three years presumably due to the looming passage of the Multiple Use Act which was meant to curb Mining Law abuses]."). Defendants' position that the Multiple Use Act gives Rosemont the right to dump 1.9 billion tons of their waste on 2,447 acres of the Coronado National Forest is unpersuasive; the record indicates that Rosemont's unpatented claims on that land are invalid as there is no valuable mineral deposits beneath that land. Accepting Defendants' position would make an end-run around the requirements of the

- 26 -

The Mining Law of 1872 specifies the parameters of extralimital rights. Section 26 allows a claimant to pursue a vein downward past the side lines of a location, but not past the end lines. *See* 30 U.S.C. § 26. Additionally, a claimant may locate and patent five acres of "nonmineral land not contiguous to the vein or load . . . for mining or milling purposes." *Id.* § 42. However, as already shown, extralimital rights extend no further.

The Forest Service predicated its decision regarding Rosemont's entitlement to process ore and dump waste rock and tailings on federal land upon the validity of Rosemont's unpatented mining claims. *See* FEIS at 101. Under this presumption, the Forest Service believed that "Rosemont . . . has a possessory interest for mining purposes in unpatented mining claims on the land where the project is proposed." *See id.*; *see also* ROD at 31 ("[The Forest Service] cannot select the no action alternative . . . because Federal law provides the right for [Rosemont] . . . to use the surface of its unpatented mining claims for mining and processing operations and reasonably incidental uses . . . [The Forest Service] cannot reject outright the proposed project"); FEIS at 94 ("The [Forest Service] may impose reasonable conditions to protect surface resources but cannot materially interfere with reasonably necessary activities *under the General Mining Law [of 1872]* that are otherwise lawful.") (emphasis added); FEIS at 10 ("The Forest Supervisor's decision space is constrained . . . the Forest Service cannot categorically prohibit mining or deny reasonable and legal mineral operations under the law."); ROD at 32 ("[The Forest Service] determined that modifying [Rosemont's Mining Plan] to comply with the current Coronado [Forest Plan] would materially interfere with [Rosemont's] mineral operations . . . [therefore, the Forest Service amended the Forest Plan] contemporaneously with the approval of [Rosemont's Mining Plan] so that [Rosemont's mining] project or activity will be consistent with the [Forest Plan] as amended."). These statements could accurately reflect the Mining Law of 1872 if the administrative record before the Forest Service reflected that Rosemont held valid unpatented mining claims in these areas.

However, the administrative record shows no basis upon which the Forest Service

Mining Law of 1872, and would encourage abuses of the Mining Law of 1872 that the Multiple Use Act of 1955 was designed to abolish.

could find Rosemont discovered a valuable mineral deposit within the facilities, tailings, and waste rock areas. In fact, the evidence in the FEIS shows the absence of any such deposit within those lands.

Regarding the Willow Canyon Formation, which underlies the facilities and tailings areas, the Forest Service offers contradictory information. First, the Forest Service states that the Willow Canyon Formation contains copper oxide ore in "potentially economic concentrations." *Id.* at 156. Rosemont intends to unearth more than 600 million tons of copper oxide, all of which the FEIS describes several pages later as "waste rock." *Id.* at 173 (Table 15). By the FEIS's own definition, waste rock either "contains no ore metals or contains ore metals at levels below the economic cutoff value." *Id.* at 1344. Furthermore, the Arizona Geological Society review of Rosemont's plan and property, in which Rosemont actively participated, states that "copper mineralization is confined to rare localized areas." *See* Rosemont Mine Tour at 6.

Considering this factual basis, the Forest Service could not determine that the Willow Canyon Formation contained an economically viable amount of copper oxide which would lend validity to Rosemont's mining claims. Rosemont's own geological survey purported to find only "rare localized areas" of copper mineralization within this formation. *See id.* The evidence within the FEIS that lends support to claim validity in this formation amounts to two sentences: one sentence claims the formation as a host rock and then describes it as "predominately arkosic siltstone, sandstone, and conglomerate"; and another sentence claims it contains "mafic or andesitic flows, which host minor mineralization." *See* FEIS at 155. The Forest Service's own description and Rosemont's proposed treatment of over 600 million tons of this copper oxide as "waste rock" belie these assertions.

Likewise, the administrative record provides, at best, internally inconsistent evidence of a valuable mineral deposit within the Gila Conglomerate beneath the waste rock area. The FEIS described the Gila Conglomerate as containing "conglomerate, pebbly sandstone, and sandstone with a calcareous matrix." *Id.* at 156. It noted, among several

other minerals, the presence of limestone clasts within this conglomerate the abundance of which, "varies, depending on the composition of nearby upslope areas." *Id.* However, none of the host rocks which the Defendants purport may exist in potentially economic quantities appear within this formation. Rosemont proposed to excavate over 150 million tons of tertiary gravel, the group to which the Gila Conglomerate pertains. *Id.* at 173. In fact, Rosemont must remove a layer of Gila Conglomerate to access the copper sulfide within the mine pit. *Id.* at 159. The Forest Service classified the entirety of this excavated tertiary gravel as waste rock. *See id.* at 173.

Furthermore, according to the maps provided in the FEIS, Mount Fagan Rhyolite and Schellenberger Canyon Formation underlie the Gila Conglomerate east of the tailings pile. *See id.* at 159. The FEIS gives a passing description of these formations and none of the minerals purported to appear in potentially economic quantities appear within these descriptions. *See id.* at 160-61. The lower portion of the Schellenberger Canyon Formation does contain a layer of "Mural limestone." *Id.* at 160. However, this limestone exists within the lower portion of a formation that runs 2,500 feet deep. *See id.* at 160-61. Moreover, two other formations overlie the Schellenberger Canyon Formation, which run at least 1000 feet deep themselves. *Id.* at 159. Finally, in its discussion of copper sulfide host rock, the FEIS names several limestone formations, but does not name the Mural limestone among them. *Id.* at 155.

The Apache Canyon Formation suffers from the same inadequacies. The formation contains limestone of which Defendants do not purport to host mineralization. *Id.* at 155-56, 161. Likewise, the administrative record shows no evidence of potentially economic concentrations of copper sulfide or copper oxide within the Mafic Lava or Older Alluvium. Moreover, Rosemont's intention to bury the Apache Canyon Formation and Older Alluvium beneath tons of waste rock and tailings provides further evidence that they host no economically viable mineralization.

The unauthorized dumping of over 1.2 billion tons of waste rock, as well as about 700 million tons of tailings, and the establishment of an ore processing facility no doubt

constitutes a depredation upon Forest Service land. The administrative record shows no basis upon which the Forest Service could find the Mining Laws would authorize this activity. The Mining Law authorizes occupation of the surface only within a claim. The record contains no information to show Rosemont discovered a valuable mineral deposit within the ore processing, or tailings and waste rock pile areas. Therefore, despite the location of these areas as a mining claim, the Forest Service could determine at best that Rosemont maintained status as a tenant at will of the United States upon these lands. In the absence of any statutory right on the part of Rosemont, the Forest Service could deny Rosemont's off claim activities as part of the Forest Service's Organic Act obligations.

The Forest Service argues that it is not required to conduct a validity determination before approving a mining plan of operations. However, a validity determination differs significantly from establishing a factual basis upon which the Forest Service can determine rights. A validity determination invokes a separate administrative procedure carried out by the BLM (which is within the Department of the Interior). In contrast, the Forest Service (which is within the Department of Agriculture) merely needed a factual basis to support Rosemont's assertion of rights. Such a finding would not preclude another individual from bringing an adverse proceeding to determine mineral rights, or the Government from initiating a validity determination. As referenced above, the fact that Rosemont proposed to dump 1.9 billion tons of waste on its unpatented claims on 2,447 acres of the Coronado National Forest was a potent indication that Rosemont's unpatented claims on the land in question were invalid (i.e., if Rosemont was voluntarily proposing to bury its unpatented claims under 1.9 billion tons of its own waste, there is a strong inference that there is no valuable mineral deposit lying below the waste site). Furthermore, Forest Service regulations and the Forest Service Manual indicate that such matters should be evaluated, and otherwise empower the Forest Service to gather facts to make an informed decision as to surface rights stemming from mining claims; in fact, there is case law from the Ninth Circuit reflecting that the Forest Service has successfully pursued such matters in the past. *See*, *e.g.*, 36 C.F.R. § 228.5(d) (in reviewing mining operation plans, "the Forest Service

will arrange for consultation with appropriate agencies of the Department of the Interior . . . with respect to mineral values, mineral resources, and mineral reserves."); Forest Service Manual § 2813.2(2) and (7) (a mining "claimant must meet the requirements as specified or implied by the mining laws . . . these require a claimant to: . . . Discover a valuable mineral deposit . . . Be prepared to show evidence of mineral discovery."); § 2819.1(1) ("When administrative problems of a mineral nature arise or unauthorized use of a mining claim is believed to exist . . . A Forest Service mineral examiner . . . may go on an unpatented mining claim to make a mineral investigation."); *Clouser*, 42 F.3d at 1525 ("[T]he Forest Service conducted a mineral examination [of mining claims on Forest Service land] . . . and initiated contest proceedings in the Department of the Interior to have the claims declared void, on the ground that no valuable mineral deposits had been discovered [prior to withdrawal of the land from mineral entry] . . . An Interior Department ("ALJ") held the claims null and void."); *Lara*, 820 F.2d at 1537-1538 ("[A] Forest Service mining engineer [("Boswell")] took samples from [defendant's mining claims on Forest service land] . . . On the basis of Boswell's [] tests the Forest Service filed administrative complaints contesting the validity of the [mining] claims"; administrative proceedings before the Department of Interior found that the claims were invalid based on Boswell's testimony, and these decisions were affirmed on appeal such that defendant was ordered to vacate the claims).

Defendants also argue that the Forest Service must allow these extralimital activities because Rosemont owns valid claims in the mine pit area. However, as explained, a separate discovery must support each claim. *See Best*, 371 U.S. at 337; *Waskey*, 223 U.S. at 91; *Lara*, 820 F.2d at 1537. Discovery in one claim cannot lend validity to an adjacent claim in which no valuable mineral deposit exists. *See id.* Rosemont's extralimital rights springing from its valid claims in the mine pit do not permit surface occupancy outside the boundaries of these claims. *See* 30 U.S.C. § 26. No limiting principle would conscript surface use under the Forest Service's interpretation of the Mining Law. This interpretation would render the act of location moot – an individual would need only discover a deposit

before gaining a right to all the surface of public lands not withdrawn. This simply does not comport with the plain language of the Mining Law.

In the Mining Law of 1872, Congress anticipated that claimants would need more than the land directly above a deposit to extract minerals. *See* 30 U.S.C. §§ 23, 42. Where Congress anticipated such use, it provided for such use. *See id.*[13] Some present-day mining operations may exceed the rights granted, and limitations imposed, by the Mining Law of 1872; the Forest Service's application of its regulations to mining operations cannot grant rights outside the bounds of the Mining Law of 1872. Defendants' remedy lies with Congress, not the courts.

**B. The Forest Service Implemented the Wrong Regulations, Misinformed the Public and Failed to Adequately Consider Reasonable Alternatives**

The Forest Service's Part 228 regulations do not allow for denial of an otherwise reasonable mining operation unless it violates some other substantive environmental law. These regulations further define "operation" to encompass essentially any mining activity, even those "reasonably incidental" to mining, regardless of whether they occur on or off a mining claim. *See* 36 C.F.R. § 228.3(a). This definition does not, on its face, run afoul of the Mining Law.

In fact, defining operation so broadly as to encompass mining activity regardless of

---

[13] For example, as referenced above, § 42 of the Mining Law of 1872 specifically provides for the use of non-contiguous, non-mineral land to be used in support of mining operations that are extracting valuable minerals on a wholly separate piece of land. *See* 30 U.S.C. § 42(a) ("Where *nonmineral* land not contiguous to the vein or lode [containing valuable minerals] is *used or occupied* by the proprietor of such vein or lode *for mining or milling purposes*, such nonadjacent surface ground may be embraced and included in an application for a patent for such vein or lode, and the same may be patented therewith . . . but no location . . . of such nonadjacent land shall exceed five acres.") (emphasis added). A very simplified example illustrates this point: (1) A mining claimant ("Smith") has five separate and valid mining claims containing silver; (2) Each of Smith's five valid mining claims is approximately 20 acres (i.e., § 23 limits the maximum size of mineral veins to 1500 feet by 600 feet which is about 20 acres) for a total of 100 acres; (3) Smith has the ability to patent up to 5 acres of non-contiguous, non-mineral land in conjunction with each valid mineral claim which can be up to 20 acres (*see* § 42(a)); (4) After showing that the five separate 20 acre mining claims are valid, Smith pays $5 per acre to the United States to obtain fee title to the mineral land containing the silver, and Smith pays an additional $5 per acre to the United States to obtain fee title to the non-mineral land which will be used to support extraction from the mineral land (*see* §§ 29, 42); (5) Smith has fee title to use 25 acres of separate non-mineral land to support extraction of silver from his 100 acres of mineral land (*see* §§ 42, 23, 29).

its location on or off a claim makes sense.  The Mining Law of 1872 authorizes activities which necessarily must occur off a mining claim. These activities - exploration, prospecting, ingress to and egress from a claim – will generally occur outside the boundaries of a claim.  Defining operation to only apply to activities that occur on a claim would limit the Forest Service's ability to regulate these activities.  *See Clouser v. Espy*, 42 F.3d at 1525-26; *Richardson*, 599 F.2d at 290-91.

The definition's inclusion of reasonably incidental mining activities maintains a certain amount of logic as well.  The construction of a stable for pack animals does not itself constitute a mining activity, but when the Forest Service prescribes that a mine must use pack animals as a means of transport through the forest, it may then qualify as reasonably incidental to the mining.  *See Clouser*, 42 F.3d at 1525-26.  It does not require much imagination to conceive of other activities which themselves do not involve the extraction or processing of ore, but which may become ancillary to that work. This definition allows the Forest Service to reach all those activities which relate to mining and may occur on a claim.

However, it does not follow that the Forest Service must use these Part 228 regulations merely because an action falls within the regulation's definition of operations. The Forest Service's reliance on its definition of operations ignores the purpose of its own regulations.  Part 228 regulates "use of the surface of National Forest System lands in connection with operations *authorized* by the United States mining laws (30 U.S.C. 21-54 [Mining Law of 1872])." 36 C.F.R. § 228.1.  Therefore, authorization under the Mining Law of 1872 acts as a precursor to any regulation through Part 228.

As discussed above, the Mining Law of 1872 explicitly authorizes several land uses. The Forest Service may regulate exploration and prospecting anywhere upon the surface of its lands because the Mining Law authorizes these activities.  It may also regulate the possession and use of a mining claim as, again, the Mining Law authorizes them.  However, the Forest Service attempts to circumvent the statutory law by applying its regulations through its definition of "operations" to unauthorized activities.  The facilities area, tailings

pile, and waste rock pile would all fall under the Part 228 regulations if they occurred on a valid mining claim. However, the Forest Service approved these activities on lands the administrative record showed did not contain a valuable mineral deposit. Therefore, the Mining Law does not authorize these activities as they would occur outside the boundaries of Rosemont's mining claims. The Forest Service could not apply its Part 228 regulations to these activities because the Mining Law did not authorize them.

In contrast, the Forest Service's Part 251 regulations apply to "all uses of National Forest System lands, improvements, and resources." 36 C.F.R. § 251.50. Any use not regulated under the Part 228, or several other groups of Forest Service regulations, falls into the Part 251 special use regulations. *See id.* These regulations provide a dual screening process in which the Forest Service may deny any activity that does not meet several standards or otherwise comport with the public interest. *See id.* § 251.54(e). The Part 251 regulations provide significant authority and discretion to prohibit activity on Forest Service lands, whereas the Part 228 regulations merely balance competing interests.

Turning to the FEIS and appended public comments, the Forest Service repeatedly states that it "cannot categorically prohibit mining or deny reasonable and legal mineral operations under the law." FEIS at 10. The Forest Service emphasized that its "decision space is constrained by Forest Service regulations that govern locatable mineral activities on NFS lands." *Id.* Based on the administrative record, the Forest Service improperly applied its Part 228 regulations to actions not authorized under the Mining Law of 1872. This mistake infected the FEIS and led to the Forest Service misinforming the public and failing to consider reasonable alternatives within the scope of its duties under the Organic Act.

For example, in response to a public comment requesting the Forest Service "give true consideration to selection of the No Action Alternative", the Forest Service responded: "The Forest Service may reject an unreasonable Mine Plan of Operation but cannot categorically prohibit mining or deny reasonable and legal mineral operations under the mining laws." *Id.* at G-10. In response to a comment requesting the Forest Service

"consider other locations for copper mining", the Forest Service responded: "The Forest Service lacks the authority to deny Rosemont Copper's proposal if it can be legally permitted." *Id.* at G-12. And in response to a comment that the Forest Service "should scale down the size of the project or limit it to private lands only", the Forest Service repeated: "The Forest Service may reject an unreasonable Mine Plan of Operation but cannot categorically prohibit mining or deny reasonable and legal mineral operations under the mining laws." *Id.* These examples did not occur in isolation. Rather, they illustrate how heavily the Forest Service relied upon this rationale[14] in its decision-making process.[15]

[14] In light of its flawed assumptions, the Forest Service primarily evaluated only five "action" alternatives, and all of these action alternatives were largely the same. *See* ROD at 16 ("Because there were relatively few significant differences between the overall impacts of the action alternatives, [the Forest Service's] decision came down to a few substantive differences or factors . . ."); ROD at 64 (discussing the numerous common features of the action alternatives); ROD at 69-70 and FEIS at 100-114 (discussing alternatives that were considered, but eliminated from detailed study).

[15] This improperly constrained consideration and analysis of alternatives was evident when the Forest rejected the fee simple alternative. *See* Forest Service Record, Bates #0282389 (Table 3) ("Limited project – limit to fee simple and patented mining claims . . . The largest contiguous parcel of land consists of a combination of patented land and BLM administered land and is located north and west of the pit area. After evaluating storage volume of this area, it would fit, at the most, 852 million cubic yards. This is insufficient for this operation [which requires an estimated 1.1 billion cubic yards] . . . This is *technically and financially infeasible*.") (emphasis added); *Id.* at Bates #0149259 (Rosemont's response to the fee simple option reflecting the estimates as to 852 million and 1.1 billion). As discussed throughout this Order, the administrative record before the Forest Service reflects that Rosemont did not have valid surface rights for thousands of acres of its unpatented mining claims. Thus, rather than summarily rejecting this claim as "technically and financially infeasible," further consideration and evaluation of this alternative was warranted as it greatly reduced the impacts to the Coronado National Forest. Furthermore, the Court notes that numerous cases have affirmed the Forest Service's authority and discretion to closely regulate mining related operations even if particular mining activities are prohibited and rendered technically and financially infeasible. *See Clouser*, 42 F.3d at 1530 ("Virtually all forms of Forest Service regulation of mining claims - for instance, limiting the permissible methods of mining and prospecting in order to reduce incidental environmental damage - will result in increased operating costs, and thereby will affect claim validity [in terms of whether minerals can be profitably extracted] . . . However, [it is] clear that such matters may be regulated by the Forest Service"; affirming the Forest Service's authority to bar motorized access to mining claims, and to limit transportation to the claims via pack mules); *Public Lands for the People v. United States Department of Agriculture*, 697 F.3d 1192, 1197 (9th Cir. 2012) ("We have upheld Forest Service decisions restricting the holders of mining claims . . . [to using] non-motorized means to access their claims . . . No statutory provision gives the Miners an unfettered right to access their mining claims . . ."); *Bohmker v. Oregon*, 903 F.3d 1029, 1041 (9th Cir. 2018) (in the context of finding that an Oregon law, that prohibited motorized means to extract gold on valid unpatented claims on Forest Service land, from the bottom of streams and rivers containing endangered salmon, did not conflict with federal laws in an as-applied preemption challenge, the court emphasized that "[b]ecause [v]irtually all forms of . . . regulation of mining claims . . . will result in increased operating costs . . . virtually every environmental regulation will render

Under the Part 251 regulations, the Forest Service could limit the mine to any of the above options if it found they ran afoul of the public interest. The Forest Service failed to take the requisite hard look at these alternatives by informing the public that it could not truly consider any alternative that rejected the MPO or substantially modified it as to make the mine economically unfeasible. *See Nat. Res. Def. Council*, 421 F.3d at 813-14. A "thorough discussion of the significant aspects of the probable environmental consequences" will include the regulatory framework in which the Forest Service analyzes those consequences. *See California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). No amount of alternatives or depth of discussion could "foster[] informed decision-making and informed public participation" when the Forest Service bases its choice of alternatives on an erroneous view of the law. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004).

**IV. Conclusion**

Throughout the administrative process, the Forest Service improperly evaluated and misapplied: 1) Rosemont's right to surface use; 2) the regulatory framework in which the Forest Service needed to analyze those surface rights; and 3) to what extent the Forest Service could regulate activities upon Forest Service land in association with those surface rights. These defects pervaded throughout the FEIS and ROD, and led to an inherently flawed analysis from the inception of the proposed Rosemont Mine. The Court grants summary judgment in favor of SSSR and the Tribes in Cases 2 and 3, vacates and remands the Forest Service's FEIS and ROD, and denies Defendants' cross-motions for summary

at least some mining claims commercially impracticable, and virtually every environmental regulation would therefore be preempted under a commercial impracticability test . . . A commercial impracticability theory, moreover, would require the preemption analysis to turn on each miner's individual financial circumstances: the law would be preempted as to some miners but not as to others. Indeed, a commercial impracticability test would give the greatest protection to the least profitable mining operations, and it would handcuff regulators from restricting even the most environmentally destructive mining methods. So long as a particularly destructive method of mining – such as blasting – presented the only commercially practicable means of extracting minerals, regulators would be barred from restricting that practice. We do not read [the Supreme Court's decision in] *Granite Rock* as supporting that result . . . [F]ederal law does not show that Congress viewed mining as the highest and best use of federal land wherever minerals were found.").

judgment in cases 2 and 3.[16]  *See* 5 U.S.C. § 706(2)(A) ("[t]he reviewing court shall . . . hold unlawful and set aside" unlawful agency actions).[17]  The Clerk of the Court shall enter judgment.

In light of this Order, there are no exigent circumstances necessitating emergency injunctive relief; as such, all of Plaintiffs' motions seeking a preliminary injunction in Consolidated Cases A and B[18] are denied without prejudice.

Dated this 31st day of July, 2019.

Honorable James A. Soto
United States District Judge

---

[16] As these issues are dispositive, the Court declines to address the other arguments made by Plaintiffs and Defendants in Cases 2 and 3.  On a later date, the Court will issue a separate Order as to the remaining case (i.e., Case 1) and the corresponding summary judgment motions (which primarily address the ESA) still pending in Case 1.
[17] Given the magnitude of the errors discussed herein, allowing the Rosemont Mine to proceed while the Forest Service conducts further proceedings on remand is unwarranted.
[18] The Court will issue a separate Order to this effect in Consolidated Case B.